UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JANEL WHITBECK,

                Plaintiff,

v.                                                                               3:25-CV-0673
                                                                                 (AMN/ML)
OTSEGO COUNTY; OTSEGO COUNTY
SHERIFF'S OFFICE; DEPUTY E. LINCOLN,
in her individual and official capacities; and
DEPUTY J. SMITH, in his individual and
official capacities,

                Defendants.

_____

APPEARANCES:                                                                     OF COUNSEL:

JANEL WHITBECK
  Plaintiff, *Pro Se*
225 Main Street
Franklin, New York 13775

MIROSLAV LOVRIC, United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

      Plaintiff Janel Whitbeck ("Plaintiff") commenced this *pro se* action against Defendants

Otsego County, Otsego County Sheriff's Office, Deputy E. Lincoln, and Deputy J. Smith

(collectively "Defendants") alleging violations of her civil rights.  (Dkt. No. 1.)  Plaintiff did not

pay the filing fee and seeks leave to proceed *in forma pauperis* ("IFP").  For the reasons set forth

below, I (1) grant Plaintiff's IFP application, and (2) recommend that the Complaint be accepted

in part for filing and dismissed in part.

## I.    BACKGROUND

Construed as liberally[1] as possible, the Complaint alleges violations of Plaintiff's civil rights by Defendants.  (*See generally* Dkt. No. 1.)

More specifically, the Complaint alleges that on March 1, 2025, Plaintiff experienced a medical emergency while attempting to complete a transaction at Walmart.  (Dkt. No. 1 at 2.) Plaintiff alleges that her trained service dog alerted her to the onset of a transient ischemic attack ("TIA").  (*Id*.)  Plaintiff alleges that she attempted to return to her vehicle to access medication, but that Walmart staff stopped her, took her to the security office, and summoned law enforcement.  (*Id*.)

The Complaint alleges that Defendants Lincoln and Smith arrested Plaintiff for petit larceny.  (Dkt. No. 1 at 2.)  Plaintiff alleges that her speech was garbled, her gait was unsteady, and she was wearing a medical alert bracelet.  (*Id*.)  Plaintiff alleges that she was not handcuffed but was physically steadied by Defendant Smith, which indicated his awareness of Plaintiff's impairment.  (*Id*.)

The Complaint alleges that Defendant Lincoln conducted a search during which she saw Plaintiff's medical alert bracelet.  Plaintiff alleges that she explained that she was experiencing a TIA but was taken to booking, fingerprinted, and photographed with facial droop.  (*Id*.)

Plaintiff alleges that the criminal charges against her were "never dropped" and she was "forced to pay $200 to clear her record."  (Dkt. No. 1 at 3.)

Based on these factual allegations, Plaintiff asserts the following five causes of action: (1) a claim of false arrest in violation of the Fourth and Fourteenth Amendments and 42 U.S.C. §

---

[1]    The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

1983; (2) a claim of deliberate indifference to medical needs in violation of Fourteenth

Amendment and 42 U.S.C. § 1983; (3) a claim that Defendants violated the New York State

Andrew Kearse Act (N.Y. Exec. Law § 837-u); (4) a claim that Defendants violated the

Americans with Disabilities Act ("ADA"); and (5) a claim that Defendant Otsego County failed

to properly train and supervise its deputies.  (Dkt. No. 1 at 2-3.)  As relief, Plaintiff seeks

monetary damages in the amount of $5,000,000.00 and injunctive relief requiring Defendant

Otsego County to implement training for deputies related to recognizing and responding to

medical emergencies.  (*Id*. at 3-4.)

    Plaintiff has not paid the filing fee and seeks leave to proceed IFP.

## II.    PLAINTIFF'S APPLICATION TO PROCEED *IN FORMA PAUPERIS*

    When a civil action is commenced in a federal district court, the statutory filing fee,

currently set at $405, must ordinarily be paid.  28 U.S.C. § 1914(a).  A court is authorized,

however, to permit a litigant to proceed IFP status if a party "is unable to pay" the standard fee

for commencing an action.  28 U.S.C. § 1915(a)(1).[2]  After reviewing Plaintiff's IFP application

(Dkt. No. 2), the Court finds that Plaintiff meets this standard.  Therefore, Plaintiff's application

to proceed IFP is granted.[3]

---

[2]    The language of that section is ambiguous because it suggests an intent to limit
availability of IFP status to prison inmates.  *See* 28 U.S.C. § 1915(a)(1) (authorizing the
commencement of an action without prepayment of fees "by a person who submits an affidavit
that includes a statement of all assets such prisoner possesses").  The courts have construed that
section, however, as making IFP status available to any litigant who can meet the governing
financial criteria.  *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City
of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

[3]    Plaintiff is reminded that, although her IFP application has been granted, she is still
required to pay fees that she may incur in this action, including copying and/or witness fees.

### III.    LEGAL STANDARD FOR REVIEW OF THE COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2).

In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 [2007]).  "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief."  *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

"In reviewing a complaint . . . the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."  *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.

Courts are "obligated to construe a pro se complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *see also Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam) (reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint sufficiently raised a cognizable claim). "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties . . . have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

## IV.    ANALYSIS

### A.    Claims Against Defendant Otsego County Sheriff's Office

"Although a municipality is subject to suit pursuant to section 1983, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal . . . department does not have the capacity to be sued as an entity separate from the municipality in which it is located." *White v. Syracuse Police Dep't*, 18-CV-1471, 2019 WL 981850, at *3 (N.D.N.Y. Jan. 7, 2019) (Peebles, M.J.) (citing *Krug v. Cnty. of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (McAvoy, J.); *Turczyn ex rel. McGregor v. City of Utica*, 13-CV-1357, 2014 WL 6685476, at *2 (N.D.N.Y. Nov. 26, 2014) (Sharpe, J.); *Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) ("Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence. Therefore, municipal departments like the Department of Social Services are not amenable to suit and no claims lie directly against the Department.")), *report and recommendation adopted by*, 2019 WL 974824 (N.D.N.Y. Feb. 28, 2019) (Suddaby, C.J.).

"[T]he Sheriff's Department [does not] exist separate and apart from the County and, as a result, [ ] can[not] be sued." *Sagaria v. Orange Cnty. Jail,* 20-CV-2287, 2021 WL 4392422, at *3 (S.D.N.Y. Sept. 24, 2021); *see also Gleeson v. County of Nassau*, 15-CV-6487, 2019 WL

4754326, at *14 (E.D.N.Y. Sept. 30, 2019) (holding that the Nassau County Sheriff's Department and Nassau County Correction Center were not proper parties because they are administrative arms of Nassau County); *Polite v. Town of Clarkstown*, 60 F. Supp. 2d 214, 216 (S.D.N.Y. 1999) ("Therefore, municipal departments in this State—such as the Clarkstown Police Department— are not amenable to suit, and no claims can lie directly against them.").

As a result, I recommend that Plaintiff's claims against Defendant Otsego County Sheriff's Office be dismissed because it is not an entity that is amenable to suit. *See Dudley v. Hochul*, 24-CV-0048, 2024 WL 1906594, at *9 (N.D.N.Y. May 1, 2024) (Lovric, M.J.) (recommending dismissal of claims against the Onondaga County Sheriff because it was "not an entity amenable to suit."), *report and recommendation adopted*, 2024 WL 2399913 (N.D.N.Y. May 23, 2024) (Hurd, J.); *Taranto v. Putnam Cnty.*, 21-CV-2455, 2023 WL 6318280, at *15 (S.D.N.Y. Sept. 28, 2023) (dismissing claims against the defendant Putnam County Sheriff's Office because it was "not a suable entity.").

### B.    Claims Pursuant to 42 U.S.C. § 1983

#### 1.    Unlawful Seizure/False Arrest Claim

"In analyzing claims alleging the constitutional tort of false arrest, '[the Court has] generally looked to the law of the state in which the arrest occurred.'" *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007) (quoting *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004)). "To establish [a claim of false arrest under New York law] the plaintiff must show that: (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Broughton v. State*, 37 N.Y.2d 451, 456 (N.Y. 1975). Confinement is "otherwise privileged" when probable cause exists, in other words, "when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to

warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).  However, "[p]laintiffs are not required to set forth a lack of probable cause in their complaint." *Case v. City of New York*, 233 F. Supp. 3d 372, 384 (S.D.N.Y. 2017).  "Whenever there has been an arrest and imprisonment without a warrant, the officer has acted extrajudicially and the presumption arises that such an arrest and imprisonment are unlawful." *Broughton*, 37 N.Y.2d at 458 (internal citations omitted).

Plaintiff has sufficiently plead her false arrest claim against Defendants Lincoln and Smith because she appears to allege that they did not have a warrant to arrest her.  Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's Fourth Amendment false arrest claim against Defendants Lincoln and Smith.

### 2.    Deliberate Indifference to Medical Need

The "Second Circuit has recently observed . . . that . . . pre-arraignment conditions of confinement claims should be treated as arising under the Fourteenth Amendment." *Stinson v. Saint Vincent's Hosp.*, 20-CV-0704, 2022 WL 2047221, at *7 (D. Conn. June 6, 2022) (citing *Shakir v. Stankye*, 805 F. App'x 35, 40 (2d Cir. 2020) (summary order)).  Under the "applicable Fourteenth Amendment standard, '[a] pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions.'" *Shakir*, 805 F. App'x at 40 (quoting *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017)).  More specifically, "a plaintiff must

demonstrate: (1) that an official 'denied [him] treatment needed to remedy a serious medical condition,' and (2) that the official did so 'because of his deliberate indifference to that need.'" *Mills v. Fenger*, 216 F. App'x 7, 10 (2d Cir. 2006) (quoting *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996)).

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's Fourteenth Amendment deliberate indifference to medical needs claim against Defendants Lincoln and Smith.

### 3.    Claims Against Defendant Otsego County

A municipality may not be held liable solely because it employs a tortfeasor. *Los Angeles Cnty., Cal. v. Humphries*, 562 U.S. 29, 36 (2010). Only when the municipality, through the execution of its policies, actually deprives an individual of his constitutional rights, is it liable for the injury. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

To establish municipal liability, the policy must actually cause the violation of constitutional rights; it must be the moving force behind the violation. *Monell*, 436 U.S. at 694; *Dominguez v. Beame*, 603 F.2d 337, 341 (2d Cir. 1979). Official policy includes the decisions of a government's lawmakers, the acts of policymaking officials, and practices that are so widespread as to "practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Municipal liability may also be shown by establishing that a policymaking official ordered or ratified the employees' actions either expressly or tacitly.

Finally, municipal liability can, under limited circumstances, be based upon a failure to properly train the municipality's employees. *Connick*, 563 U.S. at 61. However, municipal liability is most tenuous when a claim turns on the failure to train. *Id.* (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*")). To satisfy the statute, a municipality's failure to train its employees must amount to "'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.* (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)).

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's claims against Defendant Otsego County and Defendants Lincoln and Smith in their official capacities alleging that Defendant Otsego County failed to train or supervise Defendants Lincoln and Smith which resulted in Plaintiff's false arrest and deliberate indifference to her medical needs.

### C.    ADA Claim

Title II of the ADA prohibits any public entity from discriminating against "qualified" individuals with disabilities "in the provision or operation of public services, programs, or activities." *Tennessee v. Lane,* 541 U.S. 509, 517 (2004).[4]

---

[4]    Title II provides in relevant part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

To establish a violation of the ADA, the plaintiff must demonstrate (1) that she is a "qualified individual" with a disability; (2) that the defendants are subject to the ADA; and (3) that she was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant by reason of her disability. *Disabled in Action v. Bd. of Elections in City of New York,* 752 F.3d 189, 196-97 (2d Cir. 2014) (citing *McElwee v. Cnty. of Orange,* 700 F.3d 635, 640 (2d Cir. 2012)).

It appears that Plaintiff is a qualified individual with a disability[5] and Defendant Otsego County is a public entity that is subject to the ADA. Moreover, "law enforcement officers who are acting in an investigative or custodial capacity are performing 'services, programs, or activities' within the scope of Title II." *Williams v. City of New York*, 121 F. Supp. 3d 354, 368 (S.D.N.Y. 2015).

Courts in this Circuit have found two fact patterns during the course of an arrest that can commonly raise a legitimate possibility of discrimination in violation of Title II or the Rehabilitation Act. *See Durr v. Slator*, 558 F. Supp. 3d 1, 27 (N.D.N.Y. 2021) (D'Agostino, J.). The first is when police wrongfully arrest a plaintiff because they misinterpret his disability to be criminal activity. *Durr*, 558 F. Supp. 3d at 27-28. The second is when police fail to reasonably accommodate a disability during an investigation or arrest. *Id.* at 28.

As set forth above in Part IV.B.1., Plaintiff plausibly alleges that she was falsely arrested because her response to her disability was misinterpreted as criminal activity. Plaintiff alleges

---

[5]    A "qualified individual with a disability" is an individual with a disability "who, with or without reasonable modifications to rules, policies or practices, the removal of . . . communication . . . barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

that she informed Defendants Lincoln and Smith that she suffers from TIA and that they observed her medical alert bracelet and in a disoriented state.

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's claims against Defendant Otsego County and Defendants Lincoln and Smith in their official capacities alleging a claim pursuant to Title II of the ADA.[6]

### D.     New York State Claim

To the extent that Plaintiff attempts to assert a claim pursuant to N.Y. Exec. Law § 837-u, I recommend that it be dismissed for failure to state a claim upon which relief may be granted. N.Y. Exec. Law § 837-u imposes data collection and reporting requirements on the division of criminal justice services with the chief administrator of the New York State courts.  N.Y. Exec. Law § 837-u.  There is no private cause of action pursuant to N.Y. Exec. Law § 837-u.

Plaintiff also references the "New York State Andrew Kearse Act," which refers to an Assembly bill from the 2021-2022 New York State Legislative session that imposes criminal liability for the failure to obtain medical care for a person in custody displaying medical distress. *See* New York State Senate Assembly Bill A1745, https://www.nysenate.gov/legislation/bills/2021/A1745 (last visited September 23, 2025).  The Bill appears to still be in committee with the New York State Assembly.

---

[6]     "It is well-settled that . . . Title II of the ADA . . . [does not] provide[] for individual capacity suits against state officials."  *Hill v. LaClair*, 20-CV-0441, 2020 WL 2404771, *7 (N.D.N.Y. May 11, 2020) (Hurd, J.) (internal quotation marks and citation omitted).

Furthermore, even if this Bill was valid law, there is no private cause of action to enforce criminal violations. *See Linda R.S. v. Richard D.,* 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); *see also Walker v. CIBC Ltd.*, 20-CV-1337, 2021 WL 3518439, at *5 (N.D.N.Y. Apr. 13, 2021) (Hummel, M.J.) ("It appears plaintiff is either seeking the criminal prosecution of an individual or individuals or a law enforcement investigation, which is beyond this Court's jurisdiction."), *report-recommendation adopted by* 2021 WL 3204860 (N.D.N.Y. July 29, 2021) (McAvoy, J.); *McFadden v. Ortiz*, 12-CV-1244, 2013 WL 1789593, at *3 (N.D.N.Y. Apr. 26, 2013) (D'Agostino, J.) (holding that "there is no private right of action to enforce either state or federal criminal statutes.").

As a result, I recommend that Plaintiff's claim pursuant to N.Y. Exec. Law § 837-u be dismissed for failure to state a claim upon which relief may be granted.

## V.    OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.").  An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.").  Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is

not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[7]

The issue with Plaintiff's claims (1) against Defendant Otsego County Sheriff's Office, and (2) pursuant to New York Executive Law § 837-u or the "New York Andrew Kearse Act" are substantive such that a better pleading will not cure them. As a result, I recommend that Plaintiff's claims against Defendant Otsego County Sheriff's Office and pursuant to the New York Executive Law § 837-u be dismissed without leave to replead.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's application to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED**; and it is further respectfully

**RECOMMENDED** that Plaintiff's Complaint (Dkt. No. 1) be (1) **ACCEPTED FOR FILING** to the extent that it asserts (a) a claim of false arrest in violation of the Fourth Amendment and 42 U.S.C. § 1983 against Defendant Otsego County and Defendants Lincoln and Smith in their individual and official capacities; (b) a claim of deliberate indifference to medical needs in violation of the Fourteenth Amendment and 42 U.S.C. § 1983 against Defendant Otsego County and Defendants Lincoln and Smith in their individual and official capacities; and (c) a claim that Defendant Otsego County and Defendants Lincoln and Smith in their official capacities violated Title II of the ADA; and (2) **DISMISSED WITHOUT LEAVE**

---

[7]    *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

**TO REPLEAD** to the extent that it asserts claims (a) against the Otsego County Sheriff's Office, and (b) pursuant to New York Executive Law § 837-u or the "New York Andrew Kearse Act"; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this report and recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[8]

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[9]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).


Dated: September 24, 2025
       Binghamton, New York


*Miroslav Lovric*

Miroslav Lovric
U.S. Magistrate Judge

---

[8]    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[9]    If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

White v. Syracuse Police Department, Not Reported in Fed. Supp. (2019)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 15 of 120

2019 WL 981850
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jeramie WHITE, Plaintiff,
v.
SYRACUSE POLICE
DEPARTMENT, et al., Defendants.

Civil Action No. 5:18-CV-1471 (GTS/DEP)
|
Signed 01/07/2019

**Attorneys and Law Firms**

FOR PLAINTIFF: Jeramie White, Pro se, 18-B-0311, Cayuga Correctional Facility, P.O. Box 1186, Moravia, NY 13118.

ORDER, REPORT, AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

**\*1** This is a civil rights action brought by *pro se* plaintiff Jeramie White, a New York State prison inmate, pursuant to 42 U.S.C. § 1983, against the Syracuse Police Department ("SPD") and five of its officers. In his complaint, plaintiff alleges that defendants violated his constitutional rights during the course of his arrest on February 13, 2017. Plaintiff's complaint and accompanying application for leave to proceed *in forma pauperis* ("IFP") have been referred to me for review. Based upon my consideration of those materials, I will (1) grant plaintiff's amended IFP application, (2) recommend dismissal of his claim against the SPD with leave to replead, and (3) recommend that his complaint otherwise be accepted for filing.

I. BACKGROUND

Plaintiff commenced this action on or about December 20, 2018. Dkt. No. 1. According to plaintiff, he and two friends were on their way to play indoor basketball when their vehicle was pulled over for a traffic infraction. *Id.* at 4; Dkt. No. 1-1 at 4. Plaintiff alleges that after the stop, defendant William Kittle forcibly removed White from the vehicle and that Kittle, in addition to defendants Abraham Mamoun and Shawn Hauck, proceeded to use excessive force against him during the course of his arrest. Dkt. No. 1 at 4-5, 6-7; *see also* Dkt. No. 1-1 at 4, 8. Plaintiff further alleges that defendants Altimonda

and Fiorini were present and had an obligation to intervene and prevent the unlawful use of force, but failed to do so. *Id.* at 5, 7.

Plaintiff was ultimately arrested and charged with resisting arrest, in violation of N.Y. Penal Law § 205.30, and second-degree obstruction of governmental administration, in violation of N.Y. Penal Law § 195.05. Dkt. No. 1-1 at 4. As relief, plaintiff seeks compensatory and punitive damages in the amount of $1,000,000. Dkt. No. 1 at 8.

A. Plaintiff's Amended IFP Application [1]

When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $400, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed IFP if it determines that he is unable to pay the required filing fee. 28 U.S.C. § 1915(a)(1). [2] Because I conclude that plaintiff meets the requirements for IFP status, his amended application for leave to proceed without prepayment of fees is granted. [3]

B. Sufficiency of Plaintiff's Complaint

1. Governing Legal Standard

**\*2** Because I have found that plaintiff meets the financial criteria for commencing this case IFP, I must next consider the sufficiency of the claims set forth in his complaint in light of 28 U.S.C. § 1915(e). Section 1915(e) directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). Similarly, 28 U.S.C. § 1915A(b) directs a court to review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity," and to "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also* *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) ("We have found both sections [1915 and 1915A] applicable to prisoner proceedings *in forma pauperis*.").

**White v. Syracuse Police Department, Not Reported in Fed. Supp. (2019)**

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 16 of 120

In deciding whether a complaint states a colorable claim, a court must extend a certain measure of deference in favor of *pro se* litigants, *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to address the sufficiency of plaintiff's allegations, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983). The court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a *pro se* plaintiff's complaint to proceed. *See, e.g.*, *Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may *sua sponte* dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint.' " *Aguilar v. United States*, Nos. 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) ); *see also Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory, for the purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint.").

When reviewing a complaint under section 1915(e), the court is guided by the Federal Rules of Civil Procedure. Specifically, Rule 8 provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, J.) (quotation marks and italics omitted).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009). Although the court should construe the factual allegations of a complaint in a light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2) ).

### 2. Analysis of Plaintiff's Claims

**\*3** Although a municipality is subject to suit pursuant to section 1983, *see Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal police department does not have the capacity to be sued as an entity separate from the municipality in which it is located. *See Krug v. Cnty. of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (citing *Orraca v. City of N.Y.*, 879 F. Supp. 148 (S.D.N.Y. 1995) ); *Turczyn ex rel. McGregor v. City of Utica*, No. 13-CV-1357, 2014 WL 6685476, at *2 (N.D.N.Y. Nov. 26, 2014) (Sharpe, J.); *see also Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) ("Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence. Therefore, municipal departments like the Department of Social Services are not amenable to suit and no claims lie directly against the Department."). Although I would ordinarily recommend that, for the sake of judicial efficiency, the court substitute the City of Syracuse in place of the SPD, plaintiff's complaint contains no factual allegations that would support a *Monell* claim against the City of Syracuse. Accordingly, I recommend dismissal of plaintiff's claims asserted against the SPD.

With respect to his remaining claims, although plaintiff makes passing reference to his rights arising under the Eighth and Fourth Amendments, *see* Dkt. No. 1 at 6, it is clear from the factual allegations that he is asserting claims for excessive force and the failure to intervene arising under the Fourth Amendment. *See generally* Dkt. No. 1; *see also Edrei v. Maguire*, 892 F.3d 525, 533 (2d Cir. 2018) ("Arrestees may invoke the Fourth Amendment's prohibition against 'unreasonable' seizures."). In light of the court's obligation to liberally construe a *pro se* litigant's pleadings, I find that plaintiff's complaint should be accepted for filing and the

White v. Syracuse Police Department, Not Reported in Fed. Supp. (2019)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 17 of 120

individual officer defendants should be required to respond in accordance with the local rules of practice for this court and the Federal Rules of Civil Procedure. [4]

### C. Whether to Permit Amendment

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires."); *see also Mathon v. Marine Midland Bank, N.A.*, 875 F. Supp. 986, 1003 (E.D.N.Y. 1995) (permitting leave to replead where court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy"). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, No. 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).

In this case, while I recommend dismissal of plaintiff's claim against the SPD, plaintiff could potentially amend his complaint to assert a cognizable cause of action against a defendant, such as the City of Syracuse, which is amenable to suit. Accordingly, I recommend that plaintiff be granted leave to amend his complaint. If plaintiff chooses to file an amended complaint, he must clearly and concisely set forth the facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, plaintiff is informed that any such amended complaint will replace the existing complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (internal quotation marks omitted) ).

## II. SUMMARY, ORDER, AND RECOMMENDATION

**\*4** Having reviewed plaintiff's amended application for leave to proceed in this action IFP, I conclude that he has met the applicable requirements for leave to proceed without prepayment of fees, and will therefore grant his application. Turning to the merits of his complaint, to the extent that it names five police officers and alleges a violation of 42 U.S.C. § 1983, I conclude that those claims are not subject to dismissal at this procedural juncture. I recommend a finding, however, that plaintiff's claim against the SPD is legally deficient and subject to dismissal, but that plaintiff should be afforded an opportunity to amend with respect to that claim. Accordingly, it is hereby

ORDERED that plaintiff's amended application for leave to proceed in this action without prepayment of fees (Dkt. No. 6) is GRANTED; and it is further

ORDERED that plaintiff's original application for leave to proceed in this action without prepayment of fees (Dkt. No. 2) is DENIED as moot; and it is further

RECOMMENDED that plaintiff's complaint (Dkt. No. 1) be accepted for filing with respect to plaintiff's Fourth Amendment cause of action against defendants Mamoun, Kittle, Hauck, Altimonda, and Fiorini; and it is further

RECOMMENDED that plaintiff's remaining cause of action against the Syracuse Police Department be otherwise DISMISSED with leave to replead within thirty days of the issuance of an order adopting this recommendation; and it is further

RECOMMENDED that, in the event plaintiff does not choose to file an amended complaint and the above recommendations are adopted, the case should move forward with respect to plaintiff's Fourth Amendment cause of action against defendants Mamoun, Kittle, Hauck, Altimonda, and Fiorini.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. [5] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

White v. Syracuse Police Department, Not Reported in Fed. Supp. (2019)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 18 of 120

**All Citations**

Not Reported in Fed. Supp., 2019 WL 981850

---

## Footnotes

1    Plaintiff filed both an original and amended motion to proceed in this action IFP. Dkt. Nos. 2, 6. While the two motions contain slightly different information concerning plaintiff's financial status, only the amended motion contains the required certification from an official at the correctional facility in which plaintiff is confined. *Compare* Dkt. No. 3 *with* Dkt. No. 7. Accordingly, plaintiff's original IFP application is denied as incomplete.

2    The total cost for filing a civil action in this court is $400.00, consisting of the civil filing fee of $350.00, *see* 28 U.S.C. § 1914(a), and an administrative fee of $50.00. Although an inmate granted IFP status is not required to pay the $50.00 administrative fee, he is required to pay, over time, the full amount of the $350.00 filing fee regardless of the outcome of the action. *See* 28 U.S.C. § 1915(b)(3).

3    Plaintiff is reminded that, although his IFP application has been granted, he will still be required to pay fees that he incurs in this action, including copying and/or witness fees.

4    The court expresses no opinion concerning whether plaintiff's claims can survive a properly filed motion to dismiss or motion for summary judgment, or whether he may prevail at trial.

5    If you are proceeding *pro se* and are served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 19 of 120

**Turczyn ex rel. McGregor v. City of Utica, Not Reported in F.Supp.3d (2014)**

2014 WL 6685476
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kylie Ann TURCZYN, Deceased, by and through
Barbara McGREGOR, as Administratrix of
the Estate of Kylie Ann Turczyn, Plaintiff,
v.
CITY OF UTICA et al., Defendants.

No. 6:13–cv–1357 (GLS/ATB).
|
Signed Nov. 26, 2014.

**Attorneys and Law Firms**

Office of Frank Policelli, Frank Policelli, Esq., of Counsel,
Utica, NY, for the Plaintiff.

City of Utica—Corporation Counsel, Mark C. Curley, Esq.,
Merima Smajic, Esq., Zachary C. Oren, Esq., of Counsel,
Utica, NY, for the Defendants.

### *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

**\*1** Plaintiff Kylie Ann Turczyn, deceased, by and through
Barbara McGregor, as administratrix of the estate of Kylie
Ann Turczyn, commenced this action against defendants City
of Utica, City of Utica Police Dept., and Elizabeth Shanley
alleging substantive due process claims pursuant to 42 U.S.C.
§ 1983 and separate state law causes of action. (Am.Compl.,
Dkt. No. 12.) Pending is defendants' motion to dismiss for
failure to state a claim. (Dkt. No. 19.) For the reasons that
follow, the motion is granted in part and denied in part.

### II. *Background*

#### A. *Facts* [1]

Shanley, an Oneida County domestic violence investigator,
was at all relevant times assigned by the Police Department to
accomplish the goals of reducing "occurrence[s] of domestic

violence by increasing reporting and by identifying and
tracking repeat victims and/or offenders," and "increas[ing]
victims' access to supportive services by encouraging [them]
to report their abuse, thereby increasing arrest rates for
domestic offenders." (Am.Compl.¶ 10.) On June 22, 2012,
Thomas Anderson, Turczyn's former boyfriend and the father
of her daughter, broke into Turczyn's home armed with a 9
mm rifle. (*Id.* ¶ 11) Anderson repeatedly shot Turczyn, taking
her life in view of their four-year-old daughter, G.T. (*Id.*)
Anderson then dispatched himself. (*Id.*)

In the twelve months preceding this horrific event, Turczyn
made between five and ten complaints to Utica police
officers, "including informing them of a specific threat by
Anderson to kill her." (*Id.* ¶ 12.) Turczyn specifically told
Shanley "that Anderson was armed and had threatened to
kill her." (*Id.* ¶ 12(d).) Despite their knowledge of domestic
violence between Turczyn and Anderson, neither Shanley,
New York State Police, nor Utica Police took any steps to
arrest Anderson, investigate Turczyn's complaints, or follow-
up with Anderson "as is the policy and protocol of the
domestic violence unit." (*Id.* ¶ 14.)

On June 18, 2012, Shanley told Turczyn to seek an order of
protection, which she attempted to do, but was told by an
unknown person at the Oneida County Family Court to return
the following day because the court was " 'too busy.' " (*Id.*
¶¶ 15–16.) The following day, Turczyn left a voice message
for Shanley, explaining that she was unable to obtain an order
of protection and that Anderson had a gun and planned to
kill her that week. (*Id.* ¶¶ 16–18.) Despite her knowledge,
"Shanley took no action." (*Id.* ¶ 17.) Shanley also mistakenly
believed that Turczyn's issues with Anderson were outside of
the purview of Utica Police and should, instead, be dealt with
by New York State Police; however, "she did not inform any
other police agency or take any action herself." (*Id.* ¶¶ 18, 19,
20.)

#### B. *Procedural History*

Turczyn commenced this action by filing a complaint on
October 31, 2013. (Dkt. No. 1.) Defendants thereafter moved
to dismiss, (Dkt. No. 10.) In response, Turczyn filed an
amended complaint as of right, which is now the operative
pleading. (*See generally* Am. Compl.) In her amended
complaint, Turczyn alleges the following causes of action:
(1) a denial of substantive due process rights under the Fifth
and Fourteenth Amendments due to deliberate indifference;
(2) a *Monell* [2] claim against the City; (3) negligence; (4)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 20 of 120

Turczyn ex rel. McGregor v. City of Utica, Not Reported in F.Supp.3d (2014)

a "derivative action" on behalf of G.T.; and (5) negligent infliction of emotional distress. (*Id.* ¶¶ 37–74.) Defendants now move to dismiss the amended pleading pursuant to Rules 8(a)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 19.)

### III. *Standard of Review*

**\*2** The standard of review under Fed.R.Civ.P. 12(b)(6) is well settled and will not be repeated here. For a full discussion of the standard, the court refers the parties to its prior decision in *Ellis v. Cohen & Slamowitz, LLP,* 701 F.Supp.2d 215, 218 (N.D.N.Y.2010).

### IV. *Discussion*

#### A. *Preliminary Matters*

At the outset, it is noted that some of Turczyn's claims are deemed abandoned by her failure to oppose their dismissal. *See Barmore v. Aidala,* 419 F.Supp.2d 193, 201–02 (N.D.N.Y.2005) ("The failure to oppose a motion to dismiss a claim is deemed abandonment of the claim, and, in the Northern District of New York, is deemed consent to granting that portion of the motion." (internal citations omitted)); *Hanig v. Yorktown Cent. Sch. Dist.,* 384 F.Supp.2d 710, 723 (S.D.N.Y.2005) ("[B]ecause [the] plaintiff did not address [the] defendant's motion to dismiss with regard to [a particular] claim, it [wa]s deemed abandoned and ... dismissed."). In particular, Turczyn squarely opposed dismissal of her substantive due process claim as against Shanley, (Dkt. No. 20 at 8–12), and scarcely, but sufficiently to save the claim from dismissal for abandonment, offered reasons why her substantive due process claim as against the City should survive defendants' motion, (*id.* at 5–7). Aside from the substantive due process claim, Turczyn failed to offer any opposition to defendants' motion, which also sought dismissal of her pendant causes of action. (Dkt. No. 19, Attach. 6 at 31–40 & n. 15.) Accordingly, Turczyn's pendant state law claims, (Am.Compl.¶¶ 59–74), are dismissed.

Additionally, it is clear that the Police Department must be dismissed as urged by defendants, (Dkt. No. 19, Attach. 6 at 2 n. 2), because "a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence." *Varela v. City of Troy,* No. 1:10–cv–1390, 2014 WL 2176148, at \*6 (N.D.N.Y. May 22, 2014) (internal

quotation marks omitted). As such, all claims as against the Police Department are dismissed.

The court also notes that both parties have submitted certain evidence that is outside of the pleadings (Dkt. No. 19, Attachs. 3, 4; Dkt. No. 20, Attachs. 1, 2.) Beginning with defendants, they submitted a January 2, 2013 stipulation of discontinuance, which, on its face, purports to memorialize McGregor's agreement to withdraw the notice of claim filed on behalf of Turczyn and to discontinue with prejudice, (Dkt. No. 19, Attach.3), and a December 28, 2012 letter, which appears to memorialize a conversation regarding the discontinuation of legal action and execution of a stipulation, (Dkt. No. 19, Attach.4). Relying on a single out-of-Circuit decision, *see Raines v. Haverford Coll.,* 849 F.Supp. 1009, 1010 (E.D.Pa.1994), which does not appear directly to support their position nor does it give this court confidence that the kinds of documents at issue here were contemplated by that decision, defendants assert that the documents may be considered on their motion to dismiss as "part of the record of this case." (Dkt. No. 19, Attach. 6 at 25 n. 11.) Turczyn argues that defendants' reliance on the stipulation is inappropriate at this juncture, yet she offers the affidavit of McGregor, submitted to dispute the validity of the stipulation, (Dkt. No. 20, Attach.1), without any explanation as to why the court should or may consider it. (Dkt. No. 20 at 12–13.)

**\*3** The court has excluded from its consideration of this motion to dismiss the exhibits offered by defendants as well as the McGregor affidavit. *See* Fed.R.Civ.P. 12(d). The existence of some document or documents that may extinguish a plaintiff's claims, such as a release or stipulation of discontinuance, is an affirmative defense, *see Beede v. Stiefel Labs., Inc.,* No. 1:13–cv–120, 2014 WL 896725, at \*3 (N.D.N.Y. Mar.6, 2014), and " '[a]n affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6) ... if the defense appears on the face of the complaint,' " *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.,* 620 F.3d 137, 145 (2d Cir.2010) (quoting *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74 (2d Cir.1998)).

Here, the stipulation defense is not apparent from the face of the amended complaint. Moreover, the court refuses to consider the documents in question as part of the record of this case, a proposition for which no in-Circuit authority has been offered nor has any been discovered by this court. As such, the documents offered by defendants, (Dkt. No. 19, Attachs.3, 4), are not properly before the court, and their argument that Turczyn's claims must be dismissed because of

Turczyn ex rel. McGregor v. City of Utica, Not Reported in F.Supp.3d (2014)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 21 of 120

those documents is rejected. McGregor's affidavit, (Dkt. No. 20, Attach.1), which was also improvidently submitted for consideration, is likewise excluded. The court now turns to the merits of defendants' arguments regarding the substantive due process and *Monell* claims.

### B. *Rule 8*

First, defendants argue that Turczyn's § 1983 due process claim is subject to dismissal under the Rule 8 plausibility analysis—specifically because of Turczyn's failure to allege facts supportive of a sufficient nexus between Shanley's omissions and Turczyn's death. (Dkt. No. 19, Attach. 6 at 23–24.) The court disagrees. The amended complaint plausibly alleges a causal connection between the conduct of defendants—their alleged conscience-shocking failure to protect Turczyn, (Am.Compl.¶ 49)—and her injuries, *i.e.*, the allegations plausibly suggest that defendants' acts were a substantial factor in bringing about Turczyn's injuries. *See Gierlinger v. Gleason,* 160 F.3d 858, 872 (2d Cir.1998) ("[I]n all § 1983 cases[ ] the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury."). Accordingly, this argument is rejected.

### C. *Rule 12(b)(6)*

Defendants argue that Turczyn has failed to state a substantive due process claim as against Shanley or the City. (Dkt. No. 19, Attach. 6 at 220, 26–31.) Defendants contend that Turczyn alleges only passive conduct on the part of Shanley that does not give rise to a substantive due process violation. (*Id.* at 10–12.) More generally, defendants assert that Turczyn has failed to plead facts to show "implicit prior assurances through repeated sustained inaction," and that, even if she did, the state action alleged does not rise to the level of conscience-shocking behavior. (*Id.* at 15–20.) Alternatively, defendants argue that Shanley is entitled to qualified immunity. (*Id.* at 20–23.) With respect to the City, defendants contend that Turczyn has failed to allege facts that support a claim of municipal liability. (*Id.* at 26–31.) For reasons explained below, defendants' motion is denied with respect to Turczyn's substantive due process claim against Shanley, but granted with respect to her *Monell* claim against the City.

**\*4** Only one relevant exception to the general rule that no substantive due process claim lies for a state's failure to protect an individual from private violence, *see DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), potentially applies in this case. That exception imposes liability for failure to

protect where state actors in some way affirmatively assist "in creating or increasing the danger to the victim." *Okin v. Vill. of Cornwall–On–Hudson Police Dep't,* 577 F.3d 415, 428 (2d Cir.2009) (internal quotation marks and citation omitted); *see Pena v. DePrisco,* 432 F.3d 98, 110 (2d Cir.2005). "[R]epeated, sustained inaction by government officials, in the face of potential acts of violence, might constitute 'prior assurances,' rising to the level of an affirmative condoning of private violence, even if there is no explicit approval or encouragement." *Okin,* 577 F.3d at 428 (quoting *Dwares v. City of N.Y.,* 985 F.2d 94, 99 (2d Cir.1993)). Moreover, when "state officials communicate to a private person that he ... will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others, those officials can be held liable under section 1983 for injury caused by the misconduct" "even though none of the defendants [is] alleged to have communicated the approval explicitly." *Id.* at 428–29 (quoting *Pena,* 432 F.3d at 111)). In a nutshell, "[t]he affirmative conduct of a government official may give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence." *Id.* at 429.

A successful substantive due process claim also requires that the plaintiff show "that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " *Id.* at 431 (quoting *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 847 n. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). A hierarchy of intent provides guidance on the likelihood that a particular harm rises to the necessary level. Intentionally inflicted harms are most likely to meet the standard, while reckless and negligent inflictions of harm are each less likely, in graduated downward steps, to show conscience-shocking state action. *Id.* As for recklessly inflicted injuries, " '[d]eliberate indifference that shocks in one environment may not be so patently egregious in another.' " *Id.* (quoting *Lewis,* 523 U.S. at 850"). Accordingly, the inquiry is highly fact specific.

Unlike *Town of Castle Rock v. Gonzales,* 545 U.S. 748, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005), or *Neal v. Lee County,* Civil Action No. 1:08CV262, 2010 WL 582437 (N.D.Miss. Feb.12, 2010)—cases in which police had limited interaction with either the victim or killer prior to the victim's demise, and upon which defendants rely for dismissal of the claim against Shanley, (Dkt. No. 19, Attach. 6 at 3–5, 7–8)—the allegations here go substantially farther. Turczyn alleges several occasions [3] when Shanley knew of

Anderson's threatening acts and did nothing, which arguably communicated to him prior assurances that there would be no penalty to pay for his conduct. (Am.Compl.¶¶ 12–13.) "This is so even though none of the defendants are alleged to have communicated the approval explicitly." *Pena,* 432 F.3d at 111. *Okin* has specifically recognized the liability that may arise under these circumstances. *See* 577 F.3d at 428–29 (explaining that liability under § 1983 attaches when "state officials communicate to a private person that he ... will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others" (quoting *Pena,* 432 F.3d at 111)).

**\*5** The amended complaint also pleads facts that demonstrate, at this juncture, egregious behavior that shocks the contemporary conscience. As in *Okin,* the allegations here tend to show that Shanley, who was tasked with accomplishing certain goals related to curbing domestic violence, was deliberately indifferent as to whether or not Anderson would make good on his multiple threats against Turczyn's life over a twelve-month-period. (Am.Compl.¶ ¶ 10, 12.) These allegations sufficiently support that Shanley's affirmative conduct was the product of deliberate indifference that shocks the conscience, and would provide a reasonable jury with a valid basis to so find. *See Conradt v. NBC Universal, Inc.,* 536 F.Supp.2d 380, 394–95 (S.D.N.Y.2008).

Finally, Shanley is not entitled to qualified immunity at this juncture. Her argument on this issue is two-fold. First, Shanley asserts that no constitutional violation occurred, and, second, she claims that, even if a constitutional violation occurred, the right was not clearly established. (Dkt. No. 19, Attach. 6 at 20–23.) The first prong of the argument is easily swept aside by reference to the preceding paragraphs that explain that the amended complaint alleges a cognizable substantive due process violation. As for whether or not the right was clearly established, which is a prerequisite to qualified immunity, *see Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), this question has been resolved by the Second Circuit. On the issue, the court has explained that it is "clearly established," under the state-created danger theory, "that police officers are prohibited from affirmatively contributing to the vulnerability of a known victim by engaging in conduct, whether explicit or implicit, that encourages *intentional* violence against the victim, and as that is the substantive due process violation alleged here, qualified immunity does not apply." *Okin,* 577 F.3d at 434. Accordingly, Shanley is not entitled to qualified immunity at this time.

As for the City, defendants assert that Turczyn has failed to plead a *Monell* claim because the amended complaint merely alleges legal conclusions. (Dkt. No. 19, Attach. 6 at 26–31.) With respect to Turczyn's allegation that the City failed to properly train or supervise its employees, defendants contend that the amended complaint is too conclusory, but that, even if adequately pleaded, Turczyn's municipal liability claim must nonetheless fail because she has not alleged deliberate indifference. (*Id.* at 29–31.)

It is well settled that "the inadequacy of police training may serve as the basis for § 1983 liability ... where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Oh. v. Harris,* 489 U.S. 378, 380, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The deliberate indifference standard is "stringent" and requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson,* ——U.S. ——, ——, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011) (internal quotation marks and citation omitted). A showing of deliberate indifference requires that: (1) "a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "the wrong choice by the ... employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of N.Y.,* 974 F.2d 293, 297–98 (2d Cir.1992) (quoting *City of Canton,* 489 U.S. at 390 n. 10).

**\*6** Here, because Turczyn has failed to adequately plead that the City's failure to train and supervise amounted to deliberate indifference, she has failed to state a claim of municipal liability. The amended complaint uses the label "deliberate indifference" in reference to Turczyn's municipal liability claim and generically references the City's failure to properly train and supervise, but it fails to allege facts that support either conclusory notion. (Am.Compl.¶¶ 45, 52.) Turczyn's pleading failure mandates dismissal of her *Monell* claim against the City. *See Gauthier v. Kirkpatrick,* Civil Action No. 2:13–cv–187, 2013 WL 6407716, at \*10 (D.Vt. Dec.9, 2013) (dismissing failure to train *Monell* claim because the plaintiff failed to plead facts that supported the deliberate difference elements); *Santos v. New York City,* 847 F.Supp.2d 573, 577 (S.D.N.Y.2012); *see also Worrell v. City of N.Y.,* No. 12–CV–6151, 2014 WL 1224257, at \*13 (E.D.N.Y. Mar. 24, 2014).

Turczyn ex rel. McGregor v. City of Utica, Not Reported in F.Supp.3d (2014)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 23 of 120

## V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion to dismiss (Dkt. No. 19) is **GRANTED IN PART** and **DENIED IN PART** as follows:

**GRANTED** with respect to all claims alleged as against the City of Utica Police Dept. and the Clerk is directed to terminate the City of Utica Police Dept. from this action; and

**GRANTED** with respect to Turczyn's *Monell* claim against the City (Am.Compl.¶ ¶ 51–58), which is hereby **DISMISSED WITHOUT PREJUDICE,** and the Clerk is directed to terminate the City of Utica from this action; and

**GRANTED** with respect to all of Turczyn's pendant state law claims, (Am.Compl.¶ ¶ 59–74), which are hereby

**DISMISSED;** and **DENIED** in all other respects; and it is further

**ORDERED** that the sole remaining defendant, Shanley, shall file an appropriate responsive pleading within the time allotted by the rules; and it is further

**ORDERED** that the parties shall contact Magistrate Judge Andrew T. Baxter in order to schedule further proceedings; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 6685476

---

### Footnotes

1    The facts are presented in the light most favorable to plaintiff.

2    *See Monell v. Dep't of Soc. Servs. of N.Y.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

3    In fact, Turczyn claims that she lodged five to ten complaints—of which Shanley was aware—with the Utica Police within the twelve months preceding the murder. (Am.Compl.¶¶ 12, 13.) So many occurrences may amount to "repeated [and] sustained inaction ... in the face of potential acts of violence." *Okin,* 577 F.3d at 428.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 974824
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jeramie WHITE, Plaintiff,

v.

SYRACUSE POLICE DEPARTMENT; Abraham
Mamoun, Syracuse Police Dept.; William Kittle,
Syracuse Police Dept.; Shawn Hauck, Syracuse
Police Dept.; Altimonda, Syracuse Police Dept.;
and Fiorini, Syracuse Police Dept., Defendants.

5:18-CV-1471 (GTS/DEP)
|
Signed 02/28/2019

**Attorneys and Law Firms**

JERAMIE WHITE, 18-B-0311, Plaintiff, Pro Se, Cayuga
Correctional Facility, P.O. Box 1186, Moravia, New York
13118.

**DECISION and ORDER**

Hon. Glenn T. Suddaby, Chief U.S. District Judge

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by Jeramie White ("Plaintiff") against the
Syracuse Police Department and five of its employees
("Defendants"), is United States Magistrate Judge David
E. Peebles' Report-Recommendation recommending that (1)
Plaintiff's Complaint be accepted for filing by the Court
with respect to Plaintiff's Fourth Amendment cause of action
against Defendants Mamoun, Kittle, Hauck, Altimonda and
Fiorini, and (2) Plaintiff's remaining cause of action against
the Syracuse Police Department be dismissed with leave to
replead within thirty days of the issuance of an Order adopting
the Report-Recommendation. (Dkt. No. 9.) Plaintiff did not
submit an objection to the Report-Recommendation, and the
deadline by which to do so has expired. (*See generally* Docket
Sheet.) [1]

Based upon a review of this matter, the Court can find
no clear error in the Report-Recommendation: [2] Magistrate
Judge Peebles employed the proper standards, accurately
recited the facts, and reasonably applied the law to those
facts. As a result, the Court accepts and adopts the Report-
Recommendation for the reasons stated therein; Plaintiff's
Complaint is accepted for filing with respect to his Fourth
Amendment cause of action against Defendants Mamoun,
Kittle, Hauck, Altimonda and Fiorini; and Plaintiff's
remaining cause of action against the Syracuse Police
Department is dismissed with leave to replead within thirty
days of the issuance of this Decision and Order.

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Peebles' Report-
Recommendation (Dkt. No. 9) is **ACCEPTED** and
**ADOPTED** in its entirety; and it is further

**ORDERED** that Plaintiff's Complaint is accepted for filing
with respect to Plaintiff's Fourth Amendment cause of action
against Defendants Mamoun, Kittle, Hauck, Altimonda and
Fiorini; and it is further

**\*2 ORDERED** that Plaintiff's remaining cause of action
against the Syracuse Police Department is **DISMISSED with
leave to replead within THIRTY (30) DAYS** of the issuance
of this Decision and Order.

**ORDERED** that, in the event Plaintiff files an Amended
Complaint within the above-referenced thirty-day period, it
shall be referred to Magistrate Judge Peebles for review; and
it is further

**ORDERED** that, in the event Plaintiff does not file an
Amended Complaint within the above-referenced thirty-
day period, this action shall move forward with respect to
his Fourth Amendment cause of action against Defendants
Mamoun, Kittle, Hauck, Altimonda and Fiorini, and the Clerk
of the Court is directed to issue summonses and USM-285
forms at that time for service by the U.S. Marshal Service.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 974824

White v. Syracuse Police Department, Not Reported in Fed. Supp. (2019)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 25 of 120

## Footnotes

1    The Court notes that, on January 11, 2019, Plaintiff filed a letter from the City of Syracuse Citizen Review Board dated December 31, 2018, outlining its findings with respect to this matter. (Dkt. No. 10.) In its letter, the Citizen Review Board upheld Plaintiff's claim for excessive force against "Det. One," recommended a written reprimand against that individual, and absolved "Det. Two," "Sgt. One," and "Lt. One" from wrongdoing regarding the use of excessive force. (*Id.*) The Court does not liberally construe this letter as any sort of Objection to the Report-Recommendation.

2    When no objection is made to a report-recommendation, the Court subjects that report-recommendation to only a clear error review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*; *see also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks omitted).

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:25-cv-00673-AMN-ML  Document 5  Filed 09/24/25  Page 26 of 120

Sagaria v. Orange County Jail, Not Reported in Fed. Supp. (2021)

2021 WL 4392422
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

John SAGARIA, Plaintiff,
v.
ORANGE COUNTY JAIL, et al., Defendants.

No. 20-CV-2287 (KMK)
|
Signed 09/24/2021

**Attorneys and Law Firms**

Michael David Meth, Esq., Meth Law Offices, PC, Chester, NY, Counsel for Plaintiff.

Anthony Francisco Cardoso, Esq., Orange County Attorney's Office, Goshen, NY, Counsel for Defendants.

OPINION & ORDER

KENNETH M. KARAS, UNITED STATES DISTRICT JUDGE

**\*1** Plaintiff John Sagaria ("Plaintiff") brings this Action pursuant to 42 U.S.C. § 1983 against the Orange County Jail (the "Jail"), the Orange County Sheriff's Department (the "Sheriff's Department"), and the County of Orange (the "County"; collectively "Defendants") for wrongful incarceration in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article 1 Section 6 of the New York State Constitution. (Compl. (Dkt. No. 1).) Before the Court is Defendants' Motion to Dismiss (the "Motion"). (Not. of Mot. (Dkt. No. 25).) For the following reasons, the Motion is granted.

I. Background

A. Factual Background
The following facts, drawn from Plaintiff's Complaint, are taken as true for the purpose of resolving the instant Motion.

Plaintiff is a businessman who has lived in Orange County, New York for over 25 years. (Compl. ¶ 12.) His primary source of income is the two businesses he owns, both of which he must be present to operate. (Id.) Plaintiff also

is the plaintiff in a contentious divorce proceeding in the Supreme Court of Orange County, New York (the "state court"). (Id. ¶ 13.) On December 14, 2018, during a custody hearing related to this divorce proceeding, Plaintiff's ex-wife's counsel, Barbara Strauss, Esq. ("Strauss"), raised the issue of Plaintiff's unpaid spousal support. (Id. ¶ 14.) The state court denied Plaintiff's request for a hearing and offer of proof on the non-payment issue. (Id. ¶ 15.) Plaintiff was held in summary contempt of court for non-payment of spousal support, and the state court ordered his immediate release. (Id.) The state court remanded Plaintiff to the Jail pursuant to an order of commitment. (Id. ¶ 17.) Plaintiff alleges that the state court set $25,000 as the payment required for Plaintiff to purge his contempt. (Id. ¶ 16.) The Court takes judicial notice of the order of commitment, which states that Plaintiff could purge his contempt by "paying the partial sum of $25,889.64 to C[ynthia] S[agaria]," and orders Plaintiff to be imprisoned for 30 days, "or until the purge sum of $25,889.64 is paid." (See Decl. of Anthony F. Cardoso in Supp. ("Cardoso Decl.") Ex. B ("Order of Commitment") (Dkt. No. 26-2).) See Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts, ... not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."). [1]

On December 17, 2018, Plaintiff paid $25,000 to Strauss by credit card. (Compl. ¶ 19.) Strauss subsequently issued a Letter of Release to the state court and brought the letter and payment confirmation to the Sheriff's Department. (Id.) The Sheriff's Department refused to release Plaintiff because the release letter did not come from the state court. (Id. ¶¶ 19, 20.) The state court refused to sign the release order. (Id. ¶ 21.)

**\*2** On December 19, 2018, Plaintiff paid an additional $28,090.26 by credit card to the Sheriff's Department GOVPAY EXP Payment Service to satisfy the purge amount. (Id. ¶ 22.) This sum included $3,090.26 in fees. (Id. ¶ 23.) The Sheriff's Department charged Plaintiff's credit card. (Id.) Subsequently, the Sheriff's Department stated that it could accept only $10,000 via credit card. (Id. ¶ 24.) The Sheriff's Department stated that Plaintiff had to pay $25,000 in cash at the window of the Jail to be released. (Id. ¶ 26.) While Plaintiff's family and friends were gathering cash, he was advised by the state court that an additional $1,639.644 paid directly to Strauss would be required for release. (Id. ¶¶ 28, 30.) Plaintiff paid Strauss $1,639.44 in cash and was released on December 19, 2018 at 8:30 P.M. (Id. ¶¶ 30–31.) The

following day, GOVPAY EXP credited Plaintiff's credit card the $28,090.26 previously paid. (*Id.* ¶¶ 22, 33.)

Plaintiff seeks compensatory and special damages—including for emotional injury and loss of liberty, punitive damages, pre- and post-judgment interest, and attorneys' fees and costs. (*Id.* ¶ 34 & 10–11.) [2]

### B. Procedural Background

Plaintiff filed his Complaint on March 13, 2020. (Compl.) On September 28, 2020, Defendants submitted a letter requesting a pre-motion conference in anticipation of filing a motion to dismiss pursuant to Rule 12(b)(6). (Dkt. No. 21.) On October 8, 2020, the Court ordered Plaintiff to respond to Defendant's pre-motion letter by October 13, 2020, (Dkt. No. 22), which Plaintiff did, (Dkt. No. 23). On October 20, 2020, the Court adopted a briefing schedule. (Dkt. No. 24.) On November 20, 2020, Defendants filed their Motion To Dismiss. (Not. of Mot.; Cardoso Decl. (Dkt. No. 26); Not. of Mot. on Behalf of Defs. ("Defs.' Mem.") (Dkt. No. 27).) Plaintiff filed a memorandum of law in opposition to the Motion To Dismiss on December 18, 2020. (Mem. of Law in Opp'n ("Pl.'s Mem.") (Dkt. No. 28).) Defendants filed their Reply on January 5, 2021. (Reply Mem. of Law in Further Supp. of Mot. To Dismiss on Behalf of the Defs. ("Defs.' Reply") (Dkt. No. 29).)

## II. Discussion

### A. Standard of Review

When ruling on a Rule 12(b)(6) motion to dismiss, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). The Court, however, is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678 (citation and quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Specifically, the plaintiff must allege facts sufficient to show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and if the plaintiff

has not "nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed," *Twombly*, 550 U.S. at 570.

On a Rule 12(b)(6) motion to dismiss, the question "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012). Accordingly, the "purpose of *Federal Rule of Civil Procedure 12(b)(6)* is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (citation and quotation marks omitted). To decide the motion, the Court "may consider the facts as asserted within the four corners of the complaint together with the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (citation and quotation marks omitted).

### B. Analysis

### 1. Claims Against the Jail and the Sheriff's Department

**\*3** The Jail and the Sheriff's Department argue that they are administrative arms of the County and cannot be sued independently under New York law. (Defs.' Mem. 12.) The Court agrees.

The Orange County Sheriff's Department is a municipal department of the County of Orange, State of New York. Sheriff's Office, *Sheriff's Office: Orange County, New York*, https://www.orangecountygov.com/1650/Sheriffs-Office (last visited September 24, 2021). The Sheriff's Department is subdivided into multiple divisions. *Id.* The Orange County Jail is a subdivision of the Sheriff's Department. Orange County, *Corrections (Jail)*, https://www.orangecountygov.com/511/Corrections-Jail (last visited September 24, 2021). The Jail is responsible for operating and maintaining the County's correctional system. *Id.* [3]

Pursuant to *Federal Rule of Civil Procedure 17*, federal courts must look to state law when deciding whether a government entity may be sued. *Fed. R. Civ. P. 17(b)(3)* (providing that capacity to be sued is determined "for all ... parties [except individuals or corporations] by the law of the state where

Sagaria v. Orange County Jail, Not Reported in Fed. Supp. (2021)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 28 of 120

the court is located"); *see also Fanelli v. Town of Harrison*, 46 F. Supp. 2d 254, 257 (S.D.N.Y. 1999) ("New York law governs the capacity of a police department to sue or be sued."); *Orraca v. City of New York*, 897 F. Supp. 148, 152 (S.D.N.Y. 1995) ("[T]he capacity of a governmental entity to sue or be sued is a question of state law."). "Under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued." *McCloud v. Dzurenda*, No. 20-CV-6393, 2021 WL 1924181, at *3 (E.D.N.Y. May 13, 2021) (quoting *Rose v. County of Nassau*, 904 F. Supp. 2d 244, 247 (E.D.N.Y. 2012)); *see also Carr v. County of Sullivan*, No. 16-CV-06850, 2018 WL 3733952, at *2 n.6 (S.D.N.Y. Aug. 3, 2018) (noting that departments are "merely administrative arms of a municipality [that] do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued"); *Polite v. Town of Clarkstown*, 60 F. Supp. 2d 214, 216 (S.D.N.Y. 1999) (holding that "municipal departments in this State ... are not amenable to suit, and no claims can lie directly against them"); *Hoisington v. County of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) (finding that "municipal departments like the Department of Social Services are not amenable to suit"). Neither the Sheriff's Department nor the Jail exist separate and apart from the County and, as a result, neither can be sued. *See Gleeson v. County of Nassau*, No. 15-CV-6487, 2019 WL 4754326, at *14 (E.D.N.Y. Sept. 30, 2019) (finding Nassau County Sheriff's Department and Nassau County Correction Center were not proper parties because they are administrative arms of Nassau County); *Carr*, 2018 WL 3733952, at *2 n.6 (holding that the Fallsburg Police Department cannot be sued because "[i]t is well-settled that departments that are merely administrative arms of a municipality do not have legal identity separate and apart from the municipality and, therefore, cannot sue or be sued"); *Campbell v. Sposato*, No. 15-CV-1958, 2015 WL 9267222, at *4 (E.D.N.Y. Nov. 17, 2015) (finding Nassau County Correctional Center was not a proper party because it was an arm of the Department of Sheriff, which was a Nassau County department), *report and recommendation adopted*, 2015 WL 9273951 (E.D.N.Y. Dec. 16, 2015); *Joseph v. Nassau Cnty. Corr. Ctr.*, No. 12-CV-4414, 2013 WL 1702162, at *3 (E.D.N.Y. Apr. 19, 2013) (same); *Polite*, 60 F. Supp. 2d at 216–17 (dismissing claims against the Clarkstown Police Department); *see also* N.Y. GEN. MUN. LAW § 2 (noting that counties are defined as "municipal corporations").

**\*4** Thus, Plaintiff's claims against the Sheriff's Department and the Jail are dismissed with prejudice. This outcome

does not "subject ... Plaintiff to indefinite arbitrary detention." (Pl.'s Mem. 22.) Plaintiff may seek recourse against the County, which "has already been named as a defendant." *Umhey v. County of Orange*, 957 F. Supp. 525, 532 (S.D.N.Y. 1997).

### 2. Due Process

Plaintiff claims that the delay in his release violated his due process rights. (Compl. ¶¶ 49–51.) The Fourteenth Amendment to the United States Constitution provides that a State shall not "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. Plaintiff brings both substantive and procedural due process claims under the Fourteenth Amendment. To state a procedural due process claim, a plaintiff "must first establish that he enjoyed a protected liberty interest." *Arce v. Walker*, 139 F.3d 329, 333 (2d Cir. 1998). If a plaintiff establishes such a protected interest, the next question is whether "the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011). The Fourteenth Amendment guarantees " 'more than fair process'; it 'cover[s] a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them.' " *Hurd v. Fredenburgh*, 984 F.3d 1075, 1087 (2d Cir. 2021) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998)). To state a substantive due process claim, Plaintiff must allege: (1) a valid liberty or property interest, (2) which Defendants infringed in an arbitrary or irrational manner. *See Harlen Assocs. v. Incorporated Village of Mineola*, 273 F.3d 494, 503 (2d Cir. 2001). "The interference with the plaintiff's protected right must be so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." *Southerland v. City of New York*, 680 F.3d 127, 152 (2d Cir. 2012) (quotation marks omitted).

Plaintiff alleges a valid liberty interest for both a procedural and substantive due process claim. Because "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action[,] ... commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) (citation and quotation marks omitted). Here, Plaintiff alleges that he was wrongfully detained for 30 additional hours. (Compl. ¶¶ 51–53.) The Court assumes

Case 3:25-cv-00673-AMN-ML  Document 5  Filed 09/24/25  Page 29 of 120

**Sagaria v. Orange County Jail, Not Reported in Fed. Supp. (2021)**

without deciding that improper detention for this amount of time can violate substantive due process. *See Lynch v. City of New York*, 335 F. Supp. 3d 645, 655 (S.D.N.Y. 2018) (holding unconstitutional the Department of Correction's practice of forcing detainees who had already paid bail to remain detained until a critical mass awaiting release formed). Thus, the key questions are (1) whether Plaintiff plausibly alleges that Defendants failed to use constitutionally sufficient procedures, and (2) whether Plaintiff's confinement was arbitrary or irrational. The Court concludes on both questions that Plaintiff has failed to state a claim.

### a. Procedural Due Process

Given that Plaintiff had a liberty interest in freedom from bodily restraint, the question is "whether the government deprived the plaintiff of that interest without due process," which examines "what process was due to the plaintiff, and inquires whether that constitutional minimum was provided in the case under review." *Narumanchi v. Bd. of Trs. of Conn. State Univ.*, 850 F.2d 70, 72 (2d Cir. 1988) (citing *Mathews v. Eldridge*, 424 U.S. 319 (1976)).

### i. First Payment Attempt

**\*5** Plaintiff claims that Defendants failed to use constitutionally sufficient procedures in delaying his release after the Jail received a letter from Strauss consenting to Plaintiff's release. (Pl.'s Mem. 10–11.) The Court disagrees.

The Complaint acknowledges that Plaintiff was detained pursuant to a commitment order after a finding of contempt. (*See* Compl. ¶¶ 15, 17.) Plaintiff does not challenge the facial validity of this commitment order. (*See generally id.*) [4] Nor does he allege that he challenged the commitment order while he was detained. (*See generally id.*; *see also* Pl.'s Mem. 13 (stating that Plaintiff "never challenged the order").) Of course, Plaintiff was "free to raise ... legal challenges ... by seeking to have the commitment order vacated." *Ngemi v. County of Nassau*, 87 F. Supp. 3d 413, 419 (E.D.N.Y. 2015). [5] Absent such a challenge, Defendants were "bound to execute the valid order as it [was] written." *Id.* (citing *Tornheim v. Eason*, 363 F. Supp. 2d 674, 677 (S.D.N.Y. 2005) ("A sheriff is not empowered to review a facially valid court order; it is not within his scope of authority to question the legality of the provision in the [j]udgment."), *aff'd*, 175 F. App'x 427 (2d Cir.

2006)). As a result, to the extent they acted consistent with the commitment order, Defendants are entitled to quasi-judicial immunity. (*See* Defs.' Mem. 13.) *See Fludd v. Fischer*, No. 10-CV-6603, 2012 WL 3749652, at \*5 (W.D.N.Y. Aug. 28, 2012) ("Government officials carrying out a facially valid court order are entitled to immunity to suits for damages under § 1983."), *aff'd in part, vacated in part on other grounds, remanded*, 568 F. App'x 70 (2d Cir. 2014); *Tornheim*, 363 F. Supp. 2d at 677 (finding that a municipal official sued in his official capacity for executing a court order was "entitled to an absolute quasi-judicial immunity because his actions —undertaken in performance of his official duties—ha[d] an integral relationship with the judicial process"); *Respass v. N.Y.C. Police Dep't*, 852 F. Supp. 173, 177 (E.D.N.Y. 1994) (finding it "highly unlikely that the mere averment that the warden failed to look behind the facial validity of [the] plaintiff's commitment order would state a claim against the Department of Corrections"). [6]

**\*6** Plaintiff's claim thus turns on whether Plaintiff has plausibly alleged that Defendants acted beyond the scope of the commitment order. He has not. The commitment order allowed Plaintiff to purge his contempt by paying Cynthia Sagaria $25,889.64. (*See* Order of Commitment.) *See N.Y.C. Transit Auth. v. Transp. Workers Union of Am.*, 822 N.Y.S.2d 579, 589 (App. Div. 2006) (noting that a civil contemnor may end his or her incarceration by satisfying the purge conditions). Plaintiff's payment of $25,000 on December 17, 2019 was less than the required $25,889.64. (*See* Compl. ¶ 19; Order of Commitment.) Strauss's letter consenting to Plaintiff's release likewise did not require Plaintiff's release, because the commitment order did not specify that Plaintiff would be released upon consent by his ex-wife. (*See* Order of Commitment.) Because Plaintiff does not claim that Defendants violated the commitment order, he has not alleged that Defendants violated his due process rights by delaying his release after his first attempted payment. *See Ngemi*, 87 F. Supp. 3d at 419 (finding that where the sheriff was executing a facially valid commitment order by placing the plaintiff in custody, the plaintiff's complaint did not allege a valid procedural due process against any employee of the Sheriff's Office); *Pack v. Hynes*, Nos. 04-CV-574, 04-CV-2907, 2004 WL 3090592, at \*2 (E.D.N.Y. Aug. 18, 2004) ("The superintendents of various New York State correctional institutions had custody of [the] plaintiff under a sentence and judgment of convictions [that were] valid on their face. No valid claim is stated against them individually or together.").

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 30 of 120

**Sagaria v. Orange County Jail, Not Reported in Fed. Supp. (2021)**

Plaintiff cites *Town of Wilmurt v. Wright*, 171 N.Y.S. 230 (App. Div. 1918), to argue that Defendants would have been "entirely justified" in releasing Plaintiff due to his ex-wife's consent, (Pl.'s Mem. 10–11). However, *Wright* is consistent with the Court's reasoning. There, the parties were able "to agree upon [a] settlement, which would release the defendant from imprisonment." *Wright*, 171 N.Y.S. at 232. However, the defendant was released only because "an order was made discharging the defendant." *Id.* In other words, the defendant in *Wright* received a court order reversing a prior detention order. *See also First Mariner Bank v. Resol. L. Grp., P.C.*, No. 12-CV-1133, 2014 WL 1681986, at *3 (D. Md. Apr. 28, 2014) (ordering that the defendants had purged civil contempt). Defendants are not liable merely because Plaintiff failed to seek the same.

### ii. Second Payment Attempt

Plaintiff argues that the County violated his due process rights by refusing to release him after he attempted to pay the full purge amount via credit card. (Pl.'s Mem. 11–12.) The Court disagrees. [7]

Numerous courts have held that there is no "constitutional right to a certain type of bond." *Walden v. Carmack*, 156 F.3d 861, 874 (8th Cir. 1998); *see also Guam v. Tuncap*, 2011 Guam 24 ¶ 12 (noting that "other courts have held that there is no established right to a certain type of bond"); *Campbell v. Johnson*, No. 06-CV-365, 2006 WL 3408177, at *2 (N.D. Fla. Nov. 27, 2006) (holding that "there is no established constitutional right to a certain type of bond"); *cf. Holland v. Rosen*, 895 F.3d 272, 292 (3d Cir. 2018) (finding it unlikely "that the Excessive Bail Clause guarantees a right to monetary bail"). The history of New York's bail law is consistent with this principle. New York's law was "intended to reform the restrictive bail scheme" and "improve the availability of pretrial release." *People ex rel. McManus v. Horn*, 967 N.E.2d 671, 674 (N.Y. 2012). This law allows a court to require that "bail be posted in any one of three or more ... forms." N.Y. CRIM. PROC. LAW § 520.10(2)(b). The statute lists nine possible bail forms, and "[c]redit card or similar device" is only one of the options. *Id.* § 520.10(1). Thus, even in a bail regime designed to improve the availability of pretrial release, a criminal defendant is not entitled to pay bail by credit card. *See, e.g., People v. Disimile*, 142 N.Y.S.3d 319, 322 (County Ct. 2021) (setting bail as "$30,000 cash, $60,000 insurance company bond or $200,000 partially secured appearance bond with a 10% cash component"). In light of this history, it is

unsurprising that courts have rejected claims that refusing to accept credit card payment for bail is unconstitutional. *See, e.g., Wells v. Ward*, 470 F.2d 1185, 1185 (10th Cir. 1972) (affirming summary judgment against a plaintiff who alleged that "the jailer refused to accept his bail bond credit card"); *see also Kinsey v. Ohio*, No. 20-3315, 2021 WL 1100494, at *1 (6th Cir. Jan. 11, 2021) (summary order) (affirming summary judgment against a plaintiff who claimed that he was "was not permitted to pay the bail with a credit card because cash was the only acceptable method of payment"); *cf. Keele v. City of St. John*, No. 10-CV-811, 2011 WL 453254, at *3, *4 (E.D. Mo. Feb. 4, 2011) (dismissing on statute of limitations grounds the plaintiff's constitutional claim that the defendants "refused to take checks or credit cards as payment for bail").

**\*7** Finally, the Sheriff's Department did not violate Plaintiff's constitutional rights by incorrectly advising him that he could pay the full purge amount via credit card. Simply put, such miscommunications do not qualify as constitutional fouls. *See Blackburn v. Wash. Dep't of Soc. & Health Servs.*, No. 11-CV-5385, 2011 WL 3563741, at *2 (W.D. Wash. Aug. 12, 2011) (finding that, where "a miscommunication occurred over the course of one weekend," this "regrettable mistake" did not "amount[ ] to a violation under ... the Constitution because it was unintentional and brief"), *aff'd*, 472 F. App'x 569 (9th Cir. 2012); *cf. Brown v. Strickland*, No. 09-CV-3248, 2009 WL 3414344, at *1 (S.D. Tex. Oct. 20, 2009) ("Neither simple negligence nor gross negligence is enough for constitutional liability. A simple mistake does not violate the Constitution." (citation omitted)).

Because Defendants' refusal to allow Plaintiff to pay more than $10,000 via credit card towards purging his contempt does not rise to the level of a constitutional violation, Plaintiff's procedural due process claim must be dismissed. [8]

### b. Substantive Due Process [9]

The Court considers whether Plaintiff's prolonged detention was arbitrary. *See Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). "Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill advised." *Cunney v. Bd. of Trs.*, 660 F.3d 612, 626 (2d Cir. 2011) (citation omitted). "In order to shock the conscience and trigger a violation of substantive due process, official conduct must be outrageous and egregious under the circumstances; it must be truly brutal and offensive to human

**Sagaria v. Orange County Jail, Not Reported in Fed. Supp. (2021)**

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 31 of 120

dignity." *Lombardi v. Whitman*, 485 F.3d 73, 81 (2d Cir. 2007) (citation and quotation marks omitted).

**\*8** "[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). An individual who has not been adjudged guilty of a crime, like Plaintiff, may therefore only be subjected to the restrictions of a detention facility so long as they "do not amount to punishment." *Fusco v. County of Putnam*, No. 15-CV-08132, 2018 WL 1889070, at \*7 (S.D.N.Y. Apr. 18, 2018) (citing *Bell*, 441 U.S. at 536). The Second Circuit has recognized that in assessing whether prison restrictions imposed on individuals without criminal convictions comport with substantive due process, "a court must decide whether the restriction is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Almighty Supreme Born Allah v. Milling*, 876 F.3d 48, 61 (2d Cir. 2017) (alterations omitted) (quoting *Bell*, 441 U.S. at 538). [10]

When executive action "infringes a protected right, a plaintiff must show not just that the action was literally arbitrary, but that it was 'arbitrary in the constitutional sense.' " *O'Connor v. Pierson*, 426 F.3d 187, 203 (2d Cir. 2005) (citation omitted). In other words, only conduct that "shocks the conscience" will form the basis for a substantive due process violation for executive action. *Id.* In the Second Circuit, "whether executive action shocks the conscience depends on the state of mind of the government actor and the context in which the action was taken." *Id.*

Plaintiff claims that his release was delayed 30 hours. (Compl. ¶ 53.) This detention period is distinguishable from *Lynch*, which Plaintiff cites to argue that prolonged detention may violate due process. (Pl.'s. Mem. 16–17.) In *Lynch*, the court found that a city violated the plaintiff's substantive due process rights with its practice of forcing detainees who had already paid bail to remain detained until a critical mass formed, with no justification other than convenience. 335 F. Supp. 3d at 655. Here, unlike in *Lynch*, Plaintiff has not alleged that Defendants have a formal policy of prolonging the release of incarcerated individuals by transferring them elsewhere. (*See generally* Compl.) Nor has Plaintiff alleged that Defendants deprived him of the ability to purge contempt. *See supra* (discussing the absence of a constitutional right to make bail payments via credit card). Therefore, the Sheriff Department's decision to delay Plaintiff's release after it mistakenly accepted his payment

does not rise to a level that is "arbitrary in the constitutional sense.' " *O'Connor*, 426 F.3d at 203. Nor does a credit card cap "shock[ ] the conscience." *Id.*; *see also Davidson v. City of Bridgeport*, 487 F. App'x 590, 592 (2d Cir. 2012) (summary order) (holding that to establish "egregious and conscience-shocking" behavior, the plaintiff must show that the municipality "engaged in deliberate malfeasance"). Thus, Plaintiff's Fourteenth Amendment substantive due process claim is dismissed.

### 3. Eighth Amendment

Next Plaintiff claims that the delay in release time violated his Eighth Amendment rights. (Compl. ¶¶ 49–51.) Because Plaintiff was incarcerated due to an official order of commitment for failure to pay spousal support and not a criminal conviction, his delayed release claim falls under the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment. *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). While a detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner," *id.* (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)), as discussed, Plaintiff has failed to allege a Due Process claim. Further, because Plaintiff was not a criminal defendant, it is unclear that he is protected by the Eighth Amendment Excessive Bail Clause. *See Kehl*, 456 F.2d at 868–69. Even if he were, Plaintiff alleges that the state court set his purge amount, (*see* Compl. ¶ 16; *see also* Order of Commitment), and Plaintiff does not name the state court as a defendant, *see supra* Footnote 5. Plaintiff's Eighth Amendment claim is therefore dismissed. [11]

### III. Conclusion

**\*9** For the foregoing reasons, Moving Defendants' Motion To Dismiss is granted. Because this is the first adjudication of Plaintiff's claims, the dismissal is without prejudice. Plaintiff may file an amended complaint within 30 days of the date of this Opinion & Order. Failure to file an amended complaint could result in dismissal of this case with prejudice. The Clerk of the Court is respectfully directed to terminate the pending Motion, (Dkt. No. 25).

SO ORDERED.

**Sagaria v. Orange County Jail, Not Reported in Fed. Supp. (2021)**

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 32 of 120

**All Citations**

Not Reported in Fed. Supp., 2021 WL 4392422

---

### Footnotes

1    Plaintiff does not appear to contest this payment figure. (*See generally* Pl.'s Mem.) Indeed, he incorporates it into his brief. (*See id.* at 3, 12.)

2    Because the Complaint is not paginated, the Court refers where there are no paragraph numbers to the ECF-generated page numbers in the upper right-hand corner.

3    The Court may take judicial notice of the structure of the Orange County government because it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Gagnon v. Alkermes PLC,* 368 F. Supp. 3d 750, 763 (S.D.N.Y. 2019) (citing *Kramer,* 937 F.2d at 774), *reconsideration denied in part,* No. 17-CV-9178, 2019 WL 2866113 (S.D.N.Y. July 2, 2019); *cf. Gjolaj v. Bureau of Citizenship & Immigr. Servs.,* 468 F.3d 140, 143 n.2 (2d Cir. 2006) (holding that a court may take judicial notice of "a fundamental change in the political structure and government of Albania").

4    The Court notes that the order of commitment provided "how much [Plaintiff] should pay ... in order to purge himself from contempt," which is one requirement for facial validity under New York law. *See Garenani v. County of Clinton,* 552 F. Supp. 2d 328, 333 (N.D.N.Y. 2008) (citing *Loeber v. Teresi,* 681 N.Y.S.2d 416, 419 (App. Div. 1998)); *see also* N.Y. JUD. LAW § 774(1) (requiring that a commitment order "specify the amount of the fine, and the duration of the imprisonment").

5    Plaintiff alleges that the state court refused to sign the release order, (*see* Compl. ¶ 21; Pl.'s Mem. 11), and arbitrarily changed the purge conditions, (*see* Compl. ¶ 30; Pl.'s Mem. 2, 4, 10, 14). The Court does not consider these claims because the state court is neither a defendant in this Action nor a County employee. *See* N.Y. JUD. LAW § 39(6) ("[A]ll justices, judges, and nonjudicial officers and employees of the courts and court-related agencies of the unified court system ... shall be employees of the state of New York ...."). For the same reason, the Court rejects Plaintiff's argument that the state court failed to allow the required ten-day notice before considering Plaintiff's ex-wife's contempt application. (*See* Pl.'s Mem. 9.)

6    Plaintiff briefs only the issue of qualified immunity, which is not relevant to the issue of quasi-judicial immunity. As such, the Court does not address it. (*See* Pl.'s Mem. 22–23.)

7    The Court assumes without deciding that Plaintiff enjoys due process protections equivalent to those provided by the Eighth Amendment Excessive Bail Clause, even though he was detained for civil contempt. *Cf. U. S. ex rel. Goodman v. Kehl,* 456 F.2d 863, 868–69 (2d Cir. 1972) ("How far, in light of the rather obvious thrust of the Eighth Amendment toward criminal prosecutions, these principles apply to orders for civil contempt whose purpose is not to punish but to secure obedience to a court's processes may be a different question.").

8    Plaintiff's false imprisonment claim, (*see* Compl. ¶ 52), is dismissed for the same reason. Federal courts look to New York law to determine the elements of a cause of action for false imprisonment. *See Tobias v. County of Putnam,* 191 F. Supp. 2d 364, 375 (S.D.N.Y. 2002). Under New York law, "where a facially valid order issued by a court with proper jurisdiction directs confinement, that confinement is privileged and everyone connected with the matter is protected from liability for false imprisonment." *Aponte v. Fischer,* No.

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 33 of 120

**Sagaria v. Orange County Jail, Not Reported in Fed. Supp. (2021)**

14-CV-3989, 2020 WL 1911190, at *10 (S.D.N.Y. Aug. 20, 2020) (citing *Holmberg v. County of Albany*, 738 N.Y.S.2d 701, 703 (App. Div. 2002)).

9       While a plaintiff may simultaneously assert liberty interests based on procedural and substantive due process protection, if the Court finds that "the claim for substantive due process is subsumed by" the procedural due process claim, "it must be dismissed." *Rother v. NYS Dep't of Corr. & Cmty. Supervision*, 970 F. Supp. 2d 78, 100 (N.D.N.Y. 2013); *see also Cherry v. N.Y.C. Hous. Auth.*, 15-CV-6949, 2017 WL 4357344, at *29 (E.D.N.Y. Sept. 29, 2017) ("Plaintiff fails to state a claim for a violation of substantive due process because [that] claim is based on the same facts as his procedural due process claim."); *Ratajack v. Brewster Fire Dep't, Inc.*, 178 F. Supp. 3d 118, 147 (S.D.N.Y. 2016) (holding that "the overwhelming majority of [the plaintiff's] claims fall into ambit of other provisions of the Constitution," including the Due Process Clause, "thereby closing off [the plaintiff's] ability to seek relief by invoking the concept of substantive due process"); *Monko v. Cusack*, No. 11-CV-1218, 2013 WL 5441724, at *3 (N.D.N.Y. Sept. 27, 2013) (dismissing substantive due process claim where it "overlaps both his procedural due process claim and his retaliation claim" (citing *Rother*, 2013 WL 4774484, at *14)). Here, as Plaintiff relies on the same facts in both claims, Plaintiff's substantive due process claim is subsumed by his procedural due process claim, and is dismissed on this independent basis.

10      Although the Second Circuit was specifically addressing the substantive due process rights of pre-trial detainees in *Milling*, the reasoning appears to apply with equal force to Plaintiff. *See Fusco*, 2018 WL 1889070, at *5 n.3 (analogizing the due process analysis for pre-trial detainees to the due process analysis for incarcerated civil contemnors).

11      Because Plaintiff fails to allege a violation of his constitutional rights, he cannot maintain a *Monell* claim. *See Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (listing as a requirement of a *Monell* claim that the plaintiff establish "deprivation of a constitutional or statutory right"); *see also Pitchell v. Callan*, 13 F.3d 545, 549 (2d Cir. 1994) ("If [no individual defendant] inflicted a constitutional injury on [the plaintiff], 'it is inconceivable that the [municipality] could be liable to [the plaintiff].' " (alterations omitted) (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986))).

Even if he had pleaded a violation of his constitutional rights, Plaintiff could not establish a *Monell* claim because he has not alleged "that an official policy of the municipality caused [his] constitutional injury." *Roe*, 542 F.3d at 36. (*See generally* Compl.) This requirement for *Monell* liability reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). In other words, a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (italics omitted); *see also Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong"). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights."). "In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.' " *Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003). Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton*, 566 F. Supp. 2d at 271; *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation."). Here, the only valid defendant is the County. Absent an alleged policy or custom

**Sagaria v. Orange County Jail, Not Reported in Fed. Supp. (2021)**

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 34 of 120

that caused constitutional harm, Plaintiff cannot maintain a *Monell* claim against the County. *See Kinsey v. Ohio*, No. 17-CV-982, 2020 WL 1066633, at *1, *4 (S.D. Ohio Mar. 5, 2020), *aff'd*, No. 20-3315, 2021 WL 1100494 (6th Cir. Jan. 11, 2021) (dismissing the plaintiff's claim because his "amended complaint fail[ed] to allege that any ... [c]ounty custom or official policy led to a violation of his constitutional rights" where the plaintiff "offered to pay the ... bail amount by credit card, but ... [the] [c]ounty refused to accept any form of payment other than cash").

---

**End of Document**  
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag
Distinguished by  Gazzola v. County of Nassau,  E.D.N.Y.,  June 23, 2022

2019 WL 4754326
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

John GLEESON in His Own Right and as Co-Administrator of the Estate of John P. Gleeson, Deceased, Margaret Gleeson in Her Own Right and as Co-Administrator of the Estate of John P. Gleeson, Deceased, Donna Dempsey on behalf of and as the Natural Parent and Guardian of (he Property of both E.A.G., an Infant, and J.P.G., an Infant, Plaintiffs,
v.
COUNTY OF NASSAU, Nassau County Correctional Center, Nassau County Sheriff's Department, Michael J. Sposato Individually and as Sheriff of Nassau County, Armor Correctional Health Services, Inc., Armor Correctional Health Services of New York, Inc., Nassau County Corrections Officers, "John Does 1-10" in their Individual and Official Capacities, Armor Correctional Health Services, Inc. Employees and Agents, "John and Jane Does 11-20" in (heir Individual and Official Capacities, Defendants.

15-CV-6487 (AMD) (RL)
|
Signed 09/30/2019

**Attorneys and Law Firms**

James A. Pascarella, The Pascarella Law Firm PLLC, Mineola, NY, for Plaintiffs.

Christopher D. Clarke, JoAnne Filiberti, Peter James Johnson, Jr., Michael Gerard Dempsey, Leahey & Johnson, P.C., John J. Doody, Jamie Elizabeth Greenfield, Kenneth G. Gerard, Lewis Brisbois Bisgaard & Smith, LLP, New York, NY, Liora M. Ben-Sorek, Nassau County Attorney's Office, Mineola, NY, for Defendants County of Nassau, Nassau County Sheriff's Department.

Christopher D. Clarke, JoAnne Filiberti, Peter James Johnson, Jr., Michael Gerard Dempsey, Leahey & Johnson, P.C., Jamie Elizabeth Greenfield, John J. Doody, Kenneth G. Gerard, Lewis Brisbois Bisgaard & Smith LLP, New York, NY, Liora M. Ben-Sorek, Nassau County Attorney's Office, Mineola, NY, for Defendants Nassau County Correctional Center, Michael J. Sposato.

Jamie Elizabeth Greenfield, John J. Doody, Kenneth G. Gerard, Dale Nicholson McLaren, Lewis Brisbois Bisgaard & Smith LLP, Cathleen Kelly Rebar, Frank V. Kelly, Stewart Bernstiel Rebar & Smith, New York, NY, for Defendants Armor Correctional Health Services, Inc., Armor Correctional Health Services, Inc. Employees and Agents, "John and Jane Does 11-20".

John J. Doody, Dale Nicholson McLaren, Jamie Elizabeth Greenfield, Kenneth G. Gerard, Lewis Brisbois Bisgaard & Smith, LLP, Cathleen Kelly Rebar, Frank V. Kelly, Stewart Bernstiel Rebar & Smith, New York, NY, for Defendant Armor Correctional Health Services of New York, Inc.

Jamie Elizabeth Greenfield, John J. Doody, Kenneth G. Gerard, Lewis Brisbois Bisgaard & Smith LLP, New York, NY, for Defendant Nassau County Corrections Officers, "John Does 1-10".

**MEMORANDUM & ORDER**

ANN M. DONNELLY, District Judge.

**\*1**  The plaintiffs brought this action against Nassau County, Nassau County Correctional Center ("NCCC"), Nassau County Sheriff's Department, Nassau County Sheriff Michael J. Sposato (collectively the "County defendants"), Armor Correctional Health Services, Armor Correctional Health Services of New York (collectively the "Armor defendants"), and unnamed corrections officers and health services employees, in connection with the death of John P. Gleeson, who died while he was detained at the NCCC. (ECF No. 1.) The plaintiffs—surviving members of Mr. Gleeson's family—brought federal claims pursuant to 42 U.S.C. § 1983, alleging inadequate medical care under the Fourteenth Amendment, and state law claims for wrongful death and intentional infliction of emotional distress. (Id.) On November 19, 2018, the defendants moved for summary judgment. (ECF Nos. 57, 60.) For the reasons that follow, the defendants' motion is granted in part, and denied in part.

**BACKGROUND** [1]

1. *Medical Services at the NCCC*

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 36 of 120

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

The NCCC is a correctional facility operated by the Nassau County Sheriff's Department, an agency of Nassau County. (ECF No. 69), Pls.' 56.1 Counter-Statement in Response to County defendants ("Pls.' 56.1 (County)") ¶¶ 2-3.)[2] Between 1999 and 2000, the United States Department of Justice ("DOJ") investigated conditions at the NCCC. (*Id.* ¶¶ 20-21.) On September 11, 2000, the DOJ found that the NCCC was deliberately indifferent to its inmates' medical and mental needs, and that corrections officers at the NCCC had a practice of using excessive force. (*Id.* ¶ 22.) The DOJ sued Nassau County in this Court on April 22, 2002. (*Id.* ¶ 23.) The parties entered into a settlement agreement the same day, dismissing the case subject to the County's compliance with certain terms to improve conditions at the NCCC. (*Id.* ¶ 23-25.)

**\*2** The settlement agreement included specific policies and programs that the NCCC would develop and implement to improve inmate health care, including: (i) written medical policies, procedures, and protocols relating to initial health assessments, sick calls, emergency care, and medical records (*Id.* ¶ 28); (ii) new inmate health screenings that included the inmates' input about their medical history, current medication, allergy information, and immunization history (*Id.* ¶ 29); (iii) a written chronic care disease management program (*Id.* ¶ 34); and (iv) a written functional quality improvement program that included self-evaluations, recommendations for clinical guidelines, and internal peer reviews (*Id.* ¶ 38). To implement the quality improvement program, the NCCC was required to establish a Quality Improvement Committee ("QIC") chaired by a physician. (ECF No. 74-1, ¶¶ 55-56.) The terms of the settlement required the QIC to have ten monthly meetings each year to "review the status of health care provided to inmates," and to report its work to the Sheriff each month. (*Id.*)

On May 5, 2008, the parties filed a stipulation to dismiss the case because of the NCCC's substantial compliance with the settlement agreement. (*Id.* ¶ 53.) The Honorable Leonard Wexler "so ordered" the stipulation of dismissal on March 20, 2008. (*Id.* ¶ 55.)

### 2. *The NCCC's Contract with Armor*

On July 20, 2009, the County sought proposals from third-party organizations to provide medical, behavioral, and dental health care at the NCCC. (*Id.* ¶ 56.) The County's request specified that bidders must meet the standards of all DOJ settlement agreements. (*Id.* ¶¶ 57-62.)

On October 13, 2009, the Armor defendants[3] submitted a bid in which they acknowledged and agreed to meet the standards of the settlement agreement, adding that Armor "had experience complying with DOJ requirements having inherited a situation ... in which the DOJ cited the facility and the former healthcare provider." (*Id.* ¶¶ 64, 67.) A committee that included representatives from the County's Office of Management and Budget, Department of Health, Office of Mental Health, the Sheriff's Department, and the County Attorney's Office evaluated Armor's proposal, and gave it the highest score of the six other proposals. (*Id.* ¶¶ 85-87.) Armor and the NCCC entered into a proposed contract on March 18, 2011. (*Id.* ¶ 88.)

Pursuant to the contract, Armor agreed to provide services consistent with the standards established by the settlement agreement. (*Id.* ¶ 90.) Armor agreed, for example, to "develop and maintain a chronic care disease management program, consistent with nationally accepted disease guidelines[,]" (*id.* ¶ 96), and to "perform medical and mental health intake screenings within four hours of an inmate's admission to the NCCC." (*Id.* ¶ 93.) The contract also expressly incorporated the services outlined in Armor's contract proposal (*id.* ¶ 90), which included plans to install an electronic medical records system (ECF No. 57-3, Armor Contract 2011-2013 ("2011 Armor Contract") at 92, 228-31) and a protocol for approving referrals to offsite specialists (*id.* at 194-97). In its cost proposal, Armor allocated $78,688 of the contract cost for the installation of the electronic medical records system in the first year of the contract. (*Id.* at 92.) Armor represented that it emphasized "medical necessity" when it screened requests for offsite treatment; according to Armor, its process reduced "unnecessary offsite trips" and resulted in "substantial savings in security costs and NCCC overhead." (*Id.* at 194-97.) Under Armor's protocol, an Armor clinician initiated the process by submitting a specialist's request form to Armor's Director of Utilization Management and Medical Director of Utilization Management, both of whom were in Florida. (*Id.*) The directors reviewed the request to determine whether it was a "medical necessity" and either approved it or deferred it to be reevaluated within 30 days. (*Id.*)

**\*3** On April 18, 2011, the proposed contract was submitted to the Rules Committee of the Nassau County Legislature for approval. (Pls.' 56.1 (County) ¶ 106.) Michael Golio, Commanding Officer of the Sheriff's Department's Legal Unit at the NCCC, spoke in favor of the proposed contract, and

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 37 of 120

highlighted its accountability and high standards of care: "The second part of this contract is the care standards, and that's why we have the performance indicators, the performance measurements, and the financial penalties. We don't have anything of that sort currently with [the Nassau University Medical Center]." [4] (*Id.* ¶ 110.) The Rules Committee approved the contract and, on May 5, 2011, the Nassau County Executive signed the contract with Armor. (*Id.* ¶¶ 112-13.)

On June 11, 2011, only eleven days after Armor began providing medical care at the NCCC, an inmate, Roy Nordstrom, died of an acute myocardial infarction. (ECF No. 71-31.) On September 18, 2012, the New York State Commission of Correction's Medical Review Board [5] issued a report addressed to Sheriff Sposato and copied to Edward P. Mangano, who was the Nassau County Executive at the time. The Medical Review Board concluded that Mr. Nordstrom died as a result of "grossly incompetent" medical care, and issued the following directive to the Nassau County Executive:

> The Office of the Nassau County Executive shall conduct an inquiry into the fitness of Armor Correctional Health Services, Inc. as a correctional medical care provider in the Nassau County Correctional Center. Specific attention shall be directed to Armor's flagrant disregard of New York State Education Law, of the Rules of the Board of Regents, and of New York State nursing practice regulations, to wit, staffing unsupervised Licensed Practical Nurses at the Correctional Center who engaged in nursing practice beyond the scope of their licensure and in unlawful medical practice, who failed to consult with and refer to a physician in a medical emergency, and who failed to hospitalize a critically ill patient.

(*Id.* at 9.)

The County's two-year contract with Armor expired on May 31, 2013. (Pls.' 56.1 (County) ¶ 114.) On August 1, 2013, the County extended its contract with Armor to run until May 31, 2015. (*Id.* ¶ 119.)

### 3. *John Gleeson's Medical History*

Mr. Gleeson, 40 years old at the time of his death, had a history of hereditary angioedema. He went to the hospital for swelling beginning in 2002, and was diagnosed with hereditary angioedema in 2007 or 2008. (ECF No. 57-11, Margaret Gleeson Dep. ("M.G. Dep."), 105:6-16, 107:8-11.) Hereditary angioedema, which typically results from a quantitative or functional deficiency of the C1 esterase inhibitor protein, is a disorder that causes recurrent, severe swelling in the extremities, gastrointestinal tract, face, throat, and airways. (ECF No. 71-6, ¶ 10.) Left untreated, the airway swelling can lead to asphyxia and death. (*Id.*)

Mr. Gleeson took prednisone (a steroid) and Benadryl (an antihistamine) for his angioedema. (M.G. Dep. 123:8-22.) If the swelling moved from his hands to his chest or neck—which was more serious—Mr. Gleeson went to the emergency room. (*Id.*) His mother estimated that he went to the emergency room about ten times for angioedema. (*Id.* 109:4-10.)

### 4. *John Gleeson's Incarceration and Death at the NCCC*

 **\*4** In May of 2014, Mr. Gleeson was arrested for stealing scrap metal wire. On May 28, 2014, a Nassau County grand jury charged him with burglary in the third degree. (Pls.' 56.1 (County) ¶ 120.) Mr. Gleeson was admitted to the NCCC the following day, May 29, 2014, where he was held as a pretrial detainee until his death on July 14, 2014. (*Id.* ¶ 121.); *see also* (Pls.' 56.1 (Armor) ¶¶ 4, 9.) In a health assessment on the day he was admitted, Mr. Gleeson reported asthma as his only significant illness, and that Flexeril (a muscle relaxant) and Percocet (pain medication) were his only medications. [6] (ECF No. 62-1, Armor Medical Records, at 5.) [7] Mr. Gleeson did not disclose that he had hereditary angioedema during the assessment.

On June 10, 2014, Mr. Gleeson filled out a sick call request form, complaining that his arm was swollen and that he had "some kind of reaction." (*Id.* at 13.) A nurse visited him that night and noted on the call form that his swollen arm was "chronic." (*Id.*) A physician's assistant ("PA") saw Mr. Gleeson the next day; Mr. Gleeson had difficulty breathing,

Case 3:25-cv-00673-AMN-ML   Document 5   Filed 09/24/25   Page 38 of 120

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

pain and difficulty swallowing, and swelling in his left shoulder, neck, and throat. (*Id.* at 29.) The PA treated Mr. Gleeson with a nebulizer, prednisone, and Benadryl, and noted "R/O angioedema" on the urgent care assessment form. (*Id.*) On a chronic care clinic form completed the same day, the PA wrote the following in the section for assessing Mr. Gleeson's conditions: "asthma, HTN, ? angioedema." (*Id.* at 61.) (question mark in the original).

On June 17, 2014, Mr. Gleeson went to the medical unit, complaining of swelling in his hands, arms, trunk, legs, knees, and other parts of his body. (*Id.* at 28.) Dr. Sanchez saw him, and ordered a blood-draw to test for an "autoimmune disease" and the levels of C1 esterase inhibitor in his blood. (*Id.*) Mr. Gleeson returned to Dr. Sanchez a week later, on June 24, 2014, so that the doctor could examine swelling in his right upper extremity and to discuss the results of the blood tests. (*Id.* at 27.) Dr. Sanchez ordered a re-draw of the C1 Esterase test—the original specimen was not frozen as required by laboratory protocol [8]—and wrote "Rheumatology consult" on Mr. Gleeson's progress note. (*Id.*) On July 1, 2014, a PA saw Mr. Gleeson for an "Urgent Care Assessment" because of swelling on both sides of his neck; once again, the PA prescribed prednisone and Benadryl. (*Id.* at 26.) On the assessment form, under "known medical conditions of [the] patient," the PA listed "asthma, HTN, [and] recurrent episodes of edema ..." (*Id.*) A separate note on the form reads "Rheum consult." (*Id.*)

Mr. Gleeson spoke frequently with his mother throughout his incarceration. (*Id.* ¶ 126.) Although neither of them mentioned angioedema specifically, they did discuss his recurring problems with swelling. (*Id.* ¶¶ 128-132.) Ms. Gleeson had known of her son's angioedema diagnosis since 2007 (M.G. Dep. 105:6-16, 107:8-11), but did not mention the condition in conversations with her son, never urged him to discuss his condition with doctors, and never tried to speak with any officials at the NCCC about her son's condition. (Pls.' 56.1 (County) ¶¶ 132, 135); (Pls.' 56.1 (Armor) ¶ 11.) On July 1, 2014, Mr. Gleeson told his mother that his neck and throat "swelled up again ... huge today," and that he had been given Benadryl. (ECF No. 57-12, CD of Recorded Phone Calls, 710A20JQ, 4:36-5:06.) His mother replied, "Why don't they send you to the hospital for God's sake?" (*Id.*) Mr. Gleeson said that the doctor told him that he was "on the list to see a different doctor.... a rheumatologist." (*Id.*) Ms. Gleeson responded, "Ok good, just let them figure it out, let them worry about it." [9] (Pls.' 56.1 (County) ¶ 134.)

**\*5** On July 14, 2014, at 2:40 p.m., Mr. Gleeson complained to Corrections Corporal Carmine Accordino that his throat was swollen. (Pls.' 56.1 (County) ¶ 150.) Corporal Accordino relayed Mr. Gleeson's complaint to Nurse James in the medical unit, who responded that Mr. Gleeson should fill out a sick call sheet because the unit was busy. (*Id.* ¶¶ 151-52.) At 3:00 p.m., Mr. Gleeson complained again about his swollen throat. (*Id.* ¶ 153.) Corporal Accordino relayed his message to the medical unit. (*Id.*) This time, Nurse James directed Corporal Accordino to send Mr. Gleeson to the medical unit, where Mr. Gleeson checked in at 3:10 p.m. (*Id.* at ¶¶ 153-55.) According to the urgent care assessment form, Mr. Gleeson had swelling on his left neck and left hand. (Armor Medical Records at 23.) Under a section of the form entitled "DX," the diagnosis is listed as "R/O hereditary angioedema (C1 esterase)." (*Id.*) Mr. Gleeson was again prescribed prednisone and Benadryl. (*Id.*) He returned to his cell between 3:45 and 4:00 p.m. (Pls.' 56.1 (County) ¶ 155.)

At 8:55 p.m., Mr. Gleeson told Corrections Officer Del Re that his throat was sore and that he needed to go to the medical unit. (*Id.* ¶ 156.) He got to the medical unit at 9:15 p.m., with redness in his throat and swelling of his left tonsil. (Armor Medical Records at 22.) The doctor prescribed an antibiotic, and sent Mr. Gleeson back to his cell at about 9:25 p.m. (Pls.' 56.1 (County) ¶ 158.)

When he returned to his cell, Mr. Gleeson's condition worsened, prompting fellow inmates to yell for help. (ECF No. 74-39, ¶ 4.) [10] Fifteen minutes later, at 10:16 p.m., Mr. Gleeson told Corrections Officer Rubeanau that he could not breathe. (Pls.' 56.1 (County) ¶ 159.) Officer Rubeanau saw that Mr. Gleeson had a significantly swollen throat and trouble breathing, and notified the medical unit of his condition. [11] (*Id.* ¶¶ 160-61.) Corrections Officer Cavanaugh escorted Mr. Gleeson to the medical unit, and Dr. Sanchez and R.N. Qui examined him at 10:20 p.m. (*Id.* at ¶¶ 163-64.) The progress note from that night states that Mr. Gleeson had a past medical history of "asthma, hives, angioedema, and HTN." (Armor Medical Records at 24.)

The Armor medical team believed that Mr. Gleeson was suffering from an exacerbation of asthma, and gave him albuterol with a nebulizer. (*Id.*) Minutes into the treatment, Mr. Gleeson stood up, said that he could not breathe, and collapsed. (*Id.* at 63.) The Armor medical staff administered an EpiPen, directed Officer Cavanaugh to call 911, and initiated CPR treatment until the EMT arrived fifteen minutes later, at approximately 10:45 p.m. (*Id.* at 62.) The paramedics

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 39 of 120

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

tried to intubate Mr. Gleeson twice, but were unsuccessful. (*Id.*) At 10:56 p.m., the paramedics took Mr. Gleeson to Nassau University Medical Center, where he died at approximately 11:20 p.m. (Pls.' 56.1 (County) ¶¶ 167-69.)

5. *County Response.*

The day after Mr. Gleeson died, July 15, Dr. Marylyn Martin-Naar, an Armor medical director, filled out a death summary report. (Armor Medical Records at 65.) Dr. Martin-Naar wrote that Mr. Gleeson had three diagnoses, including "R/O Acquired Angioedema." (*Id.*) Dr. Martin-Naar also noted that Mr. Gleeson's treatment plan included prednisone and Benadryl, and that "next steps" included referrals to a rheumatologist and allergist to address the patient's "history of recurrent swelling of body parts." (*Id.*) In her initial findings, Dr. Martin-Naar wrote "low esterase inhibitor level" and that the "impression was R/O acquired angioedema." (*Id.* at 66.)

 **\*6**  On October 31, 2014, the Nassau County Office of the Medical Examiner determined that Mr. Gleeson died from cardiorespiratory arrest due to laryngeal edema and angioedema. (Pls.' 56.1 (County) ¶ 174.) A year later, on September 15, 2015, the Commissioner of the New York State Commission of Corrections, Dr. Phyllis Harrison-Ross, published a final report of the Medical Review Board's investigation into Mr. Gleeson's death. [12] (*Id.* ¶ 175.) The report is addressed to Sheriff Sposato, and copied to Norma L. Gonsalves, the Presiding Officer of the Nassau County Legislature at the time. (*See* ECF No. 57-22, New York State Commission of Correction's Final Report: In the Matter of the Death of John Gleeson ("NYSCOC Report").) The Board's investigation included interviews with medical and prison personnel, and a review of the relevant medical records. (*Id.*) The Board was highly critical of the way that the Armor medical staff treated Mr. Gleeson:

> Gleeson had a history of Hereditary Angioedema that went unrecognized, misdiagnosed, and improperly treated by the medical providers from Armor Inc. The Medical Review Board has found that Armor Inc.'s delivery of healthcare in this matter was incompetent and deficient due to a lack of adequate protocol, lack of coordination, lack of effective communication, and deficient medical

knowledge by the physicians and midlevel clinicians. This was compounded by a healthcare record that was unorganized, incomplete, and in selected sections illegible. The Medical Review Board finds that Armor Inc., in its contracted locations in New York State, has engaged in a pattern of inadequate and neglectful medical care and questions their ability to meet and provide for the healthcare needs of jail inmates. Had John Gleeson been provided with competent medical care by Armor Inc. in a timely manner, been properly referred to a specialist, received a correct diagnosis, and received proper medical treatment, his death may have been prevented.

(*Id.* ¶ 1.)

The Board was especially critical of the Armor medical staff's failure to refer Mr. Gleeson to a specialist, once it became clear that its treatments were ineffective:

> After four separate clinical encounters with unresolved angioedema with an unknown etiology and refractory to provided treatment, a referral to a specialist (Rheumatologist) should have been of highest priority. The Medical Review Board finds that the medical providers of Armor Inc. at the NCCC lacked the clinical knowledge to recognize that Gleeson was symptomatic of Hereditary Angioedema and continued him on an ineffective course of treatment including antihistamines and steroids. Hereditary Angioedema will not respond to therapy including steroids and antihistamines ... Had Gleeson been appropriately referred to a specialist, received a correct diagnosis, and received the proper

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 40 of 120

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

treatment, his terminal event may have been prevented.

(*Id.* ¶ 13.)

The Board ended the report with specific recommendations:

- that Armor establish an organized and uniform health record system for inmate health and mental care;

- that Armor utilize a system that assigns a single case manager for each inmate's care; and

- that Armor conduct a quality review of the care it gave Mr. Gleeson, with particular focus on "[w]hy a referral to a specialist (rheumatology) was not expedited for Gleeson ...?" "[w]hy medical staff' did not consider an immediate transfer to a hospital for Gleeson after repeated complaints of edema ...?" and "[w]hy medical providers failed to recognize that the prescribed medications would be ineffective, failed to obtain an accurate C1 Esterase reading ... and failed to recognize current medications may actually be trigger mechanism?"

**\*7** (*Id.* at 7-8.)

The Board also directed the Nassau County Legislature to investigate whether Armor was fit to serve as a correctional medical care provider, with "[s]pecific attention ... to Armor's pattern of failing to properly manage patients' chronic medical needs, failing to maintain proper and organized patient records, and failing to provide hospitalization for patients when clinically indicated." (*Id.*)

Nevertheless, in mid-2015, the County entered into another two-year contract extension with Armor, from June 1, 2015, to May 31, 2017. (Pls.' 56.1 (County) ¶ 211.)

On October 17, 2016, the Nassau County Office of the Comptroller issued a review of Armor's and the County's performance under the contract. (ECF No. 71-4, Comptroller Report.) [13] The Comptroller found that Armor's manual records system was inadequate, inefficient, and error prone, that it had high nursing and doctor turnover, and that it failed to document required background and reference checks. (*Id.* at ii.) The Comptroller underscored the Medical Review Board's finding that Armor was responsible for five inmate deaths at the NCCC from 2011 to 2015, and the

Board's direction in the last three reports that Armor pay "specific attention" to its "pattern of failing to properly manage patients' chronic medical needs ..." (*Id.* at 20-26.) The Comptroller recommended that Armor computerize its records and "strengthen its quality control process to assure medical forms are completed thoroughly and are signed, dated and legible." (*Id.* at ii.) The Comptroller also recommended that Armor "take immediate steps to hire and retain a quality medical staff." (*Id.*)

The Comptroller also found that the NCCC "failed to provide adequate oversight to ensure that Armor was in compliance with its contract with the County." (*Id.*) The NCCC did not have a medical professional on staff to oversee Armor despite the contractual agreement for a Health Care Administrator, who was to "oversee administration and monitor compliance with this agreement on behalf of the County[.]" (*Id.* at 8-9) (quoting 2011 Armor Contract at 12.) The Sheriff's Department designated a registered nurse as the Health Contract Administrator; the nurse left in August of 2013, after which the position remained vacant until 2016. [14] (*Id.*) Moreover, New York State Correction Law required that the Board of Supervisors of Nassau County appoint a "reputable physician authorized to practice medicine as physician" to the NCCC. (*Id.*) (citing N.Y. Correct. Law § 501 (McKinney 2019).) The "County Physician," like the Health Contractor Administrator, was to oversee "Armor's work and the medical care provided to the Correctional Center's patients." (*Id.*) The NCCC did not have a County Physician at any point during the Armor contract. (*Id.*) The contract also required Armor to submit monthly reports to the Health Contract Administrator measuring the quality and quantity of its services. (2011 Armor Contract § 4.) The Assistant Attorney General's affirmation, (ECF No. 71-17), discussed below, found that Armor's reports did not include data on approximately half of the twenty-four indicators required by the contract, including medical sick call statistics, mental health statistics, and initial assessment statistics. (*Id.* ¶ 33.)

**\*8** Because of its lack of oversight, the NCCC failed "to assess performance indicators and assess associated penalties as provided for in the contract[.]" (Comptroller Report at ii.) Indeed, the County assessed no penalties on Armor during the contract period—despite negotiating for 27 different performance indicators and several tiers of penalties. (*Id.* at 16-17.) Most critically, the County did not fine Armor \$155,000 (the highest penalty provided for in the contract) for its failure to achieve NCCHC accreditation. [15] Instead, the

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 41 of 120

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

County waived the requirement, without seeking the County Executive's approval. (*Id.* at 16.)

In 2016, the State of New York sued Armor, alleging that it had provided substandard medical care to inmates at the NCCC and the Niagara County Jail. [16] *People v. Armor Correctional Health Medical Services*, Index No. 450835/2016. The parties eventually settled the case, and Armor agreed "not to bid on or enter into any contract with any municipality in New York State for the provision of jail health services" for a three-year period. (ECF No. 80-3, ¶ 13.) Dorothea Caldwell-Brown, an Assistant Attorney General, submitted the results of her investigation in a sworn affirmation. [17] (ECF No. 71-17, Affirmation of Assistant Attorney General Dorothea Caldwell-Brown ("AAG Affirmation").) The investigation "revealed that Armor did not meet its contractual obligations, as evidenced by its inadequate self-auditing and continuous quality improvement processes, deficient sick call, deficient medical and mental health services, inadequate referrals to specialists, failure to maintain accurate and complete medical records and inadequate staffing." (*Id.* ¶ 11.) According to the affirmation, the Medical Review Board had found that five deaths between 2011 and 2015 at the NCCC, including Mr. Gleeson's, involved "egregious lapses in medical care. (Id. ¶ 9.)

The affirmation cited Mr. Gleeson's death as emblematic of Armor's "clear reluctance to send inmates for outside specialty care even when the inmates' medical condition cries out for attention often as assessed by Armor's own clinicians at NCCC." (*Id.* ¶¶ 150-162.) According to the affirmation, Armor's medical records demonstrated that "an Armor clinician referred [Mr. Gleeson] to a rheumatologist on two separate occasions" but that "Armor never ensured that the rheumatologist referral actually take place." (*Id.* at ¶ 162.) Armor's self-audits, the investigation found, reflected "a consistent pattern of inappropriate and failed practices relating to referrals to off-site specialists," including frequent failures to render a decision to deny or approve the request. (*Id.* at ¶¶ 153-57.)

**\*9** The County paid Armor $49.7 million from June 1, 2011 through December 31, 2015. (Comptroller Report at i.) In March of 2016, the County issued a new RFP for medical services at the NCCC. (*Id.*)

**LEGAL STANDARD**

Summary judgment is appropriate only if the parties' submissions, including deposition transcripts, affidavits, or other documentation, show that there is "no genuine dispute as to any material fact," and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). The movant has the burden of showing the absence of any genuine dispute as to a material fact. *McLee v. Chrysler Corp.,* 109 F.3d 130, 134 (2d Cir. 1997) (citation omitted). A fact is "material" when it "might affect the outcome of the suit under the governing law," and an issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Barlow v. Male Geneva Police Officer Who Arrested Me on Jan. 2005,* 434 F. App'x 22, 25 (2d Cir. 2011) (internal citations omitted). Once the moving party has met its burden, the party opposing summary judgment must identify specific facts and affirmative evidence that contradict those offered by the moving party to demonstrate that there is a genuine issue for trial. *Ethelberth v. Choice Sec. Co.,* 91 F. Supp. 3d 339, 349 (E.D.N.Y. 2015) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986)).

**DISCUSSION**

**I. The Plaintiffs' Section 1983 Claim**

To prevail on a Section 1983 claim, a plaintiff must establish that a person acting under color of state law deprived him of a federal right. *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir. 1999) (citing 42 U.S.C. § 1983). A municipality is subject to liability for damages under Section 1983 for the unconstitutional acts of its employees "where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers." *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690 (1978).

The essence of the plaintiffs' claims is that Mr. Gleeson died as a result of deliberate indifference on the part of medical staff and prison officials at the NCCC, and that the defendants are liable for Mr. Gleeson's death because they had a policy or custom of delivering inadequate healthcare to NCCC inmates, which caused Mr. Gleeson's death. In seeking summary judgment, the defendants argue that the NCCC medical staff and prison officials were not deliberately indifferent to Mr. Gleeson's health. They say that they cannot be held liable even if Mr. Gleeson's death resulted from

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 42 of 120

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

deliberate indifference because there was no policy or custom to provide inadequate healthcare.

### a. *Deliberate Indifference*

"To establish a constitutional claim arising out of inadequate medical care, an inmate must prove that prison or jail officials were deliberately indifferent to his serious medical needs." *Gomez v. County of Westchester*, 649 Fed. Appx. 93, 95 (2d Cir. 2016) (citing *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003)). A pretrial detainee's claims of inadequate medical care are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment. *See generally Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citation omitted); *Iancovangelo v. Correctional Medical Care, Inc.*, 624 Fed. Appx. 10, 12 (2d Cir. 2015) (citation omitted).

 **\*10** Under the Fourteenth Amendment, a plaintiff's claim for deliberate indifference to a serious medical need is analyzed under a two-part test. "First, the alleged deprivation of adequate medical care must be 'sufficiently serious.' " *Grimmet v. Corizon Med. Asssocs. of N.Y.*, No. 15-CV-7351, 2017 WL 2274485, at \*3 (S.D.N.Y. May 24, 2017) (quoting *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013)). "Second, the defendant must have acted with deliberate indifference, or a 'sufficiently culpable state of mind.' " *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

### i. Sufficiently Serious Deprivation

I first decide whether the Mr. Gleeson experienced a medical deprivation that was "sufficiently serious." There must be an actual "deprivation of adequate medical care," that is, a failure by prison officials "to take reasonable measures" in response to a medical condition. *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 844-47 (1994)). Second, the deprivation must be "sufficiently serious." *Id.* at 280. Because "the objective component of an Eighth Amendment [or Fourteenth Amendment] claim is necessarily contextual and fact specific, the serious medical need inquiry must be tailored to the specific circumstances of each case." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (internal quotation marks and citation omitted). If the unreasonable medical care "is a failure to provide any treatment for an inmate's medical condition,

courts examine whether the underlying medical condition is sufficiently serious," *Salahuddin*, 463 F.3d at 280, such as the existence of "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Arriaga v. Gage*, No. 16-CV-1628, 2018 WL 1750320, at \*6 (S.D.N.Y. Apr. 6, 2018) (quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (citation omitted)). If a plaintiff alleges that the prison provided inadequate care—rather than a failure to provide any treatment—the inquiry focuses on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract[.]" *Smith*, 316 F.3d at 185 (citing *Chance v. Armstrong*, 143 F.3d 398, 702-03 (2d Cir. 1998)).

The defendants do not dispute that Mr. Gleeson suffered from a serious illness—hereditary angioedema—which causes recurrent attacks of severe swelling in the extremities, gastrointestinal tract, face, and airways. The disorder can be fatal when left untreated, particularly if the swelling has spread to the patient's neck and airway. Although the record does not show that Mr. Gleeson alerted the medical staff that he had hereditary angioedema, he made frequent complaints of his symptoms—including recurrent swelling and shortness of breath—to the medical staff. In four visits to the medical unit, Mr. Gleeson's symptoms of hereditary angioedema were progressively more serious, but the staff gave him the same treatment—a steroid and an antihistamine. Moreover, although the records reflect that medical personnel thought he should see a rheumatologist, Mr. Gleeson never saw a rheumatologist or any specialist. The New York State Commission of Corrections concluded that this treatment was plainly inadequate, criticizing Armor for continuing Mr. Gleeson on an "ineffective course of treatment including antihistamines and steroids" when "a referral to a specialist (Rheumatologist) should have been of highest priority." (NYSCOC Final Report, ¶ 13.)

 **\*11** In my view, the plaintiffs have raised a triable issue of material fact about whether medical officials at the NCCC responded adequately to Mr. Gleeson's serious medical needs. *See Johnson v. Wright*, 234 F. Supp. 2d 352, 360 (S.D.N.Y. 2002) ("The fact that a plaintiff received regular medical care does not preclude a finding of deliberate indifference where the course of treatment was largely ineffective and the defendant declined to do anything more to attempt to improve the plaintiff's situation.") (quotation marks and citations omitted).

Case 3:25-cv-00673-AMN-ML   Document 5   Filed 09/24/25   Page 43 of 120

**Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)**

ii. Sufficiently Culpable State of Mind

The second element of a Fourteenth Amendment claim for inadequate medical care is that the defendant acted with "deliberate indifference" to the inmate's medical care. *Salahuddin,* 467 F.3d at 280 (citation omitted). In *Darnell v. Pineiro,* 849 F.3d 17, 32-36 (2d Cir. 2017), the Second Circuit held that a pretrial detainee need not demonstrate subjective awareness on the part of the official in a condition-of-confinement case. Since *Darnell,* district courts in this circuit have held that a pretrial detainee in a medical inadequacy case may establish deliberate indifference objectively. [18] *See Richardson v. Correctional Medical Care, Inc.,* No. 17-CV-0420, 2018 WL 1580316, at *4 (N.D.N.Y. Mar. 28, 2018) (collecting cases); *Lloyd v. City of New York,* 246 F. Supp. 3d 704, 718-19 (S.D.N.Y. Mar. 31, 2017) ("After *Darnell,* deliberate indifference is now defined objectively ... rather than ask whether the charged official knew of and disregarded an excessive risk to inmate health or safety, courts are to instead determine whether the official knew, or should have known that his or her conduct posed an excessive risk to health or safety.") (quotation marks and citation omitted). A pretrial detainee suing for deliberate indifference under the Fourteenth Amendment, is "required to show only that the prison official acted with objective recklessness, or that the defendant 'knew or should have known' that 'an excessive risk to health or safety' would result." *Grimmet,* 2017 WL 2274485, at *4 (quoting *Darnell,* 849, F.3d at 35). "As before, however, more than negligence is required to hold a defendant liable for violating" the Fourteenth Amendment. *Id.*

The plaintiffs have raised a triable issue of material fact about whether the medical officials knew or should have known about Mr. Gleeson's angioedema and the risks it posed to his health. Although Mr. Gleeson did not disclose that he had angioedema during his initial health assessment, doctors suspected almost immediately that angioedema was responsible for his swelling episodes. In fact, a physician's assistant noted angioedema as a possible diagnosis after Mr. Gleeson's first interaction with the medical staff. (Armor Medical Records at 61.) After his second visit to the medical unit, Dr. Sanchez ordered blood tests to measure Mr. Gleeson's levels of the C1 esterase inhibitor, a protein responsible for hereditary angioedema. (*Id.* at 27-28.) On the day of his death, Mr. Gleeson reported to the medical unit twice with neck swelling and redness in his throat; doctors again noted the possibility of hereditary angioedema, but sent him back to his cell with the same ineffective treatment

of steroids and antihistamines. (*Id.* at 23.) According to the progress note from that day, Mr. Gleeson had a past medical history of "asthma, hives, angioedema, and HTN." (*Id.* at 24.) Given their suspicions of hereditary angioedema, the doctors knew, or should have known, that Mr. Gleeson's symptoms were indicative of a potentially fatal condition. A reasonable jury could find that their failure to act amounted to deliberate indifference.

b. *Parties Responsible for the Deliberate Indifference*

**\*12**  The "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citations omitted). However, a municipal government, or a private entity acting under color of state law, *Bektic-Marrero v. Goldberg,* 850 F. Supp. 2d 418, 432 (S.D.N.Y. 2012), can be liable for the unconstitutional acts of its employees if the plaintiff can prove the existence of a municipal policy or custom that caused the constitutional violation. *Monell,* 436 U.S. at 690-91.

The only individuals named by the plaintiffs are "John Does 1-10"—corrections officers at the NCCC (ECF No. 1 ¶ 52), "John and Jane Does 11-20"—physicians, nurses, physician's assistants, and nurse practitioners employed by Armor (*Id.* ¶ 53), and Sheriff Michael J. Sposato. The plaintiffs assert *Monell* liability against the County of Nassau, the NCCC, the Nassau County Sheriff's Department, Armor Correctional Health Services, Inc., and Armor Correctional Health Services of New York.

The Armor defendants argue that the plaintiffs cannot sustain a Section 1983 action against "John Doe" and "Jane Doe" defendants at this point in the case. The County defendants argue that the claims against Sheriff Sposato should be dismissed because the complaint does not include sufficient allegations about his personal involvement in the constitutional violation. The County defendants also argue that the Court should dismiss claims against the NCCC and the Sheriff's Department because both are non-suable, administrative arms of the County of Nassau. Finally, all defendants argue that they cannot be held liable for Mr. Gleeson's death because the plaintiffs have not demonstrated the existence of a policy or practice that caused the constitutional violation.

i. <u>John Doe and Jane Doe Defendants</u>

The defendants move for summary judgment as to the Section 1983 claims against the John Doe and Jane Doe defendants because they have not been identified, and any effort to name them now as defendants would be time-barred. The plaintiffs respond that the identities of the specific employees who personally inflicted the constitutional injuries are "irrelevant" because the entity defendants are responsible pursuant to *Monell*. (ECF No. 73 at 4.) In other words, the plaintiffs do not intend to press their claims against the individual doctors, nurses, corrections officers, and other staff at the NCCC responsible for Mr. Gleeson's constitutional injuries.

On January 17, 2017, Magistrate Judge Arlene R. Lindsay set a February 23, 2017 deadline for any request to join additional parties or amend the pleadings. Nevertheless, even though they learned the identities of relevant county and Armor employees through document discovery, (*see, e.g.*, Armor Medical Records), the plaintiffs have not sought to amend the complaint to name the "John Doe" corrections officers or the "John and Jane Doe" employees of Armor.

The applicable statute of limitations period in New York is three years for a Section 1983 action, *Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015) (citation omitted), and the statute of limitations begins to run once the plaintiff knows of the injury on which its claim is based. *See Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994). The plaintiffs learned of Mr. Gleeson's death on July 14, 2014. Because substituting a named party for a John Doe defendant does not "relate back" to the complaint under Rule 15(c)(3), *Sepulveda v. City of New York*, No. 01-CV-3117, 2003 WL 22052870, at *2 (S.D.N.Y. Sept. 2, 2003), the plaintiffs' Section 1983 claims against the "John Doe" and "Jane Doe" defendants are dismissed as time-barred. *See, e.g.*, *Vineyard v. County of Nassau*, 329 F. Supp. 2d 364, 369-60 (E.D.N.Y. 2004); *Cantave v. New York City Police Officers*, No. 09-CV-2226, 2011 WL 1239895, at *8 (E.D.N.Y. Mar 28, 2011).

ii. <u>Sheriff Michael J. Sposato</u>

**\*13** The defendants argue that the plaintiffs cannot sue Sheriff Sposato in his individual capacity because the complaint includes no allegations that Sheriff Sposato was personally involved in the constitutional deprivation. The plaintiffs respond that the record reveals numerous examples of Sheriff Sposato's personal involvement in failing to supervise Armor's performance. The question for the Court is whether the plaintiffs have raised a triable issue of fact about Sheriff Sposato's personal involvement in the constitutional violations.

A supervisory official will not be found liable under Section 1983 simply by virtue of his "high position of authority." *Villafane v. Sposato*, No. 16-CV-3674, 2017 WL 4179855, at *12, (S.D.N.Y. Aug. 22, 2017) (quoting *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065 (2d Cir. 1989)), *report and recommendation adopted*, 2017 WL 4157220 (E.D.N.Y. Sept. 15, 2017). Rather, a plaintiff in a Section 1983 action must show that the supervisor was personally involved in a constitutional violation by either: (1) directly participating in the violation; (2) failing to remedy the wrong after it comes to his attention; (3) creating a policy or custom under which unconstitutional practices occur, or allowing the continuation of such custom and policy; (4) being grossly negligent in supervising subordinates who committed the wrongful acts; or (5) failing to act on information indicating that unconstitutional acts are occurring. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). [19]

While there is no evidence that Sheriff Sposato participated directly in the violation (factor one), or was alerted to Mr. Gleeson's ongoing mistreatment and failed to intervene (factor two), there are issues of fact precluding summary judgment as to Sheriff Sposato's personal involvement under the third, fourth, and fifth factors. Indeed, as Sheriff, he was entrusted with supervisory responsibility for Armor. For example, the four final reports from the NYSCOC in the record are addressed to Sheriff Sposato, and each faults Armor for egregiously inadequate care. Sheriff Sposato received one report, before Mr. Gleeson's death, in which the Commission found that Armor "was grossly incompetent," and recommended that the Nassau County Executive "conduct an inquiry into the fitness of Armor ... as a correctional medical care provider." (ECF No. 71-31, at 9.) Furthermore, the Sheriff's Department—headed by Sheriff Sposato—did not appoint a doctor to be the Health Contract Administrator from 2011 to 2016, and the nurse who held the position left in 2013; the Sheriff's Department left the position completely vacant until 2016, when it appointed an interim HCA and published job postings for a permanent position. Finally, the contract required that Sheriff Sposato receive written reports from the Quality Improvement Committee. The Attorney General's investigation found that these reports

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 45 of 120

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

failed to include data on approximately half of the twenty-four indicators required by the contract.

A reasonable jury could find that Sheriff Sposato should have known about the risk of constitutional violations because he received the report questioning Armor's fitness as a medical care provider.[20] *Villafane*, 2017 WL 4179855, at * 14 (to establish personal involvement under the fourth factor, "a plaintiff must demonstrate that the defendant knew or should have known that there was a high degree of risk that his subordinates would behave inappropriately ... but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk ...") A reasonable jury could also find that, in the aftermath of the NYSCOC report, Sheriff Sposato's failure to designate a Health Contract Administrator, or otherwise monitor or discipline Armor medical personnel through the tools available to him from the contract, allowed Armor's practice of inadequate medical care to continue unabated. Accordingly, the motion for summary judgment as to Sheriff Sposato in his personal capacity is denied.[21]

### iii. NCCC and NCSD

**\*14**  It is well established that neither the Nassau County Correction Center nor the Nassau County Sheriff's Department are suable entities. *See Joseph v. Nassau Cty. Corr. Ctr.*, No. 12-CV-4414, 2013 WL 1702162, at *3 (E.D.N.Y. Apr. 19, 2013) (collecting cases). Rather, they are administrative arms of Nassau County without a separate legal identity from the County. *Campbell v. Sposato*, 15-CV-1958, 2015 WL 9267222, at *5 (E.D.N.Y. Nov. 17, 2015) (interpreting the Nassau County Charter), *report and recommendation adopted*, 2015 WL 9273951 (E.D.N.Y. Dec. 16, 2015). Accordingly, I grant summary judgment in favor of the NCCC and NCSD, and dismiss them from this action.

### iv. Armor

As noted above, a prerequisite to recovery under Section 1983 "is that the alleged constitutional violation be committed by one acting under color of law." *Bektic-Marrero*, 850 F. Supp. 2d at 426 (citing *West v. Atkins*, 487 U.S. 42, 48-50 (1988)). "[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter

how discriminatory or wrongful." *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (citations and internal quotation marks omitted).

The parties agree that the Armor defendants "are considered to be state officials ... [d]espite being privately owned and operated entities[.]" (ECF No. 60-5, Armor Defs.' Br. at 9); *see also Ryan v. County of Nassau*, No. 12-CV-5343, 2016 WL 11500151, at *7 (E.D.N.Y. Mar. 31, 2016) ("Since Armor was hired to fulfill the state's constitutional obligation to provide necessary medical care for its inmates, the Court finds that it was a state actor that can be sued pursuant to Section 1983.") (citations and internal quotation marks omitted). "Although the Supreme Court's interpretation of § 1983 in *Monell* applied to municipal government and not to private entities acting under color of state law, case law has extended the *Monell* doctrine to private § 1983 defendants acting under color of state law." *Dilworth v. Goldberg*, No. 10-CV-2224, 2011 WL 3501869, at *24 (S.D.N.Y. July 28, 2011), *report and recommendation adopted*, 2011 WL 4526555 (S.D.N.Y. Sept. 30, 2011). Therefore, a private entity acting under color of state law will be liable for the constitutional violations of its employees if they resulted from the entity's policies or customs. *Id.*

A plaintiff may satisfy the "policy or custom" requirement by establishing "(1) a formal policy; (2) action taken or decisions made by policymakers that caused the violation; (3) a practice so persistent and widespread that it constitutes a 'custom or usage;' or (4) a failure to properly train or supervise [entity] employees." *Byvalets v. New York City Hous. Auth.*, No. 16-CV-6785, 2017 WL 7793638, at *14 (E.D.N.Y. July 28, 2017), *report and recommendation adopted*, 2018 WL 1067732 (E.D.N.Y. Feb. 23, 2018) (citing *White v. City of N.Y.*, 206 F. Supp. 3d 920, 937 (S.D.N.Y. 2016) (citation omitted)). The plaintiffs posit the existence of both a formal policy and informal practices at Armor.

For the formal policy, the plaintiffs point to Armor's requirement that an inmate could see a specialist or visit a hospital only after an official in Armor's Florida corporate offices approved the referral, in writing, and within thirty days of the request. According to the plaintiffs, Mr. Gleeson died while those necessary referrals were pending approval. (ECF No. 73, Pls.' Opp. Br. at 11) ("[Dr. Sanchez] made the request on two separate occasions for the decedent's referral to a rheumatologist, both well-before John Gleeson's death. The referral never happened."). Under the plaintiffs' theory,

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 46 of 120

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

Armor's referral policy prevented Mr. Gleeson from receiving adequate medical care and resulted in his death.

**\*15** It is undisputed that Armor followed a protocol that required clinicians at the NCCC to submit referral requests to Armor directors in Florida. The record also shows that Armor clinicians noted in medical records that Mr. Gleeson should see a rheumatologist for his recurrent swelling. Mr. Gleeson himself believed that he was "on the list to see a different doctor.... a rheumatologist." (ECF No. 57-12, 4:36-5:06.) It is not clear from the medical records whether doctors or PAs made a specific referral for Mr. Gleeson to see a rheumatologist; that is due in large part to the fact that the records are illegible. Certainly, there are multiple references to both hereditary angioedema and rheumatologists in the medical records. Drawing all reasonable inferences in favor of the plaintiffs, I find that there is a triable issue of fact as to whether Armor's referral request policy prevented Mr. Gleeson from seeing a rheumatologist, and caused his death.[22] Furthermore, a reasonable jury could find that Armor's woefully deficient record-keeping and its failure to install an electronic medical records system contributed to Armor's failure to ensure that the rheumatologist referral actually took place.[23]

The plaintiffs also argue that Armor had informal practices and customs that caused Mr. Gleeson's inadequate medical treatment. To prove the third *Monell* kind of liability—custom or usage—the plaintiff must establish a longstanding practice or custom which constitutes standard operating procedure. *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737 (1989). The policy must be "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Byvalets*, 2017 WL 7793638, at \*16 (quoting *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992)). In other words, the relevant practice must be "so widespread as to have the force of law." *Board of County Comm'rs. v. Brown*, 520 U.S. 397, 404 (1997) (citations omitted).

The thrust of the plaintiffs' argument is that the Armor defendants had a widespread and well-settled custom of providing inadequate medical care to prison inmates. Judges have defined "widespread" to mean that the unconstitutional acts in question are "common or prevalent throughout the [entity]" and "well-settled" to mean that the unconstitutional acts "have achieved permanent, or close to permanent, status." *Fowler v. City of New York*, No. 13-CV-2372, 2019 WL 1368994, at \*14 (E.D.N.Y. Mar. 26, 2019) (quoting *Davis v. City of New York*, 228 F. Supp. 2d 327, 346

(S.D.N.Y. 2002)). "There is no 'magic number' of instances of unconstitutional conduct that will suffice to permit the inference of a broader [entity] policy of custom." *Id.* (citations and internal quotations omitted).

The Comptroller report, AAG affirmation, and NYSCOC reports about the treatment of inmates Kevin Brown (ECF No. 71-30), Roy Nordstrom (ECF No. 71-31), and Antonio Marinaccio (ECF No. 71-32) detail Armor's "egregious lapses in medical care" and its "pattern" of inadequate care. Accordingly, the plaintiffs have raised a genuine issue of material fact as to whether the Armor defendants have a widespread and well-settled custom of providing inadequate medical care to prison inmates *See Pipitone v. City of New York*, 57 F. Supp. 3d 173, 191 (E.D.N.Y. 2014) ("[T]he Mollen Report provides powerful evidence that there was a custom and practice within the police department of tolerating corruption to avoid bad publicity. It characterizes this custom as persistent, widespread, and emanating from top commanders, including the police commissioner. The Mollen Report thus provides evidence that is sufficient to allow a jury to conclude that the supervisory and disciplinary failures described therein constituted a municipal policy for *Monell* purposes and that the City's handling of the Eppolito matter was reflective of that policy.") (citations omitted).

**\*16** The cases in which other courts in this Circuit rejected the findings of a government report as evidence of a policy or practice involved events that were too far removed from the plaintiffs' case to be probative of a then-existing policy or practice. *See, e.g. Moses*, 2017 WL 4386362, at \*12 (DOJ report analyzing excessive force incidents from 2006 to 2007 is "too disconnected in time and personnel to plausible allege a policy, practice, or custom extant in 2000 so as to affect [the plaintiff]."); *Rodriguez v. City of Westchester*, No. 15-CV-9626, 2017 WL 118027, at \*7 (S.D.N.Y. Jan. 11, 2017) (DOJ report written more than six years before the events in question occurred, and involving different third-party contractors, was "too stale, and too disconnected in personnel, to plausibly allege a policy, practice, or custom extant in 2014 so as to affect [the plaintiff]."); *Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at \*15 (S.D.N.Y. Mar. 29, 2016) (DOJ letter was too remote in time because it was written more than four years before the events in question and involved a different third-party contractor).

This case is different. The Comptroller's report and the AAG's affirmation detail the same kinds of inadequate medical care,

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 47 of 120

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

the same party (Armor), and the same time frame (2011 to 2014), as the events alleged by the plaintiffs. In fact, the AAG affirmation cited Mr. Gleeson's death as emblematic of a subset of Armor's inadequate medical care. Accordingly, the reports are sufficient to create a jury question regarding whether Armor had a custom of providing inadequate medical care that resulted in Mr. Gleeson's death.

### v. Nassau County

The County argues as a threshold matter that it cannot be held liable for any inadequate medical care on the part of the Armor medical staff because the Armor medical team "made all the treatment decisions" as the "exclusive medical provider of the NCCC." (ECF No. 80 at 2.) Municipalities cannot shield themselves from liability by delegating inmate medical care to third-party, private entities. *See Gil v. Vogilano*, 131 F. Supp. 2d 486, 493 (S.D.N.Y. 2001) ("[A] municipality's duty to provide medical care to inmates is non-delegable and is not absolved by contracting with a third party to provide care.") (citations omitted). However, that does not mean that the County is automatically liable for Armor's inadequate medical care. Only a few courts in this district have held that *respondeat superior* is a viable theory of liability in cases involving the failure to provide adequate medical care. *See e.g. Covington v. Westchester County Jail*, No. 96-CV-7551, 1998 WL 26190, at *2-3 (S.D.N.Y. Jan. 26,1998); *McNeil v. Correctional Medical Care, Inc.*, No. 18-CV-0894, 2019 WL 4415528, at *10 (N.D.N.Y. Sept. 16, 2019). These courts follow *Ancata v. Prison Health Servs. Inc.*, 769 F.2d 700 (11th Cir. 1985), a decision that has not been adopted in this Circuit. I will follow the majority view that there is no *respondeat superior* liability for municipalities under Section 1983—including for inadequate medical care cases involving private vendors—and that the plaintiffs must identify a "policy" or "custom" to impose liability on a municipality.

Accordingly, as with the Armor defendants, the plaintiffs must identify a "policy" or "custom" that caused Mr. Gleeson's injury in order to impose liability on Nassau County. The plaintiffs are entitled to establish a "policy" or "custom" through one of the four methods set forth above. Here, the plaintiffs argue that the County failed to supervise Armor. [24]

**\*17** A failure to supervise "may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact."

*Wray v. City of New York*, 490 F.3d 189, 195-96 (2d Cir. 2007) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). To prevail on this theory, the plaintiffs must demonstrate that "the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 126 (2004) (citation omitted). "Thus, where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence 'may be properly thought of as a city policy or custom that is actionable under § 1983." *Id.* (quoting *City of Canton*, 489 U.S. at 388).

To prove such deliberate indifference, "the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious ... An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (internal citation omitted).

The plaintiffs argue that the County's failure to address the "rash of inmate deaths at the NCCC since 2011" evinces deliberate indifference. (ECF No. 70 at 26.) The plaintiffs point to the NYSCOC reports, which were addressed to Sheriff Sposato and the Presiding Officer of the Nassau County Legislature, as evidence of policymakers' notice of recurring constitutional violations. The County responds that they were not on notice of Armor's inadequate treatment because the Comptroller's report and the AAG's affirmation were issued at least two years after Mr. Gleeson's death. This defense is not persuasive. The plaintiffs do not argue that those reports put the County on notice of a pattern of inadequate health care at the NCCC. Rather, they argue that the NYSCOC reports provided the requisite notice, and that the Comptroller's report and the AAG's affirmation confirm the existence of repeated past issues involving Armor that the County knew of and ignored.

The record includes one report issued before Mr. Gleeson's death—*In the Matter of the Death of Roy Nordstrom* (ECF No. 71-31)—that faults Armor for an egregious lapse in medical care. The report is addressed to Sheriff Sposato and copied to Edward P. Mangano, who was then the Nassau County

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 48 of 120

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

Executive. The Medical Review Board concluded that Armor provided "grossly incompetent" care that contributed to the Mr. Nordstrom's death from acute myocardial infarction. The Board issued the following directive to the Nassau County Executive:

> The Office of the Nassau County Executive shall conduct an inquiry into the fitness of Armor Correctional Health Services, Inc. as a correctional medical care provider in the Nassau County Correctional Center. Specific attention shall be directed to Armor's flagrant disregard of New York State Education Law, of the Rules of the Board of Regents, and of New York State nursing practice regulations, to wit, staffing unsupervised Licensed Practical Nurses at the Correctional Center who engaged in nursing practice beyond the scope of their licensure and in unlawful medical practice, who failed to consult with and refer to a physician in a medical emergency, and who failed to hospitalize a critically ill patient.

(ECF No. 71-31, at 9.)

A reasonable jury could find that the report about Mr. Nordstrom alerted Nassau County, through its policymakers Sheriff Sposato and Nassau County Executive Mangano, to a potentially serious problem of unconstitutional conduct, such that the need for supervision was "obvious." [25] *See also Cash v. County of Erie*, 654 F.3d 324 (2d Cir. 2011) (based on a single prior incident of sexual contact between a prisoner and prison guards, a jury could reasonably conclude that the municipality was on notice that its policies in that area were inadequate); *Carter v. Broome County*, No. 16-CV-422, 2019 WL 3938088, at *9 (N.D.N.Y. Aug. 21, 2019) ("[S]ummary judgment on a plaintiff's *Monell* claim is inappropriate if a fact-finder could find systemic and gross deficiencies in staffing, facilities, equipment, or procedures in a detention center's medical care system *and* that a policy-making official knows about them and fails to correct them.") (citation and quotation marks omitted). Rather than address the obvious need for closer supervision, the County scaled back its

oversight. For example, the County left the Health Contractor Administrator position vacant beginning in August 2013, and assessed no penalties on Armor for contract violations, including Armor's failure to achieve NCCHC accreditation. The Comptroller found that the County "failed to provide adequate oversight to ensure that Armor was in compliance with its contract with the County." (Comptroller Report at ii.) The plaintiffs have raised a genuine issue of material fact as to whether these failures to supervise Armor amount to deliberate indifference to the rights of inmates at the NCCC.

## II. The Plaintiffs' State Law Claims

### a. *Wrongful Death*

 **\*18**  The Armor defendants' motion for summary judgment on the plaintiffs' wrongful death claim is denied. As discussed above, there are genuine issues of material fact as to whether the Armor medical staff acted with "deliberate indifference," which is a standard akin to objective recklessness. *Grimmet*, 2017 WL 2274485, at *4 (quoting *Darnell*, 849 F.3d at 35). Further, under New York law, "an employer will be vicariously liable for the acts of his employee when these acts are within the general scope of his employment, while engaged in the master's business, and with a view to the furtherance of that business and the master's interest." *Medley v. City of New York*, No. 94-CV-3708, 1998 WL 938731, at *3 (E.D.N.Y. Dec. 3, 1998) (citation omitted). Accordingly, summary judgment cannot be entered in favor of the Armor defendants because there are triable issues of fact as to whether the Armor employees acted negligently, and in the scope of their employment, in causing Mr. Gleeson's death. *See Chong v. N.Y.C. Transit Auth.*, 83 A.D.2d 546, 547 (N.Y. App. Div. 1981) (elements of wrongful death claim include: (1) death of a human being, (2) negligence of a defendant causing death, (3) survival of distributees suffering pecuniary loss because of the death, and (4) appointment of a personal representative of the decedent).

The County defendants' motion for summary judgment on the plaintiffs' wrongful death claim is also denied. Under New York law, an entity or hospital may be vicariously liable for the negligence of independent contractors in certain circumstances based on a theory of "agency or control in fact, or apparent or ostensible agency." *See Garofolo v. State*, 135 A.D.3d 1108, 1109 (N.Y. App. Div. 2016) (citations omitted). The "ostensible agency" theory imposes vicarious liability on an entity defendant for the negligence of an independent

**Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)**

Case 3:25-cv-00673-AMN-ML Document 5 Filed 09/24/25 Page 49 of 120

contractor doctor "when an inmate has reasonably relied upon the appearance of the doctor's authority created by the words or conduct of [the entity]." *Id.* The availability of the theory depends on "whether the plaintiff could have reasonably believed, based upon all of the surrounding circumstances, that the treating physician was provided by the defendant or was otherwise acting on the defendant's behalf." *Id.* at 1110 (alteration omitted) (quoting *Soltis v. State of New York*, 172 A.D.2d 919, 920 (N.Y. App. Div. 1991)).

Here, the Armor medical staff treated Mr. Gleeson in the prison facility on multiple occasions. A reasonable jury could find that Mr. Gleeson could have reasonably believed that the County employed the Armor medical staff. *Compare Soltis,* 172 A.D.2d at 920 (the fact that the plaintiff was treated at the state facility, with the assistance of state officials, precluded summary judgment as to the state's vicarious liability for the negligence of the independent contractor), *with Garofolo,* 135 A.D.3d at 1110 (the plaintiff could not reasonably believe that the doctors were employed by the prison because the plaintiff's treatments "took place outside of the prison without the involvement of any prison employees.") Accordingly, summary judgment is denied.

#### b. *Intentional Infliction of Emotional Distress*

Intentional infliction of emotional distress has four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Greenaway v. Cty. of Nassau*, 97 F. Supp. 3d 225, 239-40 (E.D.N.Y. 2015) (quoting *Howell v. N.Y. Post Co., Inc.*, 81 N.Y.2d 115 (1993)). The "extreme and outrageous conduct" must "go beyond all possible bounds of decency" and be "atrocious, and utterly intolerable in a civilized community." *Greenaway,* 97 F. Supp. 3d at 239-40 (citations omitted). The tort "may be invoked only as a last resort, to provide relief in those circumstances where traditional theories of recovery do not." *Salmon v. Blesser,* 802 F.3d 249, 256 (2d Cir. 2015) (internal citation and quotation marks omitted).

Even drawing all inferences in the plaintiffs' favor, the record does not sustain an intentional infliction of emotional distress claim. There is no evidence about the mindset of the defendants or their employees, in part because the plaintiffs did not depose them. Furthermore, no reasonable juror would find that the evidence on this record establishes

conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *See Chanko v. Am. Broad. Cos. Inc.*, 27 N.Y.3d 46, 56 (2016). As discussed above, there is a triable issue of fact as to whether the defendants acted with deliberate indifference or negligently. These traditional claims may provide relief at trial; accordingly, the plaintiffs' claim for intentional infliction of emotional distress is dismissed. [26]

### III. Damages

**\*19** The Armor defendants make three damages-related arguments in their motion for summary judgment. First, they claim that the plaintiffs cannot sustain a claim for attorneys' fees under 42 U.S.C. § 1988 because the plaintiffs "cannot be a prevailing party on any of the civil rights claims set forth in this litigation." (ECF No. 60-5, at 15.) As discussed above, the plaintiffs' civil rights claims will be tried before a jury. Accordingly, dismissing the plaintiffs' request for attorneys' fees is premature.

Second, the defendants claim that the plaintiffs cannot recover pecuniary losses beyond funeral expenses in connection with their wrongful death claims. Damages in a wrongful death action are limited to compensation for "pecuniary loss," which is defined as "the economic value of the decedent to each distributee at the time decedent died," and includes "loss of income and financial support, loss of household services, loss of parental guidance, as well as funeral expenses and medical expenses incidental to death." *Milczarski v. Walaszek*, 108 A.D.3d 1190 (App. Div. 2013) (internal citations omitted). "To recover on their wrongful death claims, plaintiffs must present an evidentiary basis for a reasonable expectation of pecuniary loss from decedent's death." *Datskow v. Teledyne Continental Motors Aircraft Products*, 807 F. Supp. 941, 945 (W.D.N.Y. 1992) (quoting *Public Administrator of Kings County v. U.S. Fleet Leasing of New York, Inc.*, 159 A.D.2d 331, 332 (N.Y. 1990)). Generally, "because it is difficult to provide direct evidence of wrongful death damages, the calculation of pecuniary loss is a matter resting squarely within the province of the jury." *Milczarski,* 108 A.D.3d at 1190 (quoting *Parilis v. Feinstein*, 49 N.Y.2d 984, 985 (1980)).

The plaintiffs have raised an issue of triable fact as to whether the plaintiffs have a reasonable expectation of pecuniary loss from Mr. Gleeson's death that exceed funeral expenses. First, the plaintiffs established that Mr. Gleeson provided household services to his parents, ex-wife, and children. (*See,*

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 50 of 120

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

*e.g.*, M.G. Dep. 21:8-13; ECF No. 61-5, 326:6-12.) Second, the plaintiffs established that Mr. Gleeson provided financial support to his children pursuant to a divorce judgment, although he was in arrears at the time of his death, as well as contributions for vacations, holiday gifts, back to school clothing, sports equipment, and sports team fees. (ECF No. 61-5, 317:3-319:19.) Finally, the plaintiffs established that Mr. Gleeson had a relationship with his children. (M.G. Dep. 298:11-20.) In light of these facts, I will not find as a matter of law that the plaintiffs have suffered no pecuniary losses apart from funeral expenses. *See, e.g. Ryan*, 2016 WL 11500151, at *8 ("Although the record concerning potential pecuniary loss is quite limited, the Court cannot find as a matter of law that Plaintiff suffered no pecuniary injury beyond the recovery of Ryan's funeral expenses.")

Third, the Armor defendants claim that they cannot be sued for punitive damages. Courts have held that entities acting under color of state law "are not afforded the same immunities from liability as are available to the municipality." *Phelan ex rel. Phelan v. Torres*, No. 04-CV-3538, 2005 WL 4655382, at *16 (E.D.N.Y. Sept. 20, 2005)[27] (non-for-profit corporation under contract with a municipality cannot be shielded from punitive damages). Punitive damages may be awarded only when the plaintiff has demonstrated that the defendants' conduct was "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56

(1983). Nevertheless, "[g]enerally, the issue of whether to award punitive damages is an issue for the jury to decide based on an evaluation of plaintiff's proof of 'sufficiently serious misconduct.' " *Phelan*, 2005 WL 4655382, at *15 (citation omitted). Accordingly, the Armor defendants can be sued for punitive damages, and their motion for summary judgment on the issue of punitive damages is dismissed.

## CONCLUSION

**\*20** The Court grants summary judgment for Defendants "John Does 1-10," "John and Jane Does 11-20," the Nassau County Correctional Center, the Nassau County Sheriff's Department, and Michael J. Sposato in his official capacity as Sheriff of Nassau County, and dismisses them from the case. The defendants' motion for summary judgment on the intentional infliction of emotional distress claim is also granted as to all remaining defendants. The Court denies summary judgment to Sheriff Sposato in his individual capacity, Nassau County, and Armor on all remaining claims.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4754326

---

## Footnotes

1    In deciding whether summary judgment is appropriate, the Court resolves all ambiguities and draws all reasonable inferences in favor of the non-moving party, in this case, the plaintiffs. *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); *Salomon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 (2d Cir. 2008).

2    On a motion for summary judgment, the Court's consideration is limited to factual material that would be admissible in evidence at trial. *Local Unions 20 v. United Brotherhood of Carpenters and Joiners of America*, 223 F. Supp. 2d 491, 496 (S.D.N.Y. 2002). Factual allegations that are disputed without a citation to admissible evidence are deemed admitted, as long as they are also supported by the record. Local Civ. R. 56.1; *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003). Factual allegations that are not disputed are deemed admitted, as long as they are also supported by the record. *Id.* I will disregard any arguments in the Rule 56.1 statements. *Pape v. Dircksen & Talleyrand Inc.*, No. 16-CV-5377, 2019 WL 1435882, at *2 (E.D.N.Y. Feb. 1, 2019), *report and recommendation adopted*, 2019 WL 1441125 (E.D.N.Y. Mar. 31, 2019).

The parties' 56.1 submissions are not helpful in determining whether there are material disputes of fact. By way of example only, the parties spend far more time disputing the procedural history of this litigation than in

**Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)**

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 51 of 120

developing the chronology of Mr. Gleeson's treatment and death at the NCCC. Nevertheless, I have reviewed the entire record, including Mr. Gleeson's medical records, to determine the extent to which there are factual disputes.

3    The Armor defendants are foreign corporations authorized to conduct business in the state of New York. (ECF No. 72), Pls.' Counter-Statement in Response to Armor defendants ("Pls.' 56.1 (Armor)" ¶ 50)

4    The Nassau University Medical Center provided medical care to inmates at the NCCC before Armor. (ECF No. 71-4, Report of Nassau County Comptroller George Maragos ("Comptroller Report"), at i.)

5    The Medical Review Board consists of six members appointed by the governor, with the advice and consent of the senate. N.Y. Correct. Law § 43 (McKinney 2019). Three of the six members must be physicians. *Id.* Among its duties, the Board "investigate[s] and review[s] the cause and circumstances surrounding the death of any inmate of a correctional facility," and submits a report to the Commission of Correction and the administrator of the correctional facility. *Id.* § 47.

6    Mr. Gleeson also disclosed his alcohol and heroin use. (*Id.*)

7    The parties did not include in their 56.1 statements the details of Mr. Gleeson's treatment in the weeks leading up to his death. Accordingly, I have reviewed the handwritten medical records, which are difficult to read, and in some cases, completely illegible. The parties did not depose the medical personnel who authored the records.

8    ECF No. 57-22, ¶ 12.

9    Neither side includes the full details of the conversation, nor mentions Mr. Gleeson's reference to the rheumatologist.

10    The County defendants challenge the declaration of Morgan Smith, another inmate, as inadmissible hearsay. (ECF No. 80-1, § F.) Rule 56(c)(4) of the Federal Rules of Civil Procedure permits the Court to consider a declaration on summary judgment if it is made on personal knowledge and includes facts that would be admissible in evidence. While some of the statements in the Smith declaration may be inadmissible hearsay, the statement that he and other inmates were yelling for help is not offered for the truth of its content, but simply as evidence that the inmates called for help.

11    According to Mr. Smith, Mr. Gleeson's neck was "two times its normal size." (ECF No. 74-39, ¶ 4.)

12    In their reply to the plaintiffs' 56.1 counter-statement, the County defendants make a general challenge to the admissibility of some of the plaintiffs' evidence, but do not make a specific objection to the NYSCOC reports. In any event, the NYSCOC reports are admissible as public records under Federal Rule of Evidence 803(8)(A)(iii) because they contain factual findings from a legally authorized investigation, and the defendants have not suggested that the reports lack trustworthiness. *See Moses v. Westchester County Department of Correction*, No. 10-CV-9468, 2017 WL 4386362, at *10-11 (S.D.N.Y. Sept. 29, 2017).

13    None of the defendants challenge the admissibility of the Comptroller Report. The County defendants argue that I should disregard the Comptroller Report because it was "created in 2016 and has no bearing on the death of the decedent ..." (ECF No. 80-1, § F.) I address this argument in section I.b.iv of this Opinion.

14    In a letter responding to the Comptroller's report, Sheriff Sposato noted that an Interim Health Contract Administrator had been appointed in 2016, and that the Sheriff's Department had published a job announcement for a permanent replacement. (Comptroller Report at 53.) The Comptroller's views were unchanged: "[we] reiterate that this position was vacant from 2011 to 2016 and reemphasize the importance

of having a medical professional on site at the Correctional Center to oversee the medical care provided by the contractor." (*Id.* at 59.)

15 The National Commission on Correction Health Care ("NCCHC") establishes nationally recognized standards and benchmarks. (Comptroller Report at n. 27.)

16 I take judicial notice of the lawsuit filed in state court. *See Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992).

17 The County defendants object to the admissibility of the affirmation because the settlement agreement provides that it is "not intended for use by any third party in any other action or proceeding[.]" (ECF No. 80 at 8) (quoting ECF No. 80-3, ¶ 10). The affirmation is admissible as a public record under Federal Rule of Evidence 803(8)(A)(iii) because it contains factual findings from a legally authorized investigation, and the defendants have not suggested that it lacks trustworthiness. *See Bradford Trust Co. v. Merrill Lynch*, 805 F.2d 49, 54-55 (2d Cir. 1986) (FBI reports prepared for related criminal action fall under the public records hearsay objection).

18 Before the Second Circuit's decision in *Darnell*, a pretrial detainee had to prove that the defendant official was subjectively aware of the harms associated with the constitutional deprivation. In *Darnell*, the Second Circuit changed the culpability standard for conditions-of-confinement cases in light of the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), which applied an objective standard for excessive force claims brought by pretrial detainees under the Fourteenth Amendment. *Darnell*, 849 F.3d at 35.

19 *See generally Ramey v. Perez*, No. 13-CV-00017, 2014 WL 407097, at *4 (S.D.N.Y. Jan. 31, 2014) ("There has been considerable division among the district courts of the Second Circuit as to whether *Iqbal* abrogates several factors of the *Colon* test and if so to what extent.... *Colon* remains the standard in this Circuit for deciding whether personal involvement by supervisory officials is sufficiently alleged in the context of the Eighth Amendment.").

20 The AAG affirmation references three other deaths—before Mr. Gleeson's—where the Medical Review Board found that Armor was responsible for egregious lapses in medical care. (AAG Affirmation ¶ 9.) These findings support the conclusion that Sheriff Sposato should have known about the risk of constitutional violations, a question that is ultimately for a jury.

21 The plaintiffs also have sued Sheriff Sposato in his official capacity. "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the [governmental] entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). "[T]hus, within the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official capacity claims as redundant." *Stancati v. County of Nassau*, No. 14-CV-2694, 2015 WL 1529859, at *2 (E.D.N.Y. Mar. 31, 2015) (quotation marks and citation omitted). A suit against Sheriff Sposato in his official capacity will be treated and analyzed as a suit against Nassau County, and the claim against Michael J. Sposato as Sheriff of Nassau County is dismissed as duplicative and redundant.

22 There is substantial evidence in the record that Mr. Gleeson would not have died if he had been seen by a rheumatologist. (ECF No. 71-6 ¶ 22; NYCOC Report ¶ 13 ("Had Gleeson been appropriately referred to a specialist, received a correct diagnosis, and received the proper treatment, his terminal event may have been prevented.")).

23 Armor's proposed electronic medical records system, which it did not implement, could, for example, generate reports of "[p]atients' pending consultations with specialists." (2011 Armor Contract at 231.)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 53 of 120

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

24    The plaintiffs also argue that the County's approval and renewal of its contract with Armor constitutes an official policy. (ECF No. 70 at 22.) A decision adopted by a municipal body is, of course, an officially promulgated policy for the purposes of *Monell* liability. *Monell*, 436 U.S. at 690. But the County's approval of the Armor contract is too far removed from Mr. Gleeson's treatment to support the requisite causal connection. *Pipitone*, 57 F. Supp. 3d at 194 ("Municipalities can only be liable under § 1983 when they are a 'moving force' behind the constitutional deprivation.") (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).

25    The AAG affirmation references three other deaths, before Mr. Gleeson's, in which the Medical Review Board found that Armor engaged in egregious lapses in medical care. (AAG Affirmation ¶ 9.) These repeated findings of civil rights violations buttress the conclusion that by the time of Mr. Gleeson's detention, the County had notice of serious problems of unconstitutional conduct requiring better supervision.

26    Even if the plaintiffs could sustain the intentional infliction of emotional distress claim, it would be dismissed as to the County defendants. *See J.H. v. Bratton*, 248 F. Supp. 3d 401, 416 n.10 (E.D.N.Y. 2017) ("It is well settled that public policy bars claims sounding in intentional infliction of emotional distress against a government entity.") (quoting *Lauer v. City of N.Y.*, 240 A.D.2d 543 (N.Y. 1997)).

27    The Honorable Edward Korman adopted the report and recommendation in an unpublished order on November 28, 2005.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 1906594
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ellis Davon DUDLEY, II, Plaintiff,

v.

Governor Kathy HOCHUL, of New York; New York
State; Dr. James V. McDonald; Randal B. Caldwell;
Megan Johnson; Christina F. Dejoseph; Sandra Milner;
Jeffrey A. Domachowski; Karen Stanislaus; Arlene
Bradshaw; Julie A. Cecile; Onondaga County Sheriff;
Patricia L. DeRue; Sue Ottaviano; Julie A. Cerio;
Katie Boyea; David M. Primo; Martha E. Mulroy;
Michelle Pirro Baily; Unkown; Hiscock Legal Aid;
and Dep't of Health and Soc. Servs., Defendants.

5:24-CV-0048 (DNH/ML)
|
Signed May 1, 2024

**Attorneys and Law Firms**

ELLIS DAVON DUDLEY, II, Plaintiff, Pro Se, Post Office
Box 7124, Syracuse, New York 13261.

### ORDER and REPORT-RECOMMENDATION

MIROSLAV LOVRIC, United States Magistrate Judge

**\*1** The Clerk has sent this *pro se* Complaint (Dkt. No. 1)
together with an application to proceed *in forma pauperis*
("IFP") (Dkt. No. 2) and a motion for permission to file
electronically in ECF (Dkt. No. 3) filed by Ellis Davon
Dudley, II ("Plaintiff") to the Court for review. For the reasons
discussed below, I (1) grant Plaintiff's IFP application (Dkt.
No. 2), (2) recommend that Plaintiff's Complaint (Dkt. No.
1) be dismissed in its entirety without leave to amend, and
(3) deny without prejudice Plaintiff's motion for permission
to file electronically (Dkt. No. 3).

### I. BACKGROUND

Liberally construed, [1] Plaintiff's Complaint asserts that his
rights were violated by Defendants Governor Kathy Hochul,
New York State, Dr. James V. McDonald, Randal B.
Caldwell, Megan Johnson, Christina F. Dejoseph, Sandra
Milner, Jeffrey A. Domachowski, Karen Stanislaus, Arlene
Bradshaw, Julie A. Cecile, Onondaga County Sheriff, Patricia
L. DeRue, Sue Ottaviano, Julie A. Cerio, Katie Boyea, David
M. Primo, Martha E. Mulroy, Michelle Pirro Baily, Unknown,
Hiscock Legal Aid, and Department of Health and Social
Service (collectively "Defendants"), who were all involved in
Plaintiff's state court family proceedings. (*See generally* Dkt.
No. 1.)

The Complaint is difficult to decipher (*id.*), but alleges that
Plaintiff has two minor children, whom Plaintiff refers to
as "blue child" and "pink child" throughout the Complaint.
(Dkt. No. 1 at 2.) The Complaint provides a timeline of
Plaintiff's experiences with the New York State Family Court
system dating back to July 9, 2019. (*Id.*) The crux of
Plaintiff's grievance appears to be that (1) the court-ordered
child support is excessive, (2) Plaintiff and his family have
somehow "lost" their nationality because of the family court
proceedings, and (3) Plaintiff's wages were garnished to pay
his court-ordered child support and he did not consent to the
seizure of his property. (*See generally* Dkt. No. 1.)

The Complaint appears to assert the following nine causes of
action: (1) a claim of racketeering, (2) a claim that Plaintiff's
rights pursuant to the First Amendment and 42 U.S.C. § 1983
were violated; (3) a claim that Plaintiff's rights pursuant to the
Second Amendment and 42 U.S.C. § 1983 were violated; (4) a
claim that Plaintiff's rights pursuant to the Fourth Amendment
and 42 U.S.C. § 1983 were violated; (5) a claim that Plaintiff's
rights pursuant to the Fifth Amendment and 42 U.S.C. § 1983
were violated; (6) a claim that Plaintiff's rights pursuant to the
Sixth Amendment and 42 U.S.C. § 1983 were violated; (7) a
claim that Plaintiff's rights pursuant to the Eighth Amendment
and 42 U.S.C. § 1983 were violated; (8) a claim that Plaintiff's
rights pursuant to the Thirteenth Amendment and 42 U.S.C.
§ 1983 were violated; and (9) a claim that Plaintiff's rights
pursuant to the Fourteenth Amendment and 42 U.S.C. §
1983 were violated. (Dkt. No. 1 at 6.) As relief, Plaintiff
seeks damages in the "amount of 20 million dollars or a
full disclosure of all contract terms for a consideration to
acceptance at the agreement of terms of competition. As
well [as] an immediate stop to the organization tasks with
damaging and seizure [of Plaintiff's] property." (*Id.*)

**\*2** Plaintiff also filed an application to proceed IFP. (Dkt.
No. 2.)

### II. PLAINTIFF'S APPLICATION TO PROCEED *IN FORMA PAUPERIS*

When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $405, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed IFP status if a party "is unable to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1). [2] After reviewing Plaintiff's IFP application (Dkt. No. 2), the Court finds that Plaintiff meets this standard. Therefore, Plaintiff's application to proceed IFP is granted. [3] (Id.)

## III. LEGAL STANDARD FOR INITIAL REVIEW OF COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. Neitzke v. Williams, 490 U.S. 319, 325 (1989). Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. Neitzke, 490 U.S. at 327; Harkins v. Eldridge, 505 F.2d 802, 804 (8th Cir. 1974); see Fitzgerald v. First East Seventh Street Tenants Corp., 221 F.3d 362, 364 (2d Cir. 2000) (a district court "may dismiss a frivolous complaint sua sponte even when the plaintiff has paid the required filing fee[.]"); see also Pflaum v. Town of Stuyvesant, Columbia Cnty., N.Y., 11-CV-0335, 2016 WL 865296, at *1, n.2 (N.D.N.Y. Mar. 2, 2016) (Suddaby, C.J.) (finding that the Court had the power to address and dismiss additional theories of the plaintiff's retaliation claim sua sponte because those theories were so lacking in arguable merit as to be frivolous).

In order to state a claim upon which relief can be granted, a complaint must contain, inter alia, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (emphasis added) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 [2007]). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial

experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." Iqbal, 556 U.S. at 679 (internal citation and punctuation omitted).

**\*3**  "In reviewing a complaint ... the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

Courts are "obligated to construe a pro se complaint liberally." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009); see also Nance v. Kelly, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam) (reading the plaintiff's pro se complaint "broadly, as we must" and holding that the complaint sufficiently raised a cognizable claim). "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties ... have had an opportunity to respond." Anderson v. Coughlin, 700 F.2d 37, 41 (2d Cir. 1983).

## IV. ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Complaint with this principle in mind, I recommend that all causes of action be dismissed.

### A. Claims Alleging "Racketeering"

To the extent that the Complaint is construed as alleging a claim pursuant to 18 U.S.C. § 1691 et seq., ("RICO") I recommend that it be dismissed. [4]

It is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1964 establishes a private right of action for individuals who are harmed by racketeering activity. 18 U.S.C. § 1964. This private right of action permits a plaintiff to bring a RICO claim for sustaining injuries "in

Dudley v. Hochul, Not Reported in Fed. Supp. (2024)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 56 of 120

his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). Generally, a plaintiff bringing a civil RICO claim under "Section 1962(c) must allege that (1) the defendant has violated the substantive RICO statute, and (2) the plaintiff was injured in his business or property 'by reason of a violation of section 1962.' " *Malvar Egerique v. Chowaiki*, 19-CV-3110, 2020 WL 1974228, at *7 (S.D.N.Y. Apr. 24, 2020) (quoting *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983) (citing 18 U.S.C. § 1962(c))), *vacated in part on other grounds by Weiss v. David Benrimon Fine Art LLC*, 20-CV-3842, 2021 WL 6128437 (2d Cir. Dec. 28, 2021) (summary order). More specifically, to assert a civil RICO claim under Section 1962(c), a plaintiff must allege the following elements: "(1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). Additionally, a plaintiff asserting a civil RICO claim must plead facts plausibly suggesting a resulting "domestic injury" to their business or property. *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2111 (2016).

**\*4** The Complaint fails to allege facts plausibly suggesting the existence of an "enterprise" within the meaning of RICO. More specifically, Plaintiff fails to allege facts plausibly suggesting that Defendants constitute, control, or participate in any enterprise with a distinguishable existence or purpose. *See Mackin v. Auberger*, 59 F. Supp. 3d 528, 543 (W.D.N.Y. 2014) ("Plaintiff fails to allege that [the defendants] had a common or shared purpose or that they functioned as a continuing unit."). In addition, the Complaint fails to allege any facts plausibly suggesting that Defendants functioned as a continuing unit. "Without such an enterprise, a RICO claim like [Plaintiff]'s must fail." *Liang v. City of New York*, 10-CV-3089, 2013 WL 5366394, at *13 (E.D.N.Y. Sept. 24, 2013); *see also Peterson v. City of New York*, 11-CV-3141, 2012 WL 75029, at *3-4 (S.D.N.Y. Jan. 9, 2012) (dismissing the plaintiff's RICO claim because "[t]he existence of a RICO enterprise is a necessary element for liability" and the plaintiff failed to allege facts plausibly suggesting the existence of a RICO enterprise).

Moreover, the Complaint fails to allege facts plausibly suggesting a pattern of racketeering activity. 18 U.S.C. § 1961(5) (To sufficiently allege a "pattern of racketeering activity," a plaintiff must allege at least two acts of "racketeering activity" that occur within ten years of each other); *Westester Cnty. Indep. Party v. Astorino*, 137 F. Supp. 3d 586, 608 (S.D.N.Y. 2015) (emphasis in original) (quoting *Cofacredit, S.A. v. Windsor Plumbing Supply Co.,*

187 F.3d 229, 242 (2d Cir. 1999)) (To qualify as a "pattern" of racketeering activity, the predicate acts "must be from the crimes listed in [Section] 1961(1) and they must be 'related, *and* ... amount to or pose a threat of continued criminal activity.' "). The Complaint fails to allege any acts of racketeering activity and instead merely uses the word "racketeering" in a conclusory fashion without facts plausibly suggesting the commission of any predicate acts. (*See generally* Dkt. No. 1.)

For each of these alternative reasons, I recommend that Plaintiff's RICO claim be dismissed.

### B. Claims Pursuant to 42 U.S.C. § 1983

After carefully considering Plaintiff's claims pursuant to 42 U.S.C. § 1983, I recommend that they be dismissed for three reasons.

First, to the extent that there are final state court orders or judgments that Plaintiff asks this Court to overturn, those claims are barred by the *Rooker-Feldman* doctrine. *Porter v. Nasci*, 24-CV-0033, 2024 WL 1142144, at *4 (N.D.N.Y. Mar. 15, 2024) (Dancks, M.J.) (citing *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291-92 (2005); *Dorce v. City of New York*, 2 F.4th 82, 101 (2d Cir. 2021)) ("Under the *Rooker-Feldman* doctrine, a federal district court lacks authority to review a final state court order or judgment where a litigant seeks relief that invites the federal district court to reject or overturn such a final state court order or judgment."). "This includes when a litigant seeks relief that invites a federal district court to reject or overturn a final decision of a New York Family Court as to a child support dispute brought in that state court." *Porter*, 2024 WL 1142144, at *4 (citing *Sims v. Kaufman*, 23-CV-7927, 2024 WL 757338, at *4 (S.D.N.Y. Feb. 14, 2024)) (additional citation omitted); *see also Fernandez v. Turetsky*, 14-CV-4568, 2014 WL 5823116, at *4 (E.D.N.Y. Nov. 7, 2014) (collecting cases in support of the proposition that "[c]ourts have repeatedly invoked the [*Rooker-Feldman*] doctrine in cases ... in which plaintiffs challenge family court decrees setting child support arrears."), *aff'd*, 645 F. App'x 103 (2d Cir. 2016). Therefore, to the extent Plaintiff seeks to challenge a final judgment of Onondaga County Family Court or the Oneida County Family Court, any such claim is barred by the *Rooker-Feldman* doctrine. *See, e.g., Phillips v. Wagner*, 22-CV-0833, 2022 WL 17406092, at *3 (N.D.N.Y. Nov. 4, 2022) (Lovric, M.J.) ("Plaintiff's claims, while not entirely clear, seem to challenge an order ... in which the Family Court determined that he owes child support .... Plaintiff's claims for relief are barred by the *Rooker-Feldman*

Dudley v. Hochul, Not Reported in Fed. Supp. (2024)

Case 3:25-cv-00673-AMN-ML   Document 5   Filed 09/24/25   Page 57 of 120

doctrine ....") (citation omitted), *report and recommendation adopted*, 2022 WL 17403441 (N.D.N.Y. Dec. 2, 2022) (Hurd, J.), *appeal dismissed*, No. 23-68, 2023 WL 4445323 (2d Cir. Apr. 25, 2023).

**\*5** Alternatively, "in the event the underlying family court proceedings are pending, such claims are likely barred by the *Younger* abstention doctrine." *Walker v. O'Connor*, 22-CV-0581, 2022 WL 2341420, at \*6 (N.D.N.Y. June 29, 2022) (Dancks, M.J.) (citing *Younger v. Harris*, 401 U.S. 37 (1971); *Amato v. McGinty*, 21-CV-0860, 2022 WL 226798, at \*11 (N.D.N.Y. Jan. 26, 2022) (Dancks, M.J.)), *report and recommendation adopted*, 2022 WL 2805462 (N.D.N.Y. July 18, 2022) (Hurd, J.). "*Younger* generally requires federal courts to abstain from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings." *Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002) (citing *Younger*, 401 U.S. at 43-44). "*Younger* abstention is required when three conditions are met: (1) there is an ongoing state proceeding; (2) an important state interest is implicated in that proceeding; and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of the federal constitutional claims." *Diamond "D" Const. Corp.*, 282 F.3d at 198 (citing *Grieve v. Tamerin*, 269 F.3d 149, 152 (2d Cir. 2001)). Courts in this circuit have found these conditions to be satisfied in matters involving child support issues. *See, e.g., Cogswell v. Rodriguez*, 304 F. Supp. 2d 350, 357 (E.D.N.Y. 2004) (applying the *Younger* abstention doctrine to dismiss claims which arose from "pending state court proceedings involving child support.") (citation omitted); *Tomczyk v. New York Unified Ct. Sys.*, 19-CV-2753, 2019 WL 2437849, at \*3 (E.D.N.Y. June 10, 2019) (citing *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 72-73 (2013) ("[T]his Court abstains under *Younger* from interfering in Plaintiff's ongoing state-court proceedings, involving divorce and child support issues and 'implicat[ing] a State's interest in enforcing the orders and judgments of its courts.' ")). "Accordingly, to the extent that the child support issues are continuing in Family Court, the Court should abstain from interfering with that process." *Bowman v. Morris*, 19-CV-0097, 2019 WL 5150196, at \*6 (N.D.N.Y. Apr. 10, 2019) (Stewart, M.J.) (citations omitted), *report and recommendation adopted*, 2019 WL 3759174 (N.D.N.Y. Aug. 9, 2019) (Sannes, J.).

Second, Plaintiff's claims are likely barred pursuant to the domestic relations exception to the jurisdiction of federal courts. *Dudley v. Montague*, 24-CV-0223, 2024 WL 1464346, at \*4 (N.D.N.Y. Apr. 4, 2024) (Dancks, M.J.) (citing *Marshall v. Marshall*, 547 U.S. 293, 308 (2006); *Oliver v. Punter*, 22-CV-3580, 2022 WL 3228272, at \*3 (E.D.N.Y. Aug. 10, 2022) ("The domestic relations exception to federal jurisdiction divests the federal courts of power to issue divorce alimony and child custody decrees .... This exception also extends to child support determinations and the enforcement thereof.") (internal quotations and citations omitted)) ("under the domestic relations exception to the jurisdiction of federal courts, cases involving divorce, alimony, and child custody remain outside this Court's jurisdiction."). Accordingly, this Court lacks jurisdiction to adjudicate a claim involving issues of child custody and support. *See Rotondo v. New York*, 17-CV-1065, 2017 WL 5201738, at \*4 (N.D.N.Y. Oct. 31, 2017) (Peebles, M.J.) ("[I]t is manifestly clear that plaintiff's claims implicate the domestic-relations exception to federal court jurisdiction. Plaintiff challenges a state-court's determination denying him relief from a family court's child support order, and plaintiff's requests for relief include removal of the family court proceeding to federal court."), *report and recommendation adopted*, 2017 WL 5198194 (N.D.N.Y. Nov. 9, 2017) (Sharpe, J.); *Cruz v. New York*, 17-CV-0510, 2017 WL 6021838, at \*7 (N.D.N.Y. Oct. 27, 2017) (Dancks, M.J.), *report and recommendation adopted*, 2017 WL 6001833 (N.D.N.Y. Dec. 4, 2017) (Sannes, J.) (collecting cases in support of the proposition that "[c]laims involving child custody, support, and visitation brought in federal district court in this Circuit have regularly been dismissed for lack of subject matter jurisdiction based on the domestic relations exception to federal jurisdiction.").

Third, the claims against Defendants are not cognizable.

### 1. Claims Against Defendant Hochul

Sovereign immunity bars Plaintiff's claims for damages against Defendant Hochul in her official capacity. Sovereign immunity extends to "actions for the recovery of money from the state" against "state agents." *Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134 (2d Cir. 2015) (citing *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Hans v. Louisiana*, 134 U.S. 1, 15 (1890)). A lawsuit brought against officials of a government entity in their official capacities is "in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *see Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001). Because Plaintiff's claims for damages against Defendant Hochul in her official capacity

Dudley v. Hochul, Not Reported in Fed. Supp. (2024)

Case 3:25-cv-00673-AMN-ML   Document 5   Filed 09/24/25   Page 58 of 120

is effectively an "action[ ] for the recovery of money from the state," *Leitner*, 779 F.3d at 134, sovereign immunity bars them.

 **\*6** Moreover, to the extent that Plaintiff's claims against Defendant Hochul in her official capacity seek prospective relief and to the extent that Plaintiff's claims are construed as against Defendant Hochul in her individual capacity, I recommend that they be dismissed for failure to allege Defendant Hochul's personal involvement in any constitutional violation. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)); *see Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986) (holding that in order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered."); *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (internal quotation marks omitted) ("[D]irect participation as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal."). The Second Circuit has made clear that "there is no special rule for 'supervisory liability," and a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). Here, although Plaintiff names Defendant Hochul as a party, the body of the Complaint lacks any allegations of wrongdoing by her. (*See generally* Dkt. No. 1.) As a result, I recommend that Plaintiff's claims against Defendant Hochul be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B).

## 2. Claims Against Defendant New York State

As set forth above, sovereign immunity pursuant to the Eleventh Amendment bars individuals from suing states in federal court, unless Congress abrogates states' immunity or a state consents to suit. *See* U.S. Const. Amend. XI; *Gollomp v. Spitzer*, 568 F.3d 355, 365-66 (2d Cir. 2009). Accordingly, I recommend that Plaintiff's claims asserted against the New York State be dismissed pursuant to Section 1915(e)(2)(B)(i).

## 3. Claims Against Defendant McDonald

The Complaint identifies Defendant McDonald "as the commissioner of the Department of Health in New York

State." (Dkt. No. 1 at 1.) To the extent that the Complaint is construed as asserting claims against Defendant McDonald in his official capacity, he is immune from suit pursuant to the Eleventh Amendment.

Moreover, to the extent that the Complaint is construed as asserting claims against Defendant McDonald in his individual capacity, I recommend that they be dismissed for failure to assert his personal involvement in any constitutional violation.

## 4. Claims Against Defendant Caldwell

Judges are absolutely immune from suit for claims seeking damages for any actions taken within the scope of their judicial responsibilities. *See Mireles v. Waco*, 502 U.S. 9, 11-12 (1991). Generally, "acts arising out of, or related to, individual cases before [a] judge are considered judicial in nature." *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009). "[E]ven allegations of bad faith or malice cannot overcome judicial immunity." *Bliven*, 579 F.3d at 209. Judicial immunity does not apply when a judge takes action outside his or her judicial capacity, or when a judge takes action that, although judicial in nature, is taken "in the complete absence of all jurisdiction." *Mireles* 502 U.S. at 11-12; *see also Bliven*, 579 F.3d at 209-10 (describing actions that are judicial in nature). However, "the scope of [a] judge's jurisdiction must be construed broadly where the issue is the immunity of the judge." *Stump v. Sparkman*, 435 U.S. 349, 356 (1978).

Plaintiff asserts claims that appear to arise from the efforts of Defendant Caldwell, in his capacity as a family court judge in Oneida County. (Dkt. No. 1 at 6.) Defendant Judge Caldwell is therefore immune from suit under the doctrine of judicial immunity. As a result, I recommend that Plaintiff's claims against Defendant Caldwell in his individual capacity be dismissed based on the doctrine of judicial immunity.

Moreover, I recommend that Plaintiff's claims against Defendant Caldwell in his official capacity be dismissed pursuant to the Eleventh Amendment. *See Sundwall v. Leuba*, 28 F. App'x 11, 12 (2d Cir. 2001) (citing *K & A Radiologic Tech. Servs., Inc. v. Comm'r of the Dep't of Health*, 189 F.3d 273, 278 (2d Cir. 1999)) (holding that "state officers, if sued in their official capacities, are immunized from suit by private citizens under the Eleventh Amendment."); *King v. New York State*, 23-CV-3421, 2023 WL 5625440, at \*4

Dudley v. Hochul, Not Reported in Fed. Supp. (2024)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 59 of 120

(E.D.N.Y. Aug. 31, 2023) (citing *Thomas v. Martin-Gibbons*, 857 F. App'x 36, 37 (2d Cir. 2021) (affirming dismissal of *pro se* Section 1983 claims against the State of New York and a state court judge in his official capacity based on Eleventh Amendment immunity)) ("Eleventh Amendment immunity extends to state officials acting in their official capacities, including state court judges."); *Aron v. Becker*, 48 F. Supp. 3d 347, 366-67 (N.D.N.Y. 2014) (McAvoy, J.) (dismissing the plaintiff's claims against a state court judge in his official capacity based on the doctrine of Eleventh Amendment immunity).

### 5. Claims Against Defendants Johnson, Ottaviano, Boyea, and Primo

**\*7**  The Complaint alleges that Defendant Johnson was an "Onondaga Family Court attorney" who was tasked with conducting a "virtual meeting call for the Onondaga County family Courthouse." (Dkt. No. 1 at 2.) The Complaint alleges that Defendant Ottaviano was a court assistant who postponed a hearing that was scheduled for February 15, 2023. (Dkt. No. 1 at ¶ 18.) The Complaint alleges that Defendant Boyea was a "Secretary" who emailed a modified custody order signed by Defendant Cecile. (Dkt. No. 1 at ¶ 23.) Finally, the Complaint alleges that Defendant Primo is the Clerk of the Court in Onondaga County Family Court (Dkt. No. 1 at ¶ 10) and he notified the parties of a hearing scheduled on July 20, 2023 (*id.* at ¶ 22.)

"As a general principle, a government attorney is entitled to absolute immunity when functioning as an advocate of the state in a way that is intimately associated with the judicial process." *Mangiafico v. Blumenthal*, 471 F.3d 391, 396 (2d Cir. 2006) (citing *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). Judicial immunity has been extended to judicial law clerks, the New York State Chief Administrative Judge, court attorneys, and the chief clerks of several state courts. *Jackson v. Pfau*, 523 F. App'x 736, 737-38 (2d Cir. 2013) (citing *Rodriguez v. Weprin*, 116 F.3d 62, 66 (2d Cir. 1997)).

As a result, I recommend that Plaintiff's claims against Defendants Johnson, Ottaviano, Boyea, and Primo in their individual capacities be dismissed, because they are immune from suit. [5]  *See Leftridge v. Judicial Branch*, 22-CV-0411, 2023 WL 4304792, at \*9 (D. Conn. June 30, 2023) (dismissing the plaintiff's claims against the state court clerks of court based on the doctrine of quasi-judicial immunity where "their alleged actions arose out of or related to

[plaintiff]'s child support and child custody proceedings."); *Braithwaite v. Tropea*, 23-CV-1431, 2023 WL 4207907, at \*4 (E.D.N.Y. June 27, 2023) (citing *Jackson v. Pfau*, 523 F. App'x 736, 737-38 (2d Cir. 2013) (affirming dismissal pursuant to Section 1915(e)(2)(B) of pro se plaintiff's Section 1983 claims against the Chief Clerks of several state courts based on the doctrine of judicial immunity) (dismissing as frivolous the plaintiff's claims against the clerk of the court because he was entitled to absolute immunity); *Mendez v. Johnson*, 22-CV-6811, 2022 WL 3587600, at \*2 (S.D.N.Y. Aug. 22, 2022) (citing *inter alia, Chmura v. Norton, Hammersley, Lopez & Skokos Inverso PA*, 17-CV-2164, 2018 WL 2138631, at \*2 (D. Conn. May 9, 2018) (extending judicial immunity to a clerk of court); *Manko v. Ruchelsman*, 12-CV-4100, 2012 WL 4034038, at \*2 (E.D.N.Y. Sept. 10, 2012) (same)) (noting that courts have routinely granted judicial immunity to "government officials, including clerks of court and other court employees, for their acts that assist a judge in the performance of his or her judicial duties.").

**\*8**  Moreover, I recommend that Plaintiff's claims against Defendants Johnson, Ottviano, Boyea, and Primo in their official capacities be dismissed because the Onondaga Family Court is an arm of the New York state court system and New York State is immune from suit pursuant to the Eleventh Amendment. *Braithwaite*, 2023 WL 4207907, at \*4 (collecting cases) (holding that the plaintiff's claims against the Chief Clerk of the Suffolk County Court in his official capacity are barred by the Eleventh Amendment).

### 6. Claims Against Defendants Dejoseph, Cecile, Cerio, Mulroy, and Pirro Baily

Plaintiff's claims against Defendants Dejoseph, Cecile, Cerio, Mulroy, and Pirro Baily relate to their capacities as Onondaga County Family Court judges. (*See generally* Dkt. No. 1.) As set forth above in Part IV.B.4. of this Order and Report-Recommendation, Defendants Dejoseph, Cecile, Cerio, Mulroy, and Pirro Baily in their individual capacities are immune from suit pursuant to the doctrine of absolute judicial immunity. Moreover, as set forth above in Part IV.B.4. of this Order and Report-Recommendation, claims against Defendants Dejoseph, Cecile, Cerio, Mulroy, and Pirro Baily in their official capacities are essentially claims against New York State, which is immune from suit pursuant to the Eleventh Amendment.

Dudley v. Hochul, Not Reported in Fed. Supp. (2024)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 60 of 120

### 7. Claims Against Defendants DeRue and Domachowski

Plaintiff's claims against Defendants DeRue and Domachowski relate to their roles as Onondaga County Family Court support magistrates. (*See generally* Dkt. No. 1.) As set forth above in Part IV.B.4. of this Order and Report-Recommendation, Defendants DeRue and Domachowski in their individual capacities are immune from suit pursuant to the doctrine of absolute judicial immunity. *See Miller v. Primo*, 23-CV-1051, 2023 WL 6379325, at *6 (N.D.N.Y. Sept. 29, 2023) (Lovric, M.J.) (recommending dismissal of the plaintiff's claims against "Defendants DeRue and Domachowski, who acted as the support magistrate judges" and finding that such claims "are barred under the doctrine of judicial immunity"), *report and recommendation adopted by* 2023 WL 754323 (N.D.N.Y. Nov. 14, 2023) (Sannes, C.J.). Moreover, as set forth above in Part IV.B.4. of this Order and Report-Recommendation, the claims against Defendants DeRue and Domachowski in their official capacities are essentially claims against New York State, and are immune from suit pursuant to the Eleventh Amendment.

### 8. Claims Against Defendant Stanislaus

"The law is clear that court referees are entitled to absolute judicial immunity from liability with respect to acts taken in the scope of their duties." *Khrapko v. Splain*, 389 F. Supp. 3d 199, 205 (W.D.N.Y. 2019) (citing *Green v. Kadilac Mortg. Bankers, Ltd.*, 936 F. Supp. 108, 115 (S.D.N.Y. 1996); *Weiss v. Feigenbaum*, 558 F. Supp. 265, 272 (E.D.N.Y. 1982)); *accord Witcher v. Moriber*, 21-CV-6168, 2022 WL 1085297, at *2 (E.D.N.Y. Apr. 11, 2022) (citing *Wilson v. Wilson-Polson*, 446 F. App'x 330, 331 (2d Cir. 2011) (allegations that a New York State Family Court referee violated plaintiff's procedural due process rights failed in light of the referee's absolute immunity to suit); *Topolski v. Wrobleski*, 13-CV-0872, 2014 WL 2215761, at *3 (N.D.N.Y. May 29, 2014) ("Judicial immunity is so broad that judges and referees 'are not liable to civil actions for their judicial acts, even when such acts ... are alleged to have been done maliciously or corruptly.' "); *Renner v. Stanton*, 13-CV-1676, 2013 WL 1898389, at *3 (E.D.N.Y. May 7, 2013) (dismissing claims against Family Court Referee based on judicial immunity)).

**\*9** As a result, I recommend that Plaintiff's claim against Defendant Stanislaus in her individual capacity be dismissed based on the doctrine of absolute judicial

immunity. *See Miller Ex v. Primo*, 22-CV-0680, 2022 WL 16556060, at *5 (N.D.N.Y. Sept. 29, 2022) (Lovric, M.J.) (recommending dismissal of the plaintiff's claims against Defendant Stanislaus because she was entitled to absolute judicial immunity as a court attorney referee), *report and recommendation adopted by* 2022 WL 16551700 (N.D.N.Y. Oct. 31, 2022) (Sannes, C.J.).

Moreover, as set forth above in Part IV.B.4. of this Order and Report-Recommendation, any claim against Defendant Stanislaus in her official capacity is essentially a claim against New York State, which is immune from suit pursuant to the Eleventh Amendment.

### 9. Claims Against Defendant Bradshaw

Based on the allegations contained in the Complaint, it appears that Defendant Bradshaw was an attorney appointed to represent one of Plaintiff's minor children. (Dkt. No. 1 at ¶ 16.) The Second Circuit has held that "law guardians who act as 'attorney[s] for the child' are not state actors for the purposes of suits filed pursuant to § 1983." *Milan v. Wertheimer*, 808 F.3d 961, 964 (2d Cir. 2015).

As a result, I recommend that Plaintiff's claims against Defendant Bradshaw be dismissed.

### 10. Claims Against Defendant Onondaga County Sheriff

Defendant Onondaga County Sheriff is merely a department of a municipality, and thus, is not amenable to suit. *See White v. Syracuse Police Dep't*, 18-CV-1471, 2019 WL 981850, at *3 (N.D.N.Y. Jan. 7, 2019) (Peebles, M.J.) (citing *Krug v. Cnty. of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (McAvoy, J.); *Turczyn ex rel. McGregor v. City of Utica*, 13-CV-1357, 2014 WL 6685476, at *2 (N.D.N.Y. Nov. 26, 2014) (Sharpe, J.); *Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) ("Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence. Therefore, municipal departments like the Department of Social Services are not amenable to suit and no claims lie directly against the Department.")) ("Although a municipality is subject to suit pursuant to section 1983, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal ... department does not have the capacity to be sued as an entity separate from the municipality in which it is located."), *report and*

Dudley v. Hochul, Not Reported in Fed. Supp. (2024)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 61 of 120

*recommendation adopted*, 2019 WL 974824 (N.D.N.Y. Feb. 28, 2019) (Suddaby, C.J.). As a result, I recommend that Plaintiff's claims against Defendant Onondaga County Sheriff be dismissed because it is not an entity amenable to suit. [6]

### 11. Claims Against Defendant Hiscock Legal Aid

**\*10** The Complaint alleges that Defendant Hiscock Legal Aid and attorneys employed by it represented the mother of Plaintiff's minor children during the State Family Court proceedings. (Dkt. No. 1 at ¶ 5.) Notwithstanding the appointment of Defendant Hiscock Legal Aid as legal representation, it was not a state actor for purposes of 42 U.S.C. § 1983. "Although [Defendant Hiscock Legal Aid was] supplied and funded by the state, [it] act[ed] according to the best interests of [its] client with 'no obligation to the mission of the state.' " *Milan*, 808 F.3d at 964 (quoting *Meeker v. Kercher*, 782 F.2d 153, 155 (10th Cir. 1986)) (internal quotation omitted).

As a result, I recommend that Plaintiff's claims against Defendant Hiscock Legal Aid be dismissed.

### 12. Claims Against Defendant Department of Health and Social Service

It is unclear based on the allegations in the Complaint if Defendant Department of Health and Social Service is a division of New York State or Onondaga County. To the extent that it is a department of New York State, it is immune from suit pursuant to the Eleventh Amendment as set forth in Part IV.B.1 of this Order and Report-Recommendation. To the extent that Defendant Department of Health and Social Service is a department of Onondaga County, it is not amenable to suit pursuant as set forth above in Part IV.B.10 of this Order and Report-Recommendation. [7]

### 13. Claims Against Defendants Milner and Unknown

"Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff." *Cipriani v. Buffardi*, 06-CV-0889, 2007 WL 607341, at \*1 (N.D.N.Y. Feb. 20, 2007) (Kahn, J.) (citing *Gonzalez v. City of New York*, 97-CV-2246, 1998 WL 382055, at \*2 (S.D.N.Y. July 9, 1998)); *see also*

*Crown v. Wagenstein*, 96-CV-3895, 1998 WL 118169, at \*1 (S.D.N.Y. Mar. 16, 1998) (mere inclusion of warden's name in complaint insufficient to allege personal involvement); *Taylor v. City of New York*, 953 F. Supp. 95, 99 (S.D.N.Y. 1997) (same).

The Complaint names Milner and Unknown as defendants, but the body lacks any allegations of wrongdoing by these individuals. (*See generally* Dkt. No. 1.) As a result, I recommend that the claims against them be dismissed for failure to state a claim upon which relief may be granted.

For each of these alternative reasons, I recommend that the Complaint be dismissed in its entirety.

### V. OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at \*1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.). [8]

**\*11** Here, better pleading could not cure the deficiencies described above. As a result, I recommend that Plaintiff's Complaint be dismissed without leave to replead.

### VI. PLAINTIFF'S MOTION TO OBTAIN ECF LOGIN AND PASSWORD

In light of the recommended disposition of this case, Plaintiff's motion for ECF login and password is denied without prejudice. (Dkt. No. 3.) "Because this court is recommending dismissal at this time, the court will deny [P]laintiff's motion to obtain ECF privileges without

Dudley v. Hochul, Not Reported in Fed. Supp. (2024)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 62 of 120

prejudice." *Amato v. McGinty*, 17-CV-0593, 2017 WL 9487185, at *11 (N.D.N.Y. June 6, 2017) (Baxter, M.J.), *report and recommendation adopted*, 2017 WL 4083575 (N.D.N.Y. Sept. 15, 2017) (D'Agostino, J.); *see Mahmood v. United States Gov't*, 20-CV-0207, 2020 WL 3965125, at *3 (N.D.N.Y. Mar. 17, 2020) (Stewart, M.J.) (same), *report and recommendation adopted*, 2020 WL 1808206 (N.D.N.Y. Apr. 9, 2020) (D'Agostino, J.).

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's IFP application (Dkt. No. 2) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's motion to obtain an ECF login and password (Dkt. No. 3) is **DENIED without prejudice**; and it is further respectfully

**RECOMMENDED** that the **COURT DISMISS WITHOUT PREJUDICE AND WITHOUT LEAVE TO AMEND** Plaintiff's Complaint (Dkt. No. 1) in its entirety pursuant to 28 U.S.C. § 1915(e); and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Order and Report-Recommendation on Plaintiff, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[9] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

**All Citations**

Not Reported in Fed. Supp., 2024 WL 1906594

---

## Footnotes

1    The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

2    The language of that section is ambiguous because it suggests an intent to limit availability of IFP status to prison inmates. *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). The courts have construed that section, however, as making IFP status available to any litigant who can meet the governing financial criteria. *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

3    Plaintiff is reminded that, although his IFP application has been granted, he is still required to pay fees that he may incur in this action, including copying and/or witness fees.

4    Under General Order #14 and N.D.N.Y. L.R. 9.2, a party who files a RICO claim must also file a Civil RICO statement within thirty days after the filing date of the Complaint. Despite thirty days having elapsed since the filing of his Complaint, Plaintiff has failed to file a Civil RICO statement. (*See generally* docket sheet.) As a result, I recommend that, in the alternative, Plaintiff's RICO claim be dismissed. *See Poole v. Bendixen*, 20-CV-0697, 2021 WL 3737780, *12 (N.D.N.Y. Aug. 24, 2021) (Suddaby, C.J.); *Murphy v. Onondaga Cnty.*, 18-CV-1218, 2022 WL 819281, *6 (N.D.N.Y. Mar. 18, 2022) (Sharpe, J.).

5    In the alternative, I recommend that Plaintiff's claims against Defendants Johnson, Ottaviano, Boyea, and Primo be dismissed because the Complaint fails to allege the personal involvement of them in any alleged

**Dudley v. Hochul, Not Reported in Fed. Supp. (2024)**

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 63 of 120

constitutional deprivation, which is a prerequisite to an award of damages under 42 U.S.C. § 1983. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). Here, although Plaintiff names Defendants Johnson, Ottaviano, Boyea, and Primo as parties to the action, the body of the Complaint lacks any allegations of wrongdoing by them. (*See generally* Dkt. No. 1.) As a result, I recommend that, in the alternative, Plaintiff's claims against Defendants Johnson, Ottaviano, Boyea, and Primo be dismissed for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B).

6    Even if Plaintiff's claims against Defendant Onondaga County Sheriff were liberally construed as against Onondaga County, I would recommend that they be dismissed. There is no basis for municipal liability alleged in the Complaint. Plaintiff essentially complains of a discrete incident, during which an officer or individual employed by Defendant Onondaga County Sheriff did not act properly. (Dkt. No. 1 at 4.) There is no indication that Plaintiff can assert a policy or custom which would support municipal liability based on these facts. In addition, none of Plaintiff's allegations reflect a failure to train or "deliberate indifference" to the rights of persons who would come into contact with employees of Onondaga County.

7    Further, as set forth above in note 6, *supra*, to the extent that the Complaint is liberally construed as alleging a claim against Onondaga County, it fails to allege any basis for municipal liability.

8    *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)— that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

9    If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Dudley v. Hocul, Not Reported in Fed. Supp. (2024)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 64 of 120

2024 WL 2399913
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ellis Davon DUDLEY, II, Plaintiff,

v.

Governor Kathy HOCUL et al., Defendants.

5:24-CV-48
|
Signed May 23, 2024

**Attorneys and Law Firms**

ELLIS DAVON DUDLEY, II, Plaintiff, Pro Se, P.O. Box 7124, Syracuse, NY 13261.

### ORDER ON REPORT & RECOMMENDATION

DAVID N. HURD, United States District Judge

**\*1** On January 11, 2024, *pro se* plaintiff Ellis Javon Dudley, II ("plaintiff") filed this action alleging that the named defendants violated his civil rights in connection with certain family-court proceedings being conducted under New York State law. Dkt. No. 1. Along with his complaint, plaintiff moved for leave to proceed *in forma pauperis* ("IFP Application"), Dkt. No. 2, and for leave to file documents electronically, Dkt. No. 3.

On May 1, 2024, U.S. Magistrate Judge Miroslav Lovric granted plaintiff's IFP Application, denied his request to file electronically, and advised by Report & Recommendation ("R&R") that plaintiff's complaint be dismissed *without* leave to amend. Dkt. No. 5. As Judge Lovric explained, plaintiff's RICO claims were procedurally deficient and substantively meritless, while plaintiff's 42 U.S.C. § 1983 claims were barred by various claim-preclusion principles. *Id.*

Plaintiff has not filed objections, and the time period in which to do so has expired. *See* Dkt. No. 5. Upon review for clear error, the R&R is accepted and will be adopted. *See* FED R. CIV. P. 72(b).

Therefore, it is

ORDERED that

1. The Report & Recommendation is ACCEPTED;

2. Plaintiff's complaint is DISMISSED without leave to amend.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 2399913

---

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.                    1

2023 WL 6318280
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

George TARANTO, et al., Plaintiffs,

v.

PUTNAM COUNTY, et al., Defendants.

No. 21-CV-2455 (KMK)
|
Signed September 28, 2023

**Attorneys and Law Firms**

Thomas Martin Gambino, Esq., Law Office of Thomas M. Gambino & Associates PC, Poughkeepsie, NY, Counsel for Plaintiffs.

James A. Randazzo, Esq., Portale Randazzo LLP, White Plains, NY, Counsel for Defendants.

Drew William Sumner, Esq., Sumner Law LLP, White Plains, NY, Counsel for Defendants.

OPINION & ORDER

KENNETH M. KARAS, District Judge:

**\*1** Plaintiffs George Taranto ("Taranto"), Karen Taranto, and Christopher P. Taranto and Kerrianne Taranto-Garabo as Executors for the Estate of Taranto (altogether, "Plaintiffs") bring this Action, pursuant to 42 U.S.C. § 1983, against Putnam County ("County"), the Putnam County Sheriff's Office, Sheriff Robert L. Langley, Jr. ("Langley"), Deputy Sheriff Ronald C. Yeager ("Yeager"), Investigator Daniel Hunsberger ("Hunsberger"), Deputy Sheriff Ryan Diskin ("Diskin"), Deputy Sheriff Vincent Dalo ("Dalo"), Sergeant William Quick ("Quick"), and Officers John Does 1–10 (collectively, "Defendants"), in their individual and official capacities, alleging several constitutional violations and state claims. (*See generally* Second Am. Compl. (Dkt. No. 31).) Before the Court is Defendants' Motion to Dismiss (the "Motion") the claims in the Second Amended Complaint ("SAC") except for the Fourth Amendment excessive force claim, failure to intervene claims against the on-scene officers, state law claims for assault, battery, and wrongful death, and Karen Taranto's claims for loss of consortium, (*see* Notice of Defs.' Mot. To Dismiss (Dkt. No. 32)). [1] For the

following reasons, Defendants' Motion To Dismiss is granted in part and denied in part.

I. Background

A. Allegations and Materials Appropriately Considered

As a threshold matter, the Court must determine whether it may consider the (1) Notice of 50-h Hearing attached to Defendants' Motion, (*see* Dkt. No. 34) or the (2) Langley Video Interview, New York Attorney General Complaint, Putnam County Daily Voice News Article, 50-h Adjournment Letters, and Letter from Dr. Frank Kessler attached to Plaintiffs' Opposition (*see* Dkt No. 38) at this stage of the litigation. [2]

1. Applicable Law

Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the pleadings themselves," because "[t]o go beyond the allegations in the [c]omplaint would convert the Rule 12(b)(6) motion to dismiss into one for summary judgment pursuant to [Rule] 56." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002) (citation omitted). However, "the Court's consideration of documents attached to, or incorporated by reference in the [c]omplaint, and matters of which judicial notice would not convert the motion to dismiss into one for summary judgment." *Id.* (citations omitted); *see also Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (explaining that "when ruling on Rule 12(b)(6) motions to dismiss," courts may "consider the complaint in its entirety ..., documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" (quotation marks omitted)); *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) ("In deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken.' " (alteration omitted) (quoting *Samuels v. Air Transp. Loc. 504*, 992 F.2d 12, 15 (2d Cir. 1993))). Under the Federal Rules of Evidence, a court may take judicial notice of a fact outside of the pleadings provided that the fact "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

## 2. Application

**\*2** "Generally, a court may incorporate documents referenced where (1) [the] plaintiff relies on the materials in framing the complaint, (2) the complaint clearly and substantially references the documents, and (3) the document's authenticity or accuracy is undisputed." *Stewart v. Riviana Foods Inc.*, No. 16-CV-6157, 2017 WL 4045952, at *6 (S.D.N.Y. Sept. 11, 2017) (emphasis omitted) (collecting cases); *see also Dunkelberger v. Dunkelberger*, No. 14-CV-3877, 2015 WL 5730605, at *5 (S.D.N.Y. Sept. 30, 2015) ("To be incorporated by reference, the complaint must make a clear, definite, and substantial reference to the documents, and to be integral to a complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint." (alterations omitted) (quoting *Bill Diodato Photography LLC v. Avon Prods., Inc.*, No. 12-CV-847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012))).

Even if not incorporated by reference, a document on which the complaint "solely relies and which is integral to the complaint," *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (citation, emphasis, and quotation marks omitted), or a document on which "the complaint relies heavily on upon its terms and effect," *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quotation marks omitted), may also be considered by the Court on a motion to dismiss. Documents are "integral" where the plaintiff had to rely on their content "in order to explain what the actual unlawful course of conduct was on which the [d]efendants embarked." *Thomas*, 232 F. Supp. 2d at 276; *see also Gantt v. Ferrara*, No. 15-CV-7661, 2017 WL 1192889, at *14 (S.D.N.Y. Mar. 29, 2017) (holding documents were integral to the complaint where the plaintiff "relied heavily upon [them] in framing the [c]omplaint" (alterations in original) (citation omitted)). Additionally, "no serious question as to [the documents'] authenticity can exist," *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991), and it must be "clear on the record that no dispute exists regarding the authenticity or accuracy of the document," *DiFolco*, 622 F.3d at 111 (citation and quotation marks omitted).

Plaintiffs' Second Amended Complaint states that "Defendants have not held a hearing on this claim pursuant to General Municipal Law 50-h." (SAC ¶ 21.) That is Plaintiffs' sole reference to the 50-h Hearing. (*See generally id.*) No Party has attempted to explain how the Notice of

50-h Hearing, 50-h Adjournment Letters, and Letter from Dr. Frank Kessler regarding Taranto's ability to testify were clearly referenced in or integral to the Second Amended Complaint. Indeed, the Second Amended Complaint makes no reference to these documents and Plaintiffs have not relied on these documents in framing the Second Amended Complaint. Accordingly, these documents are not considered by the Court at this stage. For the same reason, the New York Attorney General Complaint against the Putnam County Sheriff's Department, the Putnam County Daily Voice News Article regarding the DiPippo settlement, and the Langley Video Interview, which are not mentioned anywhere in the Second Amended Complaint, cannot be considered.

### B. Factual Background

The following facts are drawn from the SAC and materials attached thereto and are assumed to be true for the purpose of deciding the instant Motion.

### 1. Parties

The Putnam County Sheriff's Office was and remains an agency of Putnam County. (SAC ¶ 5.) Langley, Yeager, Hunsberger, Diskin, Dalo, Quick, and Officers John Does 1-10 were employed "by Putnam County, by and through the Putnam County Sheriff's Office and/or Fire Department personnel and/or Emergency Medical Technicians" and "were acting within the scope of their employment." (*Id.* ¶¶ 6–7.) Langley "at all relevant times herein was and still is employed by Putnam County and/or Putnam County Sheriff's Office as Sheriff of Putnam County" and "supervised the actions of all subordinate officers of the Putnam County Sheriff's Office complained of herein." (*Id.* ¶¶ 10, 13.) "John Doe 1 was a Fire Department supervisor present at the time [ ] Taranto encountered the remaining Defendants" and "John Doe 2-3 are Emergency Medical Technicians present at the time [ ] Taranto encountered the remaining Defendants." (*Id.* ¶¶ 14–15.)

**\*3** "Taranto was born on December 25, 1943 and died on August 25, 2021. His estate was duly formed on November 4, 2021 in Connecticut where he resided with his wife at the time of his death. Christopher P. Taranto and Kerrianne Taranto-Garabo, the decedent's children, were appointed by the Connecticut Probate Court as co-executors for the Estate of [ ] Taranto and have been substituted herein in his place and stead." (*Id.* ¶ 17.)

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 67 of 120

2. Factual Allegations Giving Rise to the Current Action

On July 8, 2019 at approximately 2:00 AM while lawfully at his residence located at 202 Apple Tree Lane, Brewster, New York, Taranto heard noise outside his residence and saw flashlights by his window. (*Id.* ¶¶ 24–25.) Taranto exited his home and stood on his driveway with his lawfully possessed firearm at his side pointing downward towards the ground. (*Id.* ¶¶ 26–27.) Taranto heard multiple Defendants screaming at him to drop his firearm and raise his hands. (*Id.* ¶ 28.) Taranto complied with the orders and placed his firearm on the pavement and raised his hands. (*Id.* ¶ 29.) Taranto further complied with Defendants' orders to walk towards them. (*Id.* ¶ 30.)

Dalo then approached Taranto from behind and "violently threw him to the ground, banging his head on the ground, repeatedly striking him and smashing his face upon the pavement." (*Id.* ¶ 31.) "Thereafter, all Defendants continued to use force upon a prone and helpless [ ] Taranto as he lie face-down on the pavement experiencing difficulty breathing and chest pains." (*Id.* ¶ 32.) "Defendants, [ ] Yeager, [ ] Diskin, [ ] Dalo, [ ] Quick and/or John Does 1–10 proceeded to throw him to the ground, beat him about the face, head[,] and body with at least closed fists, grind his head and face on the ground and severely brutalize him." (*Id.* ¶ 40.)

During Taranto's arrest, Defendants believed Taranto to be emotionally disturbed and believed he was "verbally non-compliant." (*Id.* ¶¶ 33, 37.) Taranto was a 75-year-old, "frail man suffering from early dementia," and had recently had open heart surgery at the time of the incident. (*Id.* ¶¶ 33, 39.) Plaintiffs allege Defendants were aware of these facts at the time of the incident. (*Id.* ¶ 39.) Plaintiffs further allege that "[d]espite believing [ ] Taranto to be an emotionally disturbed person, Defendants failed to utilize a process or procedure to [e]nsure his safety." (*Id.* ¶ 34.) Plaintiffs additionally allege that "[d]uring the course of [ ] Taranto's arrest, the Defendants did not believe [ ] Taranto to have used deadly physical force against them." (*Id.* ¶ 35.) Defendants "eventually placed handcuffs" on Taranto while under the supervision of Quick. (*Id.* ¶ 41.) "As the supervisor in charge, [ ] Quick was responsible for the overall actions of the subordinate officers on scene, including the treatment of [ ] Taranto and the force used upon him." (*Id.* ¶ 42.)

"Taranto was detained in handcuffs in the rear seat of a police vehicle while pleading for help from law enforcement personnel on scene due to the excruciating pain caused by handcuffs placed on him that were fastened too tight." (*Id.* ¶ 44.) Taranto was removed from the scene while informing Defendants he was "experiencing chest pains and sustained physical injuries to his face, head, and body." (*Id.* ¶ 45.) "Defendants refused to permit [ ] Taranto to receive proper medical attention at the scene or to be removed from the scene via ambulance." (*Id.* ¶ 46.) "Any first aid provided at the scene by Fire Department personnel or Emergency Medical Technicians present at the scene was insufficient and inadequate to address [ ] Taranto's medical distress." (*Id.* ¶ 48.) Plaintiffs also allege that "[a]ny Fire Department personnel or Emergency Medical Technicians present on scene conspired with the remaining Defendants to conceal and/or cover up Defendants' excessive use of force utilized upon [ ] Taranto and the injuries caused to him." (*Id.* ¶ 49.) Taranto was eventually moved to Putnam County Hospital while in Defendants' custody unbeknownst to his family. (*Id.* ¶ 50.)

**\*4** Defendants entered Taranto's home without his or Karen Taranto's consent. (*Id.* ¶ 51.) Once inside the home, Defendants demanded Karen Taranto show them Taranto's pistol permit and stated "they almost killed her husband and would only tell her that he had been arrested." (*Id.* ¶¶ 52–53.) Defendants did not advise her that her husband was going to a hospital or that he was injured. (*Id.* ¶ 54.) Defendants left Taranto at the hospital after placing a criminal court summons in his pocket charging him with Menacing in the Second Degree "unattended and without notifying his family who several hours later received a phone call from a nurse at the hospital." (*Id.* ¶¶ 55–56.) Plaintiffs attach an appearance ticket for Taranto with the charge of Menacing in the Second Degree to the Second Amended Complaint. (SAC Ex. 4.) A nurse from Putnam Hospital called Karen Taranto to inform her that her husband was placed on life support after suffering cardiac and respiratory failure and pulmonary edema. (SAC ¶ 57.) Because Taranto was unable to breathe on his own, he was placed on a respirator—he remained unconscious for several days and was in critical condition. (*Id.* ¶¶ 58–59.) Taranto was removed to Danbury Hospital via ambulance given the critical nature of his injuries. (*Id.* ¶ 60.) After recovering consciousness and regaining the ability to breathe on his own, Taranto was released from the hospital. (*Id.* ¶ 61.)

On September 1, 2019, Taranto woke up and realized he was unable to walk. (*Id.* ¶ 62.) Taranto was taken to Danbury

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 68 of 120

Hospital where a scan revealed that he had "brain bleeds as a direct result of the brutal attack." (*Id.* ¶ 63.) The following day, Taranto underwent surgery to relieve the bleeding and pressure on his brain. (*Id.* ¶ 64.) Taranto lost control of his bladder as a result of the surgery and had permanent reduced motor skills and cognitive ability. (*Id.* ¶¶ 66–67.) Taranto remained in the hospital for another seven days and then began physical rehabilitation treatment. (*Id.* ¶ 65.)

Plaintiffs allege that the "Defendants herein have covered-up Defendants' collective misconduct and violent tendencies of the Defendants, including but not limited to Defendant Quick." (*Id.* ¶ 72.) "After knowing that the original information disseminated concerning [ ] Taranto was false, Defendants engaged in a course of conduct to continue its malicious prosecution of [ ] Taranto after falsely arresting him and criminally charging him in an attempt to justify and cover-up their prior false statements and misconduct" and "Defendants thereafter tampered with potential witnesses seeking to obtain false testimony from them and coerce[d] them to falsely testify against [ ] Taranto in criminal court." (*Id.* ¶¶ 76–77.) "Defendants have fabricated evidence against [ ] Taranto in an effort to conceal their wrongful actions." (*Id.* ¶ 87.)

Plaintiffs additionally allege that "Defendants failed to disclose criminal discovery in a timely fashion and/or at all" and that "Defendants maintain a pattern, policy and/or practice whereby criminal discovery is not provided in a timely fashion and/or at all." (*Id.* ¶¶ 82–83.) Defendants provided the Putnam County District Attorney's Office documents which have been provided to Taranto's criminal defense attorney which "came after various filings as part of this present litigation apparently in response to those filings." (*Id.* ¶¶ 88–89.) "Criminal Discovery was initially provided to defense counsel by the Putnam County District Attorney's Office on September 10, 2020, with Supplemental Disclosure being provided on November 16, 2020, April 6, 2021 and May 27, 2021"—the "May 27, 2021 Supplemental Discovery was made seven days after Plaintiffs' counsel filed his response to Defendants' pre-motion letter." (*Id.* ¶¶ 90–91.) "Other than document number 28, the disclosure presented as part of the May 27, 2021 Supplemental Discovery existed before the initial discovery response was made on September 10, 2020 but were not provided at that time." (*Id.* ¶ 92.) "One such document ... purports to be an internal investigation allegedly performed by Defendants pursuant to the arrest of George Taranto," which "is alleged to have started on July 8, 2019 and ended one-year later on July 9, 2020 resulting in

Defendant Langley condoning the actions of the Defendants herein." (*Id.* ¶¶ 93–94.) "This document, along with other documents provided by Defendants as part of [ ] Taranto's criminal prosecution, have been fabricated by the Defendants in an effort to conceal their wrong-doing." (*Id.* ¶ 95.) "[T]his report was not disclosed as part of the original criminal disclosure on September 10, 2020 or either Supplement disclosure on November 16, 2020 or April 6, 2021." (*Id.* ¶ 96.) Plaintiffs attach a list of materials disclosed to defense counsel on different dates, beginning in September 2020 and ending in May 2021. (SAC Ex. 9.)

**\*5** Plaintiffs point to "misconduct committed by the Defendants in the matter of *DiPippo v. County of Putnam, et al.* where Defendants, among other things, also failed to disclose criminal discovery." (SAC ¶ 84.) "In the matter of *DiPippo v. County of Putnam*, Defendant Quick was also one of the defendants who failed to disclose and apparently hid criminal discovery." (*Id.* ¶ 85.) [3]

The complaint arrest report attached to Plaintiffs' Second Amended Complaint July 8, 2019, reported by Yeager and reviewed by Quick, states:

> ON 07/08/2019 AT APPROXIMATELY 0310 HOURS, MEMBERS WERE INVESTIGATING A STOLEN VEHICLE INCIDENT AT 201 APPLE TREE LN IN THE TOWN OF SOUTHEAST. WHILE STANDING IN THE PARKING LOT OUTSIDE OF SAID RESIDENCE, AN OLD WHITE MALE, GEORGE C TARANTO DOB ... 1943, EXITED HIS RESIDENCE AT 202 APPLE TREE LANE AND WALKED UP TO INVESTIGATOR HUNSBERGER. INV HUNSBERGER TURNED TO ASK THE MAN TO GO BACK INTO HIS RESIDENCE WHEN MEMBER OBSERVED INV HUNSBERGER RUN TO COVER AND HEARD INV HUNSBERGER YELL "HES GOT A GUN".

> DEPUTY DALO, DEPUTY DISKIN, SERGEANT QUICK AND MYSELF ALL DREW OUR SERVICE WEAPONS AND ORDERED MR. TARANTO NUMEROUS TIMES TO PUT DOWN HIS WEAPON AND PUT HIS HANDS IN THE AIR. MR. TARANTO DID NOT INITALLY COMPLY WITH ORDERS AND TOOK COVER BEHIND A VEHICLE. ALL MEMBERS CLEARLY STATED MULTIPLE TIMES THAT WE WERE POLICE FROM THE SHERIFF'S OFFICE. AFTER MULTIPLE ORDERS TO PUT DOWN HIS WEAPON, MR. TARANTO COMPLIED, PUT HIS WEAPON DOWN ON THE PAVEMENT,

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 69 of 120

AND LISTENED TO ORDERS TO WALK TOWARD DEPUTIES. AT THIS TIME DEPUTY DALO WAS ABLE TO SNEAK UP BEHIND MR. TARANTO AND BRING HIM TO THE GROUND. ALL MEMBERS THEN ASSISTED TRYING TO GET MR. TARANTO IN HANDCUFFS. MR. TARANTO WAS ORDERED NUMEROUS TIME TO PUT HIS HANDS BEHIND HIS BACK BUT CONTINUED TO KEEP THEM LOCKED UNDER HIS BODY. MEMBERS WERE ABLE TO FREE MR. TARANTO'S ARMS AND GET THEM BEHIND HIS BACK SO THAT HE COULD BE PLACED IN HANDCUFFS.

EMS WAS CALLED TO THE SCENE TO EVALUATE MR. TARANTO FOR ANY INJURIES. HE WAS TRANSPORTED BY AMBULANCE TO PUTNAM HOSPITAL CENTER FOR FURTHER EVALUATION. MEMBER FOLLOWED THE AMBULANCE TO PHC AND ISSUED MR. TARANTO AN APPEARANCE TICKET FOR THE TOWN OF SOUTHEAST COURT FOR THE CHARGE OF MENACING IN THE 2ND DEGREE (PL 120.14(1)) FOR 08/01/2019 AT 1800 HOURS AT WHICH TIME HE WILL BE ARRAIGNED. MEMBER ALSO CHARGED MR. TARANTO WITH CRIMINAL POSSESSION OF A WEAPON IN THE 4TH DEGREE (VTL 265.01(2)), RESISTING ARREST (PL 205.30) AND OBSTRUCTING GOVERNMENTAL ADMINISTRATION IN THE 2ND DEGREE (PL 195.05).

THE COLT MUSTANG .380 PISTOL WITH A FULL MAGAZINE OF AMMUNITION

(SAC Ex. 3.) Additionally attached to the Second Amended Complaint is a use of force form prepared by Quick indicating that Taranto was emotionally disturbed, that he resisted through "Verbal Non Compliance," "Verbal Threats/ Gestures" and "Physically Uncooperative (Resisting)," that "verbal command," "physical direction," "impact weapon," and "hands" were used to control Taranto, and that "suspect was tackled then physically restrained" and sustained "laceration to head/shoulder pain." (SAC Ex. 5.)

Plaintiffs additionally attach a Putnam County Sheriff's Department Personnel Investigation conducted by Kevin McManus which lists personnel involved as Quick, Diskin, Dalo, Yeager, Hunsberger, and Investigator Ryan McMahon and states that:

**\*6** On 07/08/2019, the afore mentioned Sheriff's Office members were investigating a stolen vehicle complaint on Apple Tree Lane within Reed Farm, located in the T/O Southeast. During the investigation, the defendant exited his residence of 202 Apple Tree Lane holding a unholstered handgun. The defendant was ordered to drop his weapon multiple times over the course of 3 minutes. Upon the defendant finally placing his weapon on the ground, he was taken to the ground by Deputy Dalo and assisted by other members. The defendant continued to struggle while members attempted to handcuff him. As a result of being taken to the ground, the defendant sustained a small cut or rash to his head.

(SAC Ex. 8.) The Recommendation of Investigating Officer stated that:

All Sheriff's Office members on scene acted within the scope of their duties in assisting with effecting a lawful arrest of the defendant. Furthermore, all Sheriff's Office members acted within the scope of the New York State Penal Law as it pertains to Article 35 as well as within the rules and regulations of the Putnam County Sheriff's Department in effecting said arrest using the minimum force necessary. Since Sgt, Quick was directly involved in the incident, member believes any investigation should be conducted by his direct supervisor. Sheriff's Office Rules and Regulations Article 8.lA, in effect at the time of this incident states Any injury to a prisoner whether the injury occurred while the subject was being taken into custody or while the person was in custody of the Putnam

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 70 of 120

County Sheriff's Department shall be the subject of an internal investigation, Member observed video and spoke with Sgt, Quick and several of the Deputies involved after the incident and investigation determined that the there was no improper conduct on the part of any Sheriff's Office member on scene. Member used my discretion in determining there was no need for a detailed written report.

(*Id.*) The report is signed by Langley, among others, stating "no action needed, acceptable force used on combative subject was armed with a firearm which was still within reach." (*Id.*) Plaintiffs, citing to this document, allege Langley " 'rubber stamped' an approval of the treatment of [ ] Taranto while in police custody." (SAC ¶ 86.) "Defendant Langley's deliberate indifference to 'rubber stamp' his deputies['] misconduct during an election year is nothing more than an attempt to protect his position rather than addressing the misconduct of his deputies." (*Id.* ¶ 106.)

Finally, Plaintiffs attach Taranto's Information signed by Yeager for Menacing in the Second Degree, Criminal Possession of a Weapon in the Fourth Degree, Resisting Arrest, Obstructing Governmental Administration in the Second Degree, based upon the following facts, respectively:

The said defendant, at or about 03:10 hours on the aforesaid date, while in front of 202 Apple Tree Ln in the Town of Southeast, County of Putnam, New York, did intentionally place or attempt to place members of the Putnam County Sheriff's Office in reasonable fear of physical injury, serious physical injury or death. Specifically, your defendant placed Investigator Hunsberger, Deputy Diskin, Deputy Dalo, Deputy Yeager and Sergeant Quick in reasonable fear of physical injury, serious physical injury or death by displaying a Colt Mustang .380 pistol.

The said defendant, at or about 03:10 hours on the aforesaid date, at 202 Apple Tree Ln, in the Town of southeast, County of Putnam, New York, was in possession of a Colt Mustang .380 pistol with intent to use the same unlawfully against another.

The said defendant, at or about 03:10 hours on the aforesaid date, while at 202 Apple Tree Ln in the Town of Southeast, County of Putnam, New York, did intentionally prevent or

attempt to prevent members of the Putnam County Sheriff's Office from effecting an authorized arrest of himself, in that the defendant did physically struggle with members to avoid being handcuffed.

**\*7** The said defendant, at or about 03:10 hours on the aforesaid date, at 202 Apple Tree Ln, in the Town of Southeast, County of Putnam, New York, did intentionally prevent or attempt to prevent members of the Putnam County Sheriff's Office from performing an official function by means of intimidation, physical force or interference, or by means of an independently unlawful act in that he menaced police officers with a firearm which interfered with an official police investigation.

(SAC Ex. 10.)

C. Procedural History

Plaintiffs filed their original Complaint on March 19, 2021, (Dkt. No. 1), their Amended Complaint on July 12, 2021, (Dkt. No. 14), and their Second Amended Complaint on January 10, 2022, (Dkt. No. 31). Defendants filed their Motions to Dismiss and accompanying Memorandum of Law on January 21, 2022. (*See* Not. of Mot. (Dkt. No. 32); Mem. of Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 33).) Plaintiffs filed their Opposition on February 18, 2022. (*See* Mem. of Law for Reply to Mot. to Dismiss ("Pls.' Mem.") (Dkt. No. 37).) Plaintiffs additionally filed a motion to amend that same day. (Dkt. No. 39).) Defendants filed their Reply (*see* Reply to Mot. ("Defs.' Reply Mem.") (Dkt. No. 40)), and their Opposition to Plaintiffs' motion to amend on March 4, 2022, (Dkt. No. 41). Plaintiffs filed their Reply to Defendants' Opposition to Plaintiffs' motion to amend on March 9, 2022. (Dkt. No. 42.)

II. Discussion

A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a Rule 12(b)(6) motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79. ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

**\*8** "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegation contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw all reasonable inferences in the plaintiff's favor," *Div. 1181*, 9 F.4th at 95 (citation omitted). Additionally, "when ruling on a Rule 12(b)(6) motion to dismiss," district courts are directed to confine their consideration to "the complaint in its entirety, ... documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (quotation marks omitted); *see also Dashnau v. Unilever Mfg. (US), Inc.*, 529 F. Supp. 3d 235, 240 (S.D.N.Y. 2021) (same).

### B. Analysis

#### 1. False Arrest

A § 1983 claim for false arrest "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). A §

1983 false arrest claim "is substantially the same as a claim of false arrest under New York law." *Id.* New York law requires a plaintiff to show "that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was not otherwise privileged." *Toussaint v. Cnty. of Westchester*, No. 21-CV-03817, 2022 WL 2834108, at \*5 (S.D.N.Y. July 20, 2022). "[T]he existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest ... under § 1983." *Dillon v. Rosen*, No. 22-CV-7035, 2022 WL 4538397, at \*3 (S.D.N.Y. Sept. 28, 2022) (quoting *Jenkins v. City of N.Y.*, 478 F.3d 76, 84 (2d Cir. 2007)); *see also Figueroa v. Mazza*, 825 F.3d 89, 99 (2d Cir. 2016) ("The existence of probable cause to arrest ... will defeat a claim of false arrest under the Fourth Amendment."). "[A] claim for false arrest will not lie so long as the arresting officer had probable cause to arrest the plaintiff for some crime." *Jaegly v. Couch*, 439 F.3d 149, 150 (2d Cir. 2006).

Generally speaking, officers have probable cause to arrest when they have "reasonably trustworthy information as to facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (internal quotation marks and alterations omitted). As the Second Circuit recently observed:

> To determine the existence of probable cause, a court considers the totality of the circumstances, based on 'a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest.' The court considers those facts available to the officer at the time of the arrest and immediately before it. The significance of each of these factors may be enhanced or diminished by surrounding circumstances.

*Guan v. City of New York*, 37 F.4th 797, 804 (2d Cir. 2022) (quotation marks and citations omitted).

Moreover, "[t]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The qualified immunity defense, thus, is a broad shield that protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Kass v. City of N.Y.*, 864 F.3d 200, 206 (2d Cir. 2017) (quoting *Zalaski v. City*

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 72 of 120

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

*of Hartford*, 723 F.3d 382, 389 (2d Cir. 2013)). "[I]n the qualified immunity context, an officer invoking the probable cause defense need only establish that he or she acted with arguable probable cause[.]" *Schlaepfer v. City of N.Y.*, No. 20-CV-3339, 2022 WL 4484571, at *9 (S.D.N.Y. Sept. 27, 2022) (quotation marks omitted); *Kass*, 864 F.3d at 206 ("An officer is entitled to qualified immunity from a federal false arrest and imprisonment claim if he had arguable probable cause to arrest the plaintiff for any offense, regardless of the offense with which the plaintiff was actually charged."). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Falls v. (Police Officer) Detective Michael Pitt*, No. 16-CV-8863, 2021 WL 1164185, at *12 (S.D.N.Y. Mar. 26, 2021) (quoting *Walczyk v. Rio*, 496 F.3d 139, 163 (2d Cir. 2007)); *see also Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010) (same).

**\*9** Defendants argue there existed probable cause to arrest Taranto for, among other offenses, criminal possession of a weapon in the fourth degree. (Defs.' Mem. 4–9.) "A person is guilty of criminal possession of a weapon in the fourth degree when ... [h]e or she possesses any dagger, dangerous knife, dirk, machete, razor, stiletto, imitation pistol, undetectable knife[,] or any other dangerous or deadly instrument or weapon with intent to use the same unlawfully against another[.]" N.Y. Penal Law § 265.01(2). "Crucially, for the charge of criminal possession of a weapon in the fourth degree, 'the element of intent to use a dangerous instrument unlawfully can be presumed from a finding that defendant possessed a dangerous instrument.' " *Curanaj v. Cordone*, No. 10-CV-5689, 2012 WL 4221042, at *11 (S.D.N.Y. Sept. 19, 2012) (quoting *People v. Campbell*, 450 N.Y.S.2d 210, 211 (App. Div. 1982)). Plaintiffs clearly alleged that Taranto was in possession of a firearm, (SAC ¶¶ 26–27), accordingly, at the least, Defendants had arguable probable cause to arrest Taranto. *See Curanaj*, 2012 WL 4221042, at *11 (holding that the "[d]efendants had arguable probable cause on the charge of Criminal Possession of a Weapon in the Fourth Degree" when the plaintiff clearly "possessed a dangerous instrument"—an ax—because "[f]rom that fact, the intent element is satisfied"); N.Y. Penal Law § 265.15 ("The possession by any person of any dagger, dirk, stiletto, dangerous knife or any other weapon, instrument, appliance or substance designed, made or adapted for use primarily as a weapon, is presumptive evidence of intent to use the same unlawfully against another."); *cf. Egan v. New York City*, No. 16-CV-1479, 2018 WL 4926445, at *9 (S.D.N.Y. Oct. 10,

2018) (holding that because the "criminal purpose of a laser pointer is not immediately apparent" possession of a laser pointer would not be "enough to provide probable cause in this case: there must be probable cause to believe that Plaintiff possessed the laser with the intent to use it unlawfully"); *Levy v. City of New York*, 935 F. Supp. 2d 575, 586 (E.D.N.Y. 2013) (noting in false arrest case for N.Y. Penal Law § 265.01(2) that "[b]ecause a kitchen knife is an inherently utilitarian utensil, the key inquiry is the manner in which the kitchen knife is used"). Thus, the Court grants the Motion to Dismiss the false arrest claim.

## 2. Denial of Fair Trial

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). To state a fair trial right claim, a plaintiff must plausibly plead the following elements: "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016) (citing *Ricciuti*, 124 F.3d at 130).

Probable cause is not a defense to a denial of fair trial claim. *See Heard v. City of New York*, 319 F. Supp. 3d 687, 697 (S.D.N.Y. 2018); *Overby v. Fabian*, No. 17-CV-3377, 2018 WL 3364392, at *11 (S.D.N.Y. July 10, 2018). "Because probable cause is no defense to a denial of the right to a fair trial claim, fair trial claims cover kinds of police misconduct not addressed by false arrest or malicious prosecution claims." *Garnett*, 838 F.3d at 278; *see also Brandon v. City of New York*, 705 F. Supp. 2d 261, 276 (S.D.N.Y. 2010) (noting that the Second Circuit has permitted "claims for both malicious prosecution and a denial of [a plaintiff's] fair right to trial based on the same alleged fabrication of evidence").

Plaintiffs make many conclusory allegations regarding fabrication of evidence. For instance, Plaintiffs allege "[a]fter knowing that the original information disseminated concerning [ ] Taranto was false, Defendants engaged in a course of conduct to continue its malicious prosecution

of [ ] Taranto after falsely arresting him and criminally charging him in an attempt to justify and cover-up their prior false statements and misconduct," that "Defendants thereafter tampered with potential witnesses seeking to obtain false testimony from them and coerce them to falsely testify against [ ] Taranto in criminal court," that "Defendants have fabricated evidence against [ ] Taranto in an effort to conceal their wrongful actions," that "[a]fter knowing that the original allegations concerning [ ] Taranto were false, Defendants engaged in a course of conduct to fabricate their claims concerning [ ] Taranto," and that Defendants "[f]abricat[ed] and contrive[d] criminal charges lodged against Plaintiff." (SAC ¶¶ 76–77, 87, 99, 123.) Plaintiffs' Opposition similarly states "[a]s discussed herein, Plaintiffs have demonstrated, before discovery has proceeded, the extent and nature of the fabrication of evidence by the Defendants pursuant to the arrest and prosecution of [ ] Taranto," which "includes the criminal discovery turned over by the Defendants to the prosecutor after pleadings were docketed pursuant to this litigation despite the documents provided during criminal discovery having been previously available based upon the dates of creation." (Pls.' Mem 15.) However, the Opposition, like the Second Amended Complaint does not specifically point to particular instances of fabrication of evidence. [4]

**\*10** Conclusory statements that officers fabricated evidence do not suffice to state a claim for the denial of a fair trial. *See Longo v. Ortiz*, No. 15-CV-7716, 2016 WL 5376212, at \*6 (S.D.N.Y. Sept. 26, 2016) (holding that the plaintiff failed to state denial of fair trial claim where he alleged "he was denied the right to a fair trial ... when the defendants fabricated evidence, gave false testimony, and made false extrajudicial statements ... to be used against [the plaintiff] at trial as well as to a Supreme Court judge in an effort to secure a search warrant, indictment and conviction" (internal quotation marks omitted)); *see also Harasz v. Katz*, 239 F. Supp. 3d 461, 493 (D. Conn. 2017) (holding that the plaintiff failed to state a denial of fair trial claim where he merely alleged that officers "did in fact participate in fabrication of evidence, ignored the truth when presented[,] and chose what to bring as the truth ... [and] did not want the truth to interfere with their witch hunt."). "Instead[,] plaintiffs must identify the actual fabrication," which Plaintiffs fail to do. *Hutchins v. Solomon*, No. 16-CV-10029, 2018 WL 4757970, \*16 (S.D.N.Y. Sept. 29, 2018); *see also Thompson v. City of New York*, No. 18-CV-04105, 2020 WL 2097622, at \*4 (S.D.N.Y. May 1, 2020) ("The [c]omplaint does not identify what evidence was fabricated; and the [c]omplaint fails to identify what, if any,

fabricated evidence the defendants offered or to whom it was offered and what effect the purported false evidence would have had on the jury."); *Cunningham v. City of New York*, No. 17-CV-5124, 2018 WL 4168964, at \*5 (S.D.N.Y. Aug. 30, 2018) (dismissing fair trial claim where the complaint failed to assert that arresting report contained a fabrication); *Waddlington v. City of New York*, 971 F. Supp. 2d 286, 297 (E.D.N.Y. 2013) (dismissing fair trial claim, and noting that the "[p]laintiff at no point alleges with specificity what false information [defendant police officers] created or forwarded to the D.A.'s Office"); *cf. Long v. New York City*, No. 14-CV-9908, 2016 WL 4203545, at \*3 (S.D.N.Y. Aug. 8, 2016) ("[The p]laintiff claims specific sentences in specific documents were intentionally falsified by Officer Vazquez.").

Plaintiffs additionally allege that an investigation that ended on July 9, 2020 "along with other documents provided by Defendants as part of [ ] Taranto's criminal prosecution, have been fabricated by the Defendants in an effort to conceal their wrong-doing." (SAC ¶ 94–95.) Again, Plaintiffs have not identified any specific fabrication. Furthermore, Plaintiffs have not alleged a causal connection between any fabrication contained within the investigation, which concluded a year after Taranto was arrested, and any deprivation. "The manufacture of false evidence, in and of itself ... does not impair anyone's liberty, and therefore does not impair anyone's constitutional right ... the deprivation of liberty of which [a plaintiff] complains [must] be shown to be the result of [the defendant's] fabrication of evidence." *Zahrey v. Coffey*, 221 F.3d 342, 348–49 (2d Cir. 2000) (internal quotation marks omitted) (noting that plaintiff had alleged the "eight months he was confined, from his bail revocation (after his arrest) to his acquittal" was the result of "the manufacture of false evidence"). Without such an allegation, Plaintiffs claim cannot stand. *Cf. Ricciuti*, 124 F.3d at 126–27, 130 (holding qualified immunity is unavailable where plaintiffs alleged that a fabricated confession caused prosecutors to add another charge); *Harris v. City of New York*, No. 15-CV-8456, 2017 WL 6501912, at \*8 (S.D.N.Y. Dec. 15, 2017) ("[F]abricated evidence may cause a further deprivation if it adversely informs a prosecutor's charging and bail determinations."); *Long v. New York City*, No. 14-CV-9908, 2016 WL 4203545, at \*5 (S.D.N.Y. Aug. 8, 2016) ("[F]abrication of evidence leading to pre-trial detention can satisfy the causation element for a fair trial claim.").

### 3. Deliberate Indifference to Medical Needs

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 74 of 120

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

Because Taranto was a pre-trial detainee at the time he was allegedly denied adequate medical care, Plaintiffs' claim falls under "the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight[h] Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). A pre-trial detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Id.* (quotation marks omitted).

To establish a claim for deliberate indifference to medical needs under the Due Process Clause of the Fourteenth Amendment, a pre-trial detainee must establish two elements: (1) that the "deprivation of medical care ... [was] 'sufficiently serious,' " and (2) that the defendant "acted or failed to act with 'a sufficiently culpable state of mind.' " *Smith v. Outlaw*, No. 15-CV-9961, 2017 WL 4417699, at *2 (S.D.N.Y. Sept. 30, 2017) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006)). The first element is objective and requires allegations that suggest that the detainee was subject to "conditions posing a substantial risk of serious harm." *Blandon v. Capra*, No. 17-CV-65, 2017 WL 5624276, at *7 (S.D.N.Y. Nov. 20, 2017) (quotation marks omitted) (quoting *Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614, 620 (2d Cir. 1996)). The second element, which is applied somewhat "differently to claims under the Eighth Amendment [than] the Fourteenth Amendment," also imposes an objective standard, whereas the Eighth Amendment imposes a "subjective standard." *Howard v. Brown*, No. 15-CV-9930, 2018 WL 3611986, at *4 (S.D.N.Y. July 26, 2018) (citation omitted). That is, the law enforcement or prison official need only "recklessly fail[ ] to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35.

**\*11** Plaintiffs contend in their Opposition that "Taranto was detained at the scene for such an extended period of time" which "begs further inquiry of ... why he was not immediately transported to a hospital." (Pls.' Mem. 18.) Plaintiffs allege that before he was transported for treatment, Taranto was detained in the rear seat of a police vehicle, however the Second Amended Complaint does not allege the length of the detention. (SAC ¶ 44.) Plaintiffs additionally allege that "Taranto was eventually removed from the scene while he informed the Defendants that he was experiencing chest pains and sustained physical injuries to his face, head, and body" and transported to a hospital to received care. (*Id.* ¶¶ 45, 50.)

"When the basis for a ... claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the [detainee's] *underlying medical condition* alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious, to support a[ ] ... claim." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (citation and quotation marks omitted); *see also James v. Brown*, No. 14-CV-1767, 2016 WL 3945688, at *4 (S.D.N.Y. July 19, 2016) (noting that where an inmate alleges "an unreasonable delay or interruption in treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." (alteration and citation omitted)). "[A] short interruption of care, even if the underlying medical condition is serious, does not constitute a serious medical need where the 'alleged lapses in treatment are minor.' " *Ferguson v. Cai*, No. 11-CV-6181, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) (quoting *Smith*, 316 F.3d at 186). "Where temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in this Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness." *Id.* (collecting cases). Where a plaintiff cannot show actual injury, he may nonetheless satisfy the objective prong by demonstrating that the delay of medical treatment exposed him to "an unreasonable risk of future harm." *Smith*, 316 F.3d at 188. However, "the inmate must show that the risk of future harm is 'so grave that it violates contemporary standards of decency.' " *Braxton v. Nichols*, No. 08-CV-8568, 2010 WL 1010001, at *3 (S.D.N.Y. Mar. 18, 2010) (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)).

"Although in many cases, calling for medical assistance within an hour or so of the injury may have sufficed in meeting an official's duties, *see Pateman v. City of White Plains*, No. 17-CV-6156, 2020 WL 1497054, at *21 (S.D.N.Y. Mar. 25, 2020) (collecting cases), the Second Circuit has also noted that 'it's the particular risk of harm faced by a [detainee] due to the challenged deprivation of care' that is relevant to deliberate indifference claims, *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003) (citation omitted)." *Maldonado v. Town of Greenburgh*, 460 F. Supp. 3d 382, 396 (S.D.N.Y. 2020). Therefore, "delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for the delay." *Id.* (quoting *Smith*, 316 F.3d at 186). For instance, in

*Maldonado*, this Court held that a pretrial detainee's estate plausibly alleged deliberate indifference to medical needs when the pretrial detainee was tasered, was not responding to NARCAN, and even though the defendant was told the pretrial detainee needed to be rushed to medical treatment immediately, there was a 20-minute delay in transporting the pretrial detainee to the emergency room. *Id.* at 389, 397. The pretrial detainee was pronounced dead at the hospital. *Id.* at 390. Here, Plaintiffs have not alleged how much time transpired between the incident and Taranto's arrival at the hospital—it is possible Taranto was transported to the hospital almost immediately after the alleged incident. *See Cooper v. City of New York*, No. 14-CV-3698, 2016 WL 4491719, at *1, 8 (E.D.N.Y. Aug. 25, 2016) (holding plaintiff who was attacked by police, became unconscious, and fell into a coma had not alleged deliberate indifference to medical needs when the "incident took place at 1:15pm, and it was reported at 1:32pm" and plaintiff was then admitted to the emergency room approximately 20 minutes later". Indeed, Plaintiffs allege that Taranto was removed from the scene "while" informing Defendants he was "experiencing chest pains and sustained physical injuries to his face, head, and body"—indicating there was no delay between Taranto's complaints and his transport to the hospital. (SAC ¶ 45.) Additionally, Plaintiffs have not alleged any fact indicating that any delay worsened Taranto's medical condition. Without any sense of the time that transpired between Taranto's injury and the subsequent transport to the hospital or any allegations as to whether any delay worsened or posed any specific risk to Taranto's medical condition, Plaintiffs have not plausibly alleged any delay constitutes deliberate indifference to medical needs. *See Smith*, 316 F.3d at 186 ("[It is] the particular risk of harm faced by a [detainee] due to the challenged deprivation of care, rather than the severity of the [detainee's] underlying medical condition, considered in the abstract, that is relevant.").

**\*12** Plaintiffs additionally allege that "Defendants refused to permit [ ] Taranto to receive proper medical attention at the scene or to be removed from the scene via ambulance," and that "[a]ny first aid provided at the scene by any Fire Department personnel or Emergency Medical Technician present at the scene was insufficient and inadequate to address [ ] Taranto's medical distress." (*Id.* ¶¶ 46, 48.) "While Plaintiff[s] allege[ ] that 'all defendants' failed to provide adequate medical treatment, that allegation is insufficient because it is conclusory." *Sterling v. Akinyombo*, No. 20-CV-10804, 2022 WL 2657223, at *5 (S.D.N.Y. July 8, 2022) (citation omitted). Plaintiffs have not alleged which

Defendants were involved in any deprivations of care or what medical attention was or was not provided at the scene. Such conclusory allegations cannot withstand Defendants' Motion to Dismiss. *See Price v. Koenigsmann*, No. 19-CV-4068, 2022 WL 125818, at *5 (S.D.N.Y. Jan. 13, 2022) (holding that factual allegations plaintiff makes that reference "Defendants" and their deliberate indifference to his medical needs "are vague and conclusory" and therefore cannot support a plausible deliberate indifference claim).

#### 4. 1985(3) Conspiracy

To state a claim for conspiracy in violation of § 1985(3), a plaintiff must allege (1) a conspiracy, (2) with the intent or purpose to deprive a person of equal protection of the law, (3) an act in furtherance of the conspiracy, (4) which results in an injury to a person, or a person's property, or the deprivation of a federal constitutional right. *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015). "In order to maintain an action under [§] 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that [the] defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (citation and internal quotation marks omitted). "In addition, a plaintiff must allege that she is a member of a protected class and that the conspirators acted with class-based discriminatory motivation." *Arroyo-Horne v. City of New York*, No. 16-CV-3857, 2019 WL 3428577, at *5 (E.D.N.Y. July 30, 2019), *aff'd*, 831 F. App'x 536 (2d Cir. 2020).

Defendants argue that Plaintiffs failed to plead any specifics about the alleged conspiracy and failed to plead a factual basis supporting a meeting of the minds. (Defs.' Reply Mem. 4.) Plaintiffs argue that they have sufficiently pled a cause of action of conspiracy noting that the identities of the John Doe Defendants are unknown but that they were present on the scene at the time of Taranto's arrest and failed to intervene when Taranto was assaulted, failed to provide proper medical attention, and "covered-up the wrongdoing of the known Defendants." (Pls.' Mem. 15.) Plaintiffs also allege that "[i]n furtherance of the conspiracy, Defendants fabricated evidence against [Taranto], failed to provide evidence in a timely manner despite it being available during [ ] Taranto's criminal prosecution and engaged in acts to cover up the excessive use of force upon [ ] Taranto by the Defendants herein." (SAC ¶ 153.) However, Plaintiffs have not included any facts which support a plausible allegation that Defendants conspired together, let alone conspired to deprive Taranto's of

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 76 of 120

equal protection of the laws. Accordingly, the claim cannot stand. *See Ziglar v. Abbasi*, 582 U.S. 120, 154 (2017) ("To state a claim under § 1985(3), a plaintiff must first show that the defendants conspired—that is, reached an agreement —with one another."); *see also Arroyo-Horne*, 2019 WL 3428577, at *5 (dismissing 1985 conspiracy claim when the complaint "does not provide any allegations or include any facts from which the Court could conclude that any individual(s) conspired to deprive Plaintiff of equal protection of the laws or equal privileges and immunities under the laws."); *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 308 (S.D.N.Y. 2013) (dismissing the plaintiff's section 1985(3) claim because the complaint did not "set forth any specific facts that indicate any sort of meeting of the minds ... let alone an agreement to violate [the plaintiffs' rights]" (emphasis omitted)); *Friends of Falun Gong v. Pacific Cultural Enter., Inc.*, 288 F. Supp. 2d 273, 279 (E.D.N.Y. 2003) (finding that the plaintiff failed to adequately plead a section 1985(3) claim because "the complaint [did] not include any facts that could support an inference of a conspiracy" and because the plaintiff "cite[d] no facts from which a meeting of the minds could be inferred").

 **\*13** However, even if Plaintiffs have plausibly alleged concerted action by Defendants, the claim still fails. Defendants additionally argue that Plaintiffs' § 1985(3) should fail as "Plaintiffs failed to plead membership in a protected class under § 1985(3)." (Defs.' Reply Mem. 4.) The Court agrees. To establish a violation of § 1985(3), a plaintiff must establish, among other elements, that the conspiracy was motivated by "some racial or perhaps otherwise class-based, invidious discriminatory animus." *McDaniel v. City of New York*, 585 F. Supp. 3d 503, 522 (S.D.N.Y. 2022), *report and recommendation adopted*, No. 19-CV-11265, 2022 WL 874769 (S.D.N.Y. Mar. 24, 2022) (quotation marks omitted). Plaintiffs have not attempted to do so. (*See generally* SAC.) Accordingly, the section 1985(3) conspiracy claim fails on this ground as well. *McDaniel*, 585 F. Supp. 3d at 522 (dismissing claims pursuant to § 1985 when the complaint "provides no factual assertions that would establish the requisite discriminatory animus"); *see also Joyner v. Alston & Bird LLP*, No. 21-CV-8549, 2022 WL 6244417, at *10 (S.D.N.Y. May 13, 2022), *report and recommendation adopted*, No. 21-CV-8549, 2022 WL 4115954 (S.D.N.Y. Sept. 9, 2022) (dismissing claim § 1985(3) in part because plaintiff had not alleged "discriminatory animus aimed at depriving her of a federal constitutional right").

### 5. 1983 "Cover-Up" Claim

"In a section 1983 claim alleging a cover-up by government agents, the constitutional right at issue is the First Amendment right of access to courts: the theory is that the cover-up has made it impossible for the plaintiff to litigate an underlying claim, because material evidence was destroyed, for instance, or because the statute of limitations expired before the plaintiff discovered the cover-up." *Tavares v. New York City Health & Hosps. Corp.*, No. 13-CV-3148, 2015 WL 158863, at *7 (S.D.N.Y. Jan. 13, 2015) (citing *Christopher v. Harbury*, 536 U.S. 403, 413–14 & n. 11 (2002) (describing these claims as "backward-looking access claims")). "The Second Circuit has emphasized, however, that '[t]he viability of [such] claims is far from clear,' pointing out that the *Harbury* decision was careful not to endorse their validity." *Id.* (citing *Sousa v. Marquez*, 702 F.3d 124, 128 (2d Cir. 2012)).

Nevertheless, even assuming backward-looking access claims are actionable, Plaintiffs' fail. "[S]uch claims are available only if a judicial remedy was 'completely foreclosed' by the alleged cover-up." *Sousa*, 702 F.3d at 128 (quoting *Broudy v. Mather*, 460 F.3d 106, 120 (D.C. Cir. 2006)). Plaintiffs' claims are clearly not foreclosed as they are bringing them in this very Action and have not argued that any claims have been foreclosed—accordingly the claim is dismissed. *See Tavares*, 2015 WL 158863, at *7–8 (dismissing "cover-up" claim when plaintiff "has not alleged that the DOCCS [d]efendants' actions prevented him from litigating his underlying Eighth Amendment and state-law medical malpractice claims against the City [d]efendants —indeed, he is bringing those very claims in this action.").

### 6. Individual Liability

Defendants argue that Plaintiffs "impermissibly plead all causes of action against all named Defendants instead of bringing each cause of action against only the involved [D]efendants." (Defs.' Mem. 14.) Specifically, Defendants argue that Plaintiffs' "Fourth Amendment false arrest and excessive force claims" and failure to intervene claims against Langley "who was not present at the scene on July 8, 2019" must fail for lack of personal involvement. (*Id.*)

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Sterling*,

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 77 of 120

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

2022 WL 2657223, at *4 (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). "[A] plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quotation marks omitted); *see also Leneau v. Ponte*, No. 16-CV-776, 2018 WL 566456, at *15 (S.D.N.Y. Jan. 25, 2018) (dismissing allegations against a defendant for lack of personal involvement because the "[p]laintiff's general allegation that all defendants were involved in the alleged constitutional violations does not rescue the claims against" a particular defendant). Accordingly, "a plaintiff may not rely on a special test for supervisory liability" instead, "[t]he violation must be established against the supervisory official directly." *Tangreti*, 983 F.3d 616–18.

**\*14** The Court agrees that Plaintiffs have not alleged Langley's personal involvement in Plaintiffs' remaining constitutional claim, namely their excessive force claim. While Plaintiffs have pled that Langley "failed to intercede to terminate the aforementioned assault upon [ ] Taranto" they have not alleged he was present during the incident at issue or how he somehow permitted the use of force to occur. (SAC ¶ 71.) And while they allege Langley "was personally aware of the events complained of herein as they were occurring" they have not alleged any fact indicating this was the case. (*Id.* ¶ 73.) Such conclusory allegations do not sufficiently allege personal involvement. *See Falls v. Pitt*, No. 16-CV-8863, 2018 WL 3768036, at *6 (S.D.N.Y. Aug. 8, 2018) (finding personal involvement not established where the plaintiff failed to allege the defendants were "present" for the alleged violation or "participated directly" in or "somehow permitted" the alleged violation); *Lara-Grimaldi v. Cnty. of Putnam*, No. 17-CV-622, 2018 WL 1626348, at *11 (S.D.N.Y. Mar. 29, 2018) (holding personal involvement not established where the "[c]omplaint contain[ed] no allegations whatsoever that [the defendant] was involved in, aware of, or somehow permitted" the violation).

Plaintiffs additionally state in their Opposition that dismissal of Langley is inappropriate at this stage because he "established policy, was responsible for the training and discipline of officers and the overall operation of the Defendant police department." (Pls.' Mem. 19.) "While personal involvement of a supervisor may be established by showing that he created a policy or custom under which the violation occurred, conclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal

involvement." *Koehl v. Bernstein,* No. 10-CV-3808, 2011 WL 2436817, at *19 (S.D.N.Y. June 17, 2011), *report and recommendation adopted by,* No. 10-CV-3808, 2011 WL 4390007 (S.D.N.Y. Sept. 21, 2011) (citation omitted). Plaintiffs appear to only allege a single instance of excessive force in their Second Amended Complaint, namely the incident at issue. (*See generally* SAC.) "Allegations involving only a single incident are generally insufficient to demonstrate the existence of an official policy or custom for purposes of establishing personal involvement under § 1983." *Parris v. N.Y. State Dep't Corr. Servs.,* 947 F. Supp. 2d 354, 364 (S.D.N.Y. 2013). Accordingly, this single alleged use of force is insufficient to plausibly allege personal involvement on the basis of a policy. *See Tubbs v. Venettozzi,* No. 19-CV-126, 2019 WL 2610942, at *8 (N.D.N.Y. June 26, 2019) (holding that allegations that Superintendent was made aware of complaints about due process violations and allowed a custom of due process violations in disciplinary hearings failed when plaintiff only alleged two such incidents); *Lindsey v. Butler,* 43 F. Supp. 3d 317, 331 (S.D.N.Y. 2014), *on reconsideration in part,* No. 11-CV-9102, 2014 WL 5757448 (S.D.N.Y. Nov. 5, 2014) (holding that plaintiff's claims that Commissioner Kelly "created or adopted" an unconstitutional policy were insufficient to plausibly allege personal involvement "[w]ithout more than the allegations related to the single incident in the station house"). Additionally, insofar as Plaintiffs seek to hold Langley liable on the basis of his supervisory position, the Second Circuit has made clear that in the wake of *Iqbal,* plaintiffs cannot rely on supervisory liability to establish personal involvement. *Tangreti,* 983 F.3d at 620 (holding it was insufficient to show that defendant "was negligent, or even grossly negligent, in her supervision of the correctional officers or in failing to act on the information she had" for the purposes of personal involvement); *see also Bridgewater v. Taylor,* 832 F. Supp. 2d 337, 348 (S.D.N.Y. 2011) (holding personal involvement not established where the plaintiff made conclusory claims that a supervisory official failed to provide proper training and supervision or created a policy).

### 7. Putnam County Sheriff's Office

**\*15** Defendants argue that "claims against the Putnam County Sheriff's Office must be dismissed because the police department is a non-suable entity." (Defs.' Mem. 23.) The Court agrees. Under law of the State of New York, "a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence." *Hoisington*

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 78 of 120

*v. County of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999). "[T]he Sheriff's Department [does not] exist separate and apart from the County and, as a result, [ ] can[not] be sued." *Sagaria v. Orange Cnty. Jail*, No. 20-CV-2287, 2021 WL 4392422, at *3 (S.D.N.Y. Sept. 24, 2021); *see also Gleeson v. County of Nassau*, No. 15-CV-6487, 2019 WL 4754326, at *14 (E.D.N.Y. Sept. 30, 2019) (holding Nassau County Sheriff's Department and Nassau County Correction Center were not proper parties because they are administrative arms of Nassau County); *Polite v. Town of Clarkstown*, 60 F. Supp. 2d 214, 216 (S.D.N.Y. 1999) ("Therefore, municipal departments in this State—such as the Clarkstown Police Department—are not amenable to suit, and no claims can lie directly against them.") Indeed, "Plaintiffs concede the Putnam County Sheriff's Office is not a suable entity." (Pls.' Mem. 26.)

### 8. *Monell* Claim

"To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under color of state law, deprived him of a federal constitutional or statutory right." *Sykes v. Bank of Am.*, 723 F.3d 399, 405–06 (2d Cir. 2013). However, "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); *see also Williams v. Lohard*, No. 20-CV-10571, 2022 WL 269164, at *3 (S.D.N.Y. Jan. 28, 2022) ("[The] [p]laintiff's claim against the [c]ity fails for lack of facts supporting the existence of a municipal policy or practice." (citing cases)); *Palmer v. City of New York*, 564 F. Supp. 3d 221, 240 (E.D.N.Y. 2021) (dismissing claim against city where the plaintiffs failed to "sufficiently allege[ ] that they suffered constitutional violations as a result of an official policy or custom" (quotation marks omitted)); *Salvatierra v. Connolly*, No. 09-CV-3722, 2010 WL 5480756, at *10 (S.D.N.Y. Sept. 1, 2010) (dismissing a claim against agencies where the plaintiff did not allege that any policy or custom caused the deprivation of his rights), *report and recommendation adopted*, 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011).

This multi-factor test, and particularly the fifth element, reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (holding that a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior." (italics omitted)); *Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong"); *Newton v. City of N.Y.*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

**\*16** "In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.'" *Davis v. City of N.Y.*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003). Normally, "a custom or policy cannot be shown by pointing to a mere employee of the [municipality]." *Newton*, 566 F. Supp. 2d at 271; *see also City of Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Bird v. Cnty. of Westchester*, No. 20-CV-10076, at *12 (S.D.N.Y. June 23, 2022) ("[The] [p]laintiff fails to allege the existence of any other similar incident, which dooms [the p]laintiff's claim because a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality." (quotation marks omitted)); *Santana v. City of N.Y.*, No. 15-CV-6715, 2018 WL 1633563, at *10 (S.D.N.Y. Mar. 29, 2018) ("[A] 'single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy.'") (quoting *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir.

Case 3:25-cv-00673-AMN-ML   Document 5   Filed 09/24/25   Page 79 of 120

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

1998)); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Atadzhanov v. City of New York,* No. 21-CV-5098, 2022 WL 4331304, at *11 (S.D.N.Y. Sept. 19, 2022) (citations omitted); *see also Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226–27 (2d Cir. 2004) (describing methods of establishing *Monell* liability). Moreover, as noted, a plaintiff must also establish a causal link between the municipality's policy, custom, or practice and the alleged constitutional injury. *See Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a constitutional violation. There must at least be an affirmative link between[, for example,] the training inadequacies alleged, and the particular constitutional violation at issue." (emphasis omitted)); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiffs' injury, *Monell* prohibits a finding of liability against the [c]ity."); *Hincapie v. City of New York,* 434 F. Supp. 3d 61, 77 (S.D.N.Y. 2020) (holding that the plaintiff "fails to state a *Monell* claim" because the plaintiff "has not

pled facts demonstrating a direct link between his injuries and the alleged municipal policy"); *Johnson v. City of New York,* No. 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that after demonstrating the existence of a municipal policy or custom, "a plaintiff must establish a causal connection—an affirmative link—between the policy and the deprivation of his constitutional rights" (quotation marks omitted)).

Plaintiffs assert that the County is liable to Plaintiffs for the alleged constitutional deprivations based upon its maintenance of "a policy, practice or custom, officially or unofficially, of unconstitutional practices, including the use of force, the cover-up of police misconduct, the failure to maintain an independent police review board, the fabrication of evidence, the intimidation of witnesses, the failure to disclose discovery during criminal prosecution and the condoning of police misconduct." (SAC ¶ 161.) Plaintiffs further allege that the County "by and through its policy makers, maintained a policy, practice or custom, officially or unofficially, of failing to adequately supervise, discipline and/ or train its officers, including with respect to the use of force, tactics with respect to emotionally disturbed persons and the use of weapons during police encounters." (*Id.* ¶ 162.)

**\*17** Plaintiffs do not allege that the County maintains a formal policy officially endorsed by the municipality. (*See generally id.*) [5] Accordingly, the Court need only analyze whether Plaintiffs have plausibly alleged that there existed a sufficiently widespread practice to constitute a custom, whether policymakers failed to provide adequate training or supervision so grossly that it rises to gross indifference, or whether actions by final policymakers constituted official policy. *See Atadzhanov,* 2022 WL 4331304, at *11 (listing the four modes of proving a policy, custom, or practice under *Monell*).

### a. Widespread Practice

To demonstrate a de facto policy or custom through a widespread practice, a plaintiff must "show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Buari v. City of N.Y.*, 530 F. Supp. 3d 356, 398 (S.D.N.Y. 2021) (quoting *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004)). A practice can constitute a custom under *Monell* when the practice is "persistent and widespread," or "permanent and

well settled as to constitute a 'custom or usage' with the force of law" and to "imply the constructive knowledge of policymaking officials." *In re N.Y.C. Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 400 (S.D.N.Y. 2021) (quoting *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870–71 (2d Cir. 1992)); *see also Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 532 (S.D.N.Y. 2012) (noting that to demonstrate a practice is sufficiently widespread and crystalized to constitute a custom under *Monell*, "a plaintiff must prove that the custom at issue is permanent and well-settled" (citing *Praprotnik*, 485 U.S. at 127)).

**\*18**  Plaintiffs allege that "Defendants maintain a pattern, policy and/or practice whereby criminal discovery is not provided in a timely fashion and/or at all" and cite to *DiPippo v. County of Putnam*, No. 17-CV-7948, 2019 WL 1004152 (S.D.N.Y. Feb. 28, 2019). (SAC ¶¶ 83–84.) In *DiPippo*, plaintiff Anthony DiPippo alleged in part that he was denied a fair trial and wrongfully convicted based upon fabricated evidence during his criminal trials in 1994 and 2012. 2019 WL 1004152, at \*8. The court held that plaintiff had

> pleaded ample specific facts indicating that Defendants used extremely similar coercive investigative techniques on at least six witnesses within the [ ] investigation [at issue]. These techniques included: procuring testimony that implicated DiPippo in exchange for leniency, threatening witnesses with prosecutions against them if they did not provide inculpatory testimony, harassing and assaulting witnesses over extended periods of time, isolating witnesses and interrogating them for hours, forcing or attempting to force witnesses to sign false affidavits or other pre-written statements, administering sham polygraph examinations, failing to keep records of meetings with witnesses, using force on witnesses, and denying witnesses the opportunity to consult with counsel.

*Id.* at \*9. Based on these allegations, and the fact that "DiPippo was wrongfully convicted twice and tried three times by a jury" and the plaintiff "alleged facts that indicated that the [Putnam County Sheriff's Department] officers used similar unconstitutional methods in every trial" the court held that, that the plaintiff had sufficiently pled a *Monell* claim under a widespread practice theory. *Id.* at \*11.

Defendants argue that Plaintiffs' sole reliance on this case dooms their *Monell* claim as the case resolved by settlement without determination or admission of liability. (Defs.' Mem. 18–19.) Indeed, courts in this District have held that "citations to lawsuits, even if they did involve comparable conduct, do not alone establish a custom or practice that is widespread and persistent, *particularly if the lawsuits did not result in an adjudication of liability.*" *Bethune v. Westchester County*, No. 18-CV-3500, 2020 WL 1032508, at \*5 (S.D.N.Y. Mar. 2, 2020) (emphasis added) (granting a motion to dismiss where the plaintiff premised *Monell* liability on, inter alia, citations to several filed lawsuits); *see also Barnett v. Westchester County*, No. 18-CV-2483, 2020 WL 1032445, at \*5 (S.D.N.Y. Feb. 28, 2020) (same); *Vincent v. Winski*, No. 14-CV-7744, 2018 WL 1441370, at \*17 (S.D.N.Y. Mar. 22, 2018) (granting the defendants' motion to dismiss *Monell* claims where "the only facts that [the] [p]laintiff identifie[d] in support of any pattern of mishandling situations because of a failure to train ... consist[ed] of other litigations resulting in settlements"); *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at \*17 (S.D.N.Y. Mar. 26, 2015) (concluding that "lawsuits cited by [the] [p]laintiff in the [proposed amended complaint], even when combined with [other] allegations ..., are insufficient to plausibly support an inference of a widespread custom" to establish *Monell* municipal liability). *DiPippo* was settled without an admission of liability. *See* Stipulation of Discontinuance with Prejudice, *DiPippo*, 2019 WL 1004152, Dkt. No. 98. Accordingly, Plaintiffs cannot allege a widespread practice on the basis of *DiPippo* alone. *See McDonald v. City of Troy*, 542 F. Supp. 3d 161, 175–76 (N.D.N.Y. 2021) (holding that while "Plaintiffs' eight settled [excessive force] lawsuits over eight years is not the best record for a small city like Troy to sport .... [B]ecause plaintiff has not pointed to a single related case that actually resulted in a finding of liability on the City's part, that showing falls woefully short of establishing *Monell* liability"); *An v. City of New York*, 230 F. Supp. 3d 224, 229–30 (S.D.N.Y. 2017) (granting a motion to dismiss where a complaint sought to establish *Monell* liability based on "cites [to] six lawsuits filed between 2012 and 2016 and one newspaper report" but failed to plausibly allege a custom

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 81 of 120

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

because "the Complaint fail[ed] to allege that any of the six lawsuits, which were filed over a course of four years, resulted in a finding that the NYPD officers violated the plaintiffs' First Amendment rights"). [6]

### b. Failure to Train

**\*19** *Monell* liability can also exist " 'where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions.' " *Fraser*, 2021 WL 1338795, at \*10 (quoting *Reynolds*, 506 F.3d at 192). One category of municipal acquiescence involves a failure to train public officials. However, a failure to train constitutes a policy or custom that is actionable under § 1983 only where "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390. The Second Circuit has held that a finding of deliberate indifference requires: (1) "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "that the wrong choice by the ... employee will frequently cause the deprivation of a citizen's constitutional rights." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (alteration in original) (quoting *Walker v. City of N.Y.*, 974 F.2d 293, 297–98 (2d Cir. 1992)). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61.

To set forth a failure to train claim, "a plaintiff must plausibly allege a specific deficiency in the municipality's training." *Tieman*, 2015 WL 1379652, at \*22. Here, Plaintiffs' claim fails first and foremost because they have not alleged a specific training deficiency. Indeed, Plaintiffs' Second Amended Complaint does not "contain sufficient factual matter" to state a training deficiency "that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Instead, Plaintiffs only broadly allege "Defendant Putnam County and/or Putnam County Sheriff's Office breached their duty to the public and the Plaintiff

specifically by deploying Deputies without first properly screening the hiring of and training of them," that the County failed to "train its officers, including with respect to the use of force, tactics with respect to responding to emotionally disturbed persons and the use of weapons during police encounters," and that "Langley has failed to train and/or retrain his deputies, including the Defendants herein, in the proper and lawful use of force," "the proper treatment of prisoners requiring medical attention," "proper response and/or treatment of emotionally disturbed persons," and the "requirement to timely transmit criminal discovery as part of a criminal prosecution." (SAC ¶¶ 108–111, 162, 201.) Simply put, the sum total of Plaintiffs' failure-to-train claim is based on a threadbare description of the County's training, and is the type of conclusory claim that courts routinely dismiss. *See, e.g.*, *Clarke v. Antonini*, No. 21-CV-1877, 2022 WL 4387357, at \*12 (S.D.N.Y. Sept. 22, 2022) (dismissing *Monell* claim where plaintiff failed to "allege a specific deficiency in either the [c]ity or the [c]ounty's training for his failure-to-train theory"); *Lehal v. Cent. Falls Det. Facility Corp.*, No. 13-CV-3923, 2016 WL 7377238, at \*11 (S.D.N.Y. Nov. 21, 2016) (dismissing failure to train claim when a "[p]laintiff's new allegations regarding a supposed lack of training are too general and speculative to support a *Monell* claim"); *Triano*, 895 F. Supp. 2d at 539–40 (dismissing *Monell* claim where the plaintiff "merely alleged that the [t]own failed to train its employees, without providing any supporting factual detail about alleged deficiencies in the training program"); *Walker v. City of New York*, No. 14-CV-808, 2015 WL 4254026, at \*11 (S.D.N.Y. July 14, 2015) (dismissing failure to train claim where the plaintiff "neither cites to procedural manuals and training guides, nor highlights the pertinent aspects of police training in order to prove the claim").

Furthermore, in addition to identifying a specific training deficiency, a plaintiff must "establish that that deficiency caused the constitutional deprivation." *Benn v. City of New York*, No. 18-CV-722, 2021 WL 3193022, at \*6 (S.D.N.Y. July 28, 2021) (citation omitted). Plaintiffs, however, only make conclusory assertions that Langley, "as Sheriff of Putnam County and/or subordinates under his command, fail to properly train and/or supervise its officers resulting in the unlawful actions complained of herein." (SAC ¶ 115.) Plaintiffs' conclusory assertions do not suffice to plausibly allege that a deficiency in training caused Taranto's injury. *See King v. City of Beacon Police Dep't*, No. 20-CV-5815, 2021 WL 1550073, at \*3 (S.D.N.Y. Apr. 20, 2021) (dismissing *Monell* claims when a plaintiff's allegations that his injuries "resulted from a municipal policy or custom" were

"wholly conclusory"); *Acosta v. City of New York*, No. 11-CV-856, 2012 WL 1506954, at *11 (S.D.N.Y. Apr. 26, 2012) (dismissing *Monell* claim where the plaintiff merely alleged that the city "failed to train its police officers," because the plaintiff "failed to set forth factual allegations that would support a plausible inference that the [c]ity's 'policies' or 'customs' caused ... [the] alleged violations of [the] plaintiff's rights").

**\*20** In sum, Plaintiffs have not pled a plausible *Monell* claim under a failure to train theory.

c. Failure to Discipline or Supervise

"In *City of Canton*, the Supreme Court established the 'deliberate indifference' standard in the context of a claim for failure to train, but 'the stringent causation and culpability requirements set out in that case have been applied to a broad range of supervisory liability claims,' including claims for failure to supervise and failure to discipline." *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 306 (S.D.N.Y. 2015) (quoting *Reynolds*, 506 F.3d at 192).

"To establish *Monell* liability premised on a failure to supervise, a plaintiff must plead that (1) there was a pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity, and (2) the municipality consistently failed to investigate those allegations." *Lopes v. Westchester Cnty.*, No. 18-CV-8205, 2020 WL 1445729, at *5 (S.D.N.Y. Mar. 25, 2020). Alternatively, "a plaintiff may plead (1) that there was a pattern of actual similar constitutional violations and (2) the municipality consistently failed to discipline those involved." *Tieman*, 2015 WL 1379652 at *21 (emphasis omitted). To establish deliberate indifference for a failure to supervise and/or discipline claim, the plaintiff must show that "the need for more or better supervision to protect against constitutional violations was obvious," which may be established "through proof of repeated complaints of civil rights violations ... if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Buari,* 530 F. Supp. 3d at 400.

"[A]n allegation of numerous claims of [the underlying constitutional wrong] by itself is insufficient to raise an inference of deliberate indifference due to failure to supervise." *Tieman*, 2015 WL 1379652, at *21. Rather, a plaintiff must allege that "meaningful attempts to investigate

repeated claims ... are absent." *Id.* (quoting *Hart v. City of Binghamton*, No. 10-CV-1064, 2012 WL 1565085, at *5 (N.D.N.Y. May 2, 2012)). In other words, "[f]or deliberate indifference to be shown, the response must amount to a persistent failure to investigate the complaints or discipline those whose conduct prompted the complaints." *Hart,* 2012 WL 1565085, at *5. Plaintiffs do not make any such allegation, instead Plaintiffs allege that Langley, "as Sheriff of Putnam County and/or subordinates under his command, fail to ... supervise its officers resulting in the unlawful actions complained of herein," failed "to discipline subordinates upon findings of misconduct," and that the "attack against [ ] Taranto could have been prevented had Putnam County and/or Sheriff Langley acted properly by removing Deputies who have demonstrated violent tendencies, failed to act within the boundaries of law, properly train its officers, properly supervise its officers and/or to discipline officer misconduct." (SAC ¶¶ 75, 115.) While the *DiPippo* case points to misconduct that occurred in the Putnam County Sheriff's Office, Plaintiffs make no specific factual allegations regarding any failures to investigate complaints or discipline officers involved in that matter by the Putnam County Sheriff's Office's in the Second Amended Complaint. (*See generally* SAC.) The only relevant allegations in the Second Amended Complaint are that "Plaintiffs are presently aware of similar misconduct committed by the Defendants in the matter of *DiPippo v. County of Putnam, et al.* where Defendants, among other things, also failed to disclose criminal discovery," and that "[i]n the matter of *DiPippo v. County of Putnam*, Defendant Quick was also one of the defendants who failed to disclose and apparently hid criminal discovery." (*Id.* ¶¶ 84–85.) However, Plaintiffs have made no allegations regarding any prior lack of investigation into or disciplining of Quick, or any other officer for that matter, in the Second Amended Complaint, which dooms their claim. *See Esperanza v. City of New York*, 325 F. Supp. 3d 288, 309 (E.D.N.Y. 2018) ("Plaintiffs do not allege any specific facts regarding whether the [c]ity investigated or disciplined Lluka in response to the complaints of excessive force."); *Walker*, 2015 WL 4254026, at *11 (noting that "[e]ven if [the] [p]laintiff had shown an obvious need for more or better supervision by listing the numerous lawsuits and complaints, he has not stated any facts to show that the [c]ity has acted with deliberate indifference" where "he does not specifically claim that the [c]ity *failed to investigate* the list of lawsuits"). Cases finding failures to supervise or discipline have required more. *See, e.g., Buari,* 530 F. Supp. 3d at 407–08 (ruling that the plaintiff sufficiently alleged failure to supervise when "in approximately 72 cases where courts had found prosecutorial

misconduct occurred [ ]including the use of and failure to correct false or misleading testimony and *Brady* violations[ ], officials could only identify one prosecutor from between 1975 and 1996 who had been disciplined in any respect"); *Marlin v. City of New York*, No. 15-CV-2235, 2016 WL 4939371, at *20–21 (S.D.N.Y. Sept. 7, 2016) (denying motion to dismiss on failure to discipline claim where officers were not disciplined in over thirty-five percent of substantiated complaints, which "plausibly suggest[ed] that the City did nothing"). [7]

### d. Final Policymaker

**\*21** "Actions by an individual with final decision-making authority in a municipality constitute official policy for purposes of a § 1983 claim." *Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003). "[E]ven a single action by a decisionmaker who possesses final authority to establish municipal policy with respect to the action ordered is sufficient to implicate the municipality in the constitutional deprivation for the purposes of § 1983." *Amnesty*, 361 F.3d at 126 (internal quotation marks and citation omitted). When a non-decisionmaker committed the constitutional violation "a plaintiff must allege facts suggesting that an officer with final policymaking authority ordered, ratified, or 'was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions.' " *Hu v. City of New York*, 927 F.3d 81, 105 (2d Cir. 2019) (quoting *Amnesty Am.*, 361 F.3d at 126).

"An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." *Anthony*, 339 F.3d at 139. When alleging policymakers caused the violation, "the critical inquiry is not whether an official generally has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit." *Guity v. Uniondale Union Free School Dist.*, No. 18-CV-04369, 2019 WL 3402280, at *7 (E.D.N.Y. July 26, 2019) (alteration omitted). "Whether an official has final policymaking authority is a legal question, determined on the basis of state law." *Roe*, 542 F.3d at 37.

Plaintiffs do allege in the Second Amended Complaint that "Defendant Langley is the final decision/policy maker of the Putnam County Sheriff's Department and in is familiar with, creates and implements his Department's practices and

policies." (SAC ¶ 107.) However, Plaintiffs do not point to any support for this proposition, which they must do to sufficiently allege Langley was a final policymaker with respect to the particular conduct challenged in this lawsuit. *See Coppola v. Town of Plattekill*, No. 17-CV-1032, 2018 WL 1441306, at *10 (N.D.N.Y. Mar. 22, 2018) ("[M]inimal, conclusory statements fall short of satisfying Plaintiff's burden to allege facts creating a plausible inference that either of these defendants were final policymakers. Plaintiff does not direct the Court to New York State law, municipal charters, or any other source that could support her claim."); *W.A. v. Hendrick Hudson Cent. Sch. Dist.*, No. 14-CV-8093, 2016 WL 1274587, at *12–13 (S.D.N.Y. Mar. 31, 2016) (dismissing a *Monell* claim where the plaintiffs "allege[d] that 'Coughlin, as an administrator for the District, possesses policy making authority,' " but "cite[d] no state or county law that actually vests Coughlin with final policymaking authority over the maintenance and protection of student records"); *Canner v. City of Long Beach*, No. 12-CV-2611, 2015 WL 4926014, at *6 (E.D.N.Y. Aug. 18, 2015) (noting a prior order where the court dismissed the plaintiffs' *Monell* claim where "plaintiffs did not reference any state law supporting their claim that [an official] was a final policymaker"); *see also Jeffes v. Barnes*, 208 F.3d 49, 57–58 (2d Cir. 2000) ("Where a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law."); *Long v. Cnty. of Orleans*, 540 F. Supp. 3d 344, 352–53 (W.D.N.Y. 2021), *appeal dismissed* (Sept. 1, 2021) (holding at summary judgment that the "[p]laintiff's vague assertion of final policymaking authority by Sheriff Bower is simply insufficient to satisfy his burden" when the plaintiff "neither produced nor pointed to any evidence or legal authority supporting the conclusion that Sheriff Bower had final policymaking authority regarding the force to be used in effectuating an arrest or when probable cause for an arrest has been established" (quotation marks omitted)). Accordingly, the *Monell* claim cannot stand. [8]

### 9. State Claims

**\*22** Defendants move to dismiss all of Plaintiffs' state claims "except for state law claims for assault, battery and wrongful death, and Ms. Taranto's corollary claims for loss of consortium." (Defs.' Mem. 2.) [9]

## a. Defamation

To state a claim for defamation under New York law, a plaintiff must allege "(1) a false statement about the plaintiff; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on part of the publisher; (4) that either constitutes defamation per se or caused special damages." *Alvarado v. Mount Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763, 790 (S.D.N.Y. 2019) (quotation marks omitted). Under New York law, "spoken defamatory words are slander; written defamatory words are libel." *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001); *see also Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000) ("Libel is a method of defamation expressed in writing or print.").

**\*23** A plaintiff must plead the defamatory statements with some particularity. N.Y. C.P.L.R. 3016(a) ("In an action for libel or slander, the particular words complained of shall be set forth in the complaint, but their application to the plaintiff may be stated generally."). Under Federal Rule of Civil Procedure 8's liberal pleading standards, this requires a plaintiff to "identify the allegedly defamatory statements, the person who made the statements, the time when the statements were made, and the third parties to whom the statements were published." *Neal v. Asta Funding, Inc.*, 13-CV-2176, 2014 WL 3887760, at \*3 (S.D.N.Y. June 17, 2014).

Plaintiffs argue they have sufficiently pled a cause of action for defamation because the "filing of false criminal allegations sufficiently demonstrates libel/slander per se." (Pls.' Mem. 26.) More specifically, Plaintiffs allege that "Defendants, individually and/or collectively, have defamed [Taranto] by libel per se and/or slander per se, libel and/or slander, based upon the false arrest of Plaintiff and release of false information concerning said arrest, the sum and substance of which defamatory statements was that [Taranto] engaged in acts constituting the crime of Menacing in the Second Degree and other alleged criminal acts despite knowing them to be false." (SAC ¶ 206.)

However, "[o]fficers may not be held liable for any allegedly defamatory statements in their criminal complaints, because 'individuals participating in a public function such as judicial proceedings are afforded protection from liability by an absolute immunity.' " *Grant v. City of Syracuse*, No. 15-CV-445, 2017 WL 5564605, at \*11 (N.D.N.Y. Nov. 17, 2017); *Lockett v. City of Middletown*, No. 19-CV-08255,

2021 WL 1092357, at \*6 (S.D.N.Y. Mar. 22, 2021) (same). Accordingly, "[a] person filing a formal complaint charging another with a crime is ... entitled to absolute immunity from a civil suit for defamation." *Grant*, 2017 WL 5564605, at \*11 (citation omitted); *see also Frederique v. Cnty. of Nassau*, 168 F. Supp. 3d 455, 488 (E.D.N.Y. 2016) ("[T]o the extent that Plaintiffs argue that the Felony Complaints and District Court Informations contained defamatory statements, the [Nassau County Police Department] officers who made those statements are protected from liability by an absolute immunity."); *Goncalves v. Reynolds*, 198 F. Supp. 2d 278, 282 (W.D.N.Y. 2001) (holding that absolute immunity shielded the defendant from liability for defamation where the "defendant's actions with respect to plaintiff's arrest and the bringing of the assault charge were clearly prosecutorial in nature, and were directly related to the decision to prosecute plaintiff"). Accordingly, Plaintiffs' defamation claim cannot stand.

## b. Negligence

The elements of a negligence claim under New York law are: "(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach." *Lombard v. Booz–Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002) (citing *Merino v. New York City Transit Auth.*, 639 N.Y.S.2d 784 (App. Div. 1996)).

Plaintiffs argue they "have sufficiently pled negligence as an alternate theory of liability," because Defendants "owned [sic] a duty of care to [ ] Taranto who was deprived of his liberties while in Defendants['] custody, care and control." (Pls.' Mem. 25.) "Under New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994); *see also Toure v. Air France*, No. 21-CV-1645, 2022 WL 4079592, at \*3 (E.D.N.Y. Sept. 6, 2022) ("[A] plaintiff seeking damages for an injury resulting from a wrongful arrest and detention may not recover under broad general principles of negligence ... but must proceed by way of the traditional remedies of false arrest and imprisonment.") (citation omitted); *Durr v. Slator*, 558 F. Supp. 3d 1, 40 (N.D.N.Y. 2021) ("When a plaintiff brings excessive force and assault claims which are premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to the same conduct will not lie." (citation and

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 85 of 120

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

quotation marks omitted)); *Dollard v. City of New York*, 408 F. Supp. 3d 231, 238–39 (E.D.N.Y. 2019) ("New York does not, as a matter of public policy, recognize a claim for negligence arising out of an arrest or prosecution.... To the extent that a claim for negligence and/or NIED is based upon injury incident to an arrest, a plaintiff must resort to the traditional tort remedies of false arrest, false imprisonment, and malicious prosecution."); *Sullivan v. City of New York*, No. 17-CV-3779, 2018 WL 3368706, at *18 (S.D.N.Y. July 10, 2018) ("New York courts have long held that, where a plaintiff brings false-arrest and false-imprisonment claims, she cannot also recover under broad principles of negligence."). Accordingly, Plaintiffs cannot maintain a negligence claim insofar as that claim overlaps with excessive force, false arrest, false imprisonment, and malicious prosecution causes of action.

**\*24** "However, a plaintiff may proceed with negligence claims brought against law enforcement officials if such claims are not duplicative of false arrest, false imprisonment, or malicious prosecution." *Lalonde v. City of Ogdensburg*, —— F. Supp. 3d ——, 2023 WL 2537626, at *29 (N.D.N.Y. Mar. 16, 2023). Accordingly, courts have allowed negligence actions pertaining to deprivations of adequate medical care to proceed. *See Durr*, 558 F. Supp. 3d at 40–41 (holding that plaintiff plausibly alleged both a deliberate indifference to medical claim needs claim and a negligence claim related to the failure to provide medical care upon his arrest).

"[I]t is well-established in New York that when the State assumes physical custody of inmates or detainees, who cannot protect and defend themselves in the same way as those at liberty can, the State owes a duty of care to safeguard those individuals from harm." *Maldonado*, 460 F. Supp. 3d at 400–01 (quotation and citation omitted). Accordingly, courts have found that when a plaintiff is injured during an arrest and the arresting officers fail to provide medical care upon arrest, a plaintiff may proceed with a negligence claim. *See Durr*, 558 F. Supp. 3d at 41 (holding negligence claim survived when the "complaint plausibly alleges that Plaintiff was seriously injured during the course of his arrest and that the City Defendants, knowing that Plaintiff was in severe pain, declined to take him to the Upstate Emergency Department for treatment, despite being instructed to do so by healthcare personnel").

Plaintiffs allege that "Defendants refused to permit [ ] Taranto to receive proper medical attention at the scene or to be removed from the scene via ambulance," and that "[a]ny first aid provided at the scene by any Fire Department personnel or Emergency Medical Technician present at the scene was insufficient and inadequate to address [ ] Taranto's medical distress." (SAC ¶¶ 46, 48.) Federal Rule of Civil Procedure 8 "requires, at a minimum, that a complaint give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." *Patrico v. Voya Fin., Inc.*, No. 16-CV-7070, 2017 WL 2684065, at *5 (S.D.N.Y. June 20, 2017) (quotation marks omitted). A complaint fails this standard when it "lump[s] all the defendants together in each claim and provid[es] no factual basis to distinguish their conduct." *Id.* Plaintiffs have brought the claims against multiple Defendants, namely Putnam County Sheriff's Office employees, not all of whom were present at the scene, and possibly Fire Department personnel, and Emergency Medical Technicians. (*See generally* SAC.) It is unclear from Plaintiffs' pleadings which Defendants prevented Taranto from receiving proper medical attention or what medical attention Taranto was prevented from receiving, as Plaintiffs have simply pled that "Defendants" were responsible for such actions and have not provided a "plausible factual basis to distinguish the conduct of each of the defendants." *Bardwil Indus. Inc. v. Kennedy*, No. 19-CV-8211, 2020 WL 2748248, at *3 (S.D.N.Y. May 27, 2020). On that basis, the negligence claim must fail. *See Nesbeth v. N.Y.C. Mgmt. LLC*, 17-CV-8650, 2019 WL 110953 (S.D.N.Y. Jan. 4, 2019) ("[I]t is well-established in this Circuit that plaintiffs cannot simply lump defendants together for pleading purposes" under Rule 8 (quotation marks omitted)); *Medina v. Bauer*, No. 02-CV-8837, 2004 WL 136636, at *6 (S.D.N.Y. Jan. 27, 2004) ("By lumping all the defendants together and failing to distinguish their conduct, plaintiff's amended complaint fails to satisfy the requirements of Rule 8. Specifically, the allegations fail to give adequate notice to these defendants as to what they did wrong.").

### c. Negligent Hiring, Supervision, and Training

**\*25** Defendants argue that Plaintiffs' negligent-hiring, retention, training, and supervision claims are not actionable under New York law because all Defendants were acting within the scope of their employment. (Defs.' Mem. 21.) Indeed, Plaintiffs allege that, at all relevant times, Defendants "were acting within the scope of their employment and in furtherance of the purposes and business of Putnam County and/or the Putnam County Sheriff's Office, and/ or Fire Department personnel and/or Emergency Medical Technicians." (SAC ¶ 7.) "New York law provides that an

employer can be liable for the torts of an employee who acts within the scope of his or her employment under the theory of respondeat superior, but no claim may proceed against the employer for negligent hiring, retention, supervision or training." *Hurt v. City of New York*, No. 15-CV-7612, 2018 WL 4007639, at *4 (S.D.N.Y. Aug. 22, 2018) (quotation marks omitted). An "exception to [this] general principle exists where the plaintiff is seeking punitive damages from the employer based on alleged gross negligence in the hiring or retention of the employee." *Nesheiwat v. City of Poughkeepsie*, No. 11-CV-7072, 2013 WL 620267, at *2 (S.D.N.Y. Feb. 13, 2013).

"It is [ ] well settled that 'the State and its political subdivisions [such as counties] are not subject to punitive damages ... [as] the goals of punishment and deterrence are not served when punitive damages are imposed against the State, for in such circumstances, it ultimately is the innocent taxpayer who is punished.' " *Martinez v. Cnty. of Suffolk*, 999 F. Supp. 2d 424, 433 (E.D.N.Y. 2014) (citing *Hubbard v. Town of Sand Lake*, 667 N.Y.S.2d 496, 498 (App. Div. 1998)); *see also Ogunkoya v. Cnty. of Monroe*, No. 15-CV-6119, 2020 WL 3791850, at *8 (E.D.N.Y. July 7, 2020) (noting that municipalities are not subject to punitive damages). "Thus, the negligent hiring claim ... is dismissed." *Martinez,* 999 F. Supp. 2d at 433.

### d. Prima Facie Tort

To survive a motion to dismiss on a claim of prima facie tort, a plaintiff must allege: (1) the defendant's intentional infliction of harm; (2) special damages resulting from the defendant's actions; (3) a lack of "excuse or justification"; and (4) that the defendant's act or acts would otherwise be lawful. *NE Brands LLC v. Seattle Pac. Indus., Inc.*, No. 19-CV-7420, 2020 WL 4287989, at *2 (S.D.N.Y. July 27, 2020) (quoting *U.S. for Use and Benefit of Evergreen Pipeline Constr. Co., Inc. v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 161 (2d Cir. 1996)). "Special damages" refers to an injury made up of a "specific and measurable loss." *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 143 (1985). Defendants argue that Plaintiffs have failed to allege any specific damages and their claim therefore fails. (Defs.' Mem. 22.) Plaintiffs have failed to respond to this argument. (*See generally* Pls.' Mem.)

Federal courts have the discretion to deem a claim abandoned when a defendant moves to dismiss that claim and the plaintiff fails to address in their opposition papers the

defendant's arguments for dismissing such a claim. *See, e.g., Lipton v. Cnty. of Orange*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed."); *Anti–Monopoly, Inc. v. Hasbro, Inc.*, 958 F. Supp. 895, 907 n.11 (S.D.N.Y. 1997) ("[T]he failure to provide argument on a point at issue constitutes abandonment of the issue ... which provides an independent basis for dismissal." (citations omitted)), *aff'd,* 130 F.3d 1101 (2d Cir. 1997); *see also Robinson v. Fischer*, No. 09-CV-8882, 2010 WL 5376204, at *10 (S.D.N.Y. Dec. 29, 2010) (report and recommendation) (collecting cases). Because Plaintiffs have failed to address Defendants' argument for dismissing the prima facie tort claim, that claim is abandoned. *See Laface v. E. Suffolk BOCES*, No. 18-CV-1314, 2019 WL 1959489, at *8 (E.D.N.Y. May 2, 2019) ("In the Second Circuit, a plaintiff's failure to respond to contentions raised in a motion to dismiss constitute[s] an abandonment of those claims." (alteration and quotation marks omitted) (collecting cases)); *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-CV-442, 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014) ("At the motion to dismiss stage ... a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim.").

### III. Conclusion

**\*26** For the foregoing reasons, Defendants' Motion is granted in part and denied in part. Defendants' request that all of Plaintiffs' state causes of action be dismissed as a result of Plaintiffs' failure to comply with New York's General Municipal Law is denied. The remainder of Defendants' Motion is granted. Because this is the first adjudication of Plaintiffs' claims on the merits, Plaintiffs' claims are dismissed without prejudice. If Plaintiffs wish to file a third amended complaint alleging additional facts and otherwise addressing the deficiencies identified above, Plaintiffs must do so within 30 days of the date of this Opinion & Order. There will be no extensions. Plaintiffs are further advised that the third amended complaint will completely replace, not supplement, the instant Second Amended Complaint. The third amended complaint must therefore contain all of the claims, defendants, and factual allegations that Plaintiffs wish the Court to consider. If Plaintiffs fail to timely file a third amended complaint, the claims may be dismissed with prejudice.

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 87 of 120

The Court will hold a status conference on October 3, 2023, at 12:15 P.M.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 6318280

---

## Footnotes

1    Plaintiffs have withdrawn their malicious prosecution and Eighth Amendment claims. (Mem. of Law for Reply to Mot. to Dismiss. 14, 16.)

2    The Arrest Report, Use of Force Form, Appearance Ticket, Criminal Court Information, Criminal Court Discovery, Photograph Hospital, Photograph Surgery, and Personnel Investigation, attached to Plaintiffs' Opposition, are also attached to the Second Amended Complaint.

3    Defendants note that the defendant in *DiPippo v. County of Putnam* was actually Quick's father. (Defs.' Mem. 18.)

4    Plaintiffs in their Opposition also point to "the statements of [ ] Langley, which purport to have one of his subordinates change the Use of Force Form with respect to the use of an impact weapon upon [ ] Taranto." (Pls.' Mem 15.) Plaintiffs do not make any such allegations in the Second Amended Complaint.

5    Plaintiffs posit that the municipal liability lies because of "the failure to maintain an independent police review board." (SAC ¶ 161.) However, an alleged absence of a formal policy is not a policy: "the absence of a policy is not a policy and is not actionable under *Monell*." *Zachary v. City of Newburgh*, No. 13-CV-5737, 2014 WL 1508705, at *5 (S.D.N.Y. Apr. 1, 2014) (citing *Monell*, 436 U.S. at 690–91); *see also Quinones v. New York City*, No. 19-CV-5400, 2020 WL 5665142, at *19 (S.D.N.Y. Aug. 17, 2020) ("[B]ut, under *Monell*, a municipality's failure to put a formal policy in place to prevent unlawful conduct is not the same thing as an actionable policy."), *report and recommendation adopted*, No. 19-CV-5400, 2020 WL 6901340 (S.D.N.Y. Nov. 23, 2020). "Nonetheless, the Supreme Court has left a narrow opening for § 1983 claims like the one [the Court] address[es] here seeking liability based not on affirmative conduct but on a government official's failure to act." *Reynolds v. Giuliani*, 506 F.3d 183, 191–92 (2d Cir. 2007) (citing *City of Canton*, 489 U.S. at 394–95 (O'Connor, J., concurring in part and dissenting in part) ("Where ... a claim of municipal liability is predicated upon a failure to act, the requisite degree of fault must be shown by proof of background events and circumstances which establish that the 'policy of inaction' is the functional equivalent of a decision by the city itself to violate the Constitution.")). When a municipality "does not have an adequate policy ...*Monell* liability exists 'where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Fraser v. City of N.Y.*, No. 20-CV-4926, 2021 WL 1338795, at *10 (S.D.N.Y. Apr. 9, 2021) (quoting *Reynolds*, 506 F.3d at 192). "Such a pattern, if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of *Monell*." *Id.*

6    Plaintiffs have not argued that they have plausibly alleged municipal liability on the basis of a widespread practice of excessive force. (Pls.' Mem. 22–24.) Indeed, Plaintiffs have not pointed to any other instances of excessive use of force beyond the incident described at hand. (*See generally* SAC.) This alone is fatal to Plaintiffs' *Monell* claim. *See Aragon v. New York*, No. 14-CV-9797, 2017 WL 2703562, at *6 (S.D.N.Y. June 22, 2017) (dismissing claims where "[the] [p]laintiff seems to allege the existence of a practice adopted by the [County] solely based on [the] [p]laintiff's alleged experience"); *Gordon v. City of New York*, No. 10-CV-5148,

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

Case 3:25-cv-00673-AMN-ML     Document 5     Filed 09/24/25     Page 88 of 120

2012 WL 1068023, at *4 (E.D.N.Y. Mar. 29, 2012) (dismissing *Monell* claim where the plaintiff's "allegation [was] unsupported by anything other than the facts of what occurred in his particular case").

7    In *DiPippo*, the court noted that Plaintiff alleged that "Stephens and other supervisors purportedly knew about Castaldo and Quick's misconduct, personally participated in it, and failed to document or disclose it. Stephens and other supervisors also allegedly failed to prevent Castaldo and Quick from engaging in misconduct, participated in it, encouraged it, and affirmatively misrepresented to prosecutors that no misconduct had occurred ... Stephens updated Thoubboron about all major investigatory developments. Hence, Thoubboron was either aware of the misconduct committed by Defendants Stephens, Castaldo, and Quick or willfully blind to it." 2019 WL 1004152, at *6. However, Plaintiffs have made no specific allegations in the Second Amended Complaint about any alleged failure to supervise or discipline.

Plaintiffs additionally allege that "[a]t all times mentioned herein and prior to the incidents described herein, Putnam County, by and through its policy makers, maintained a policy, practice or custom, officially or unofficially, of failing to adequately supervise, discipline and/or train its officers, including with respect to the use of force, tactics with respect to responding to emotionally disturbed persons and the use of weapons during police encounters." (SAC ¶ 162.) Plaintiffs have not alleged any prior failures to supervise or discipline officers for use of force, tactics with respect to responding to emotionally disturbed persons and the use of weapons during police encounters.

8    Furthermore, Plaintiffs do not specifically argue in their Opposition that *Monell* liability is predicated upon an act of a final policymaker or point to a specific to act in their briefing. (Pls.' Mem. 22–24.)

9    Defendants aver that Plaintiffs' state law claims are precluded due to their failure to comply with General Municipal Law § 50-h. (Defs.' Mem 20–21.) Section 50-h states:

> [w]herever a notice of claim is filed against a city, county, town, village, fire district, ambulance district or school district the city, county, town, village, fire district, ambulance district or school district shall have the right to demand an examination of the claimant relative to the occurrence and extent of the injuries or damages for which claim is made, which examination shall be upon oral questions unless the parties otherwise stipulate .... The action ... may not be commenced until compliance with the demand for examination if the claimant fails to appear at the hearing or requests an adjournment or postponement beyond the ninety day period.

N.Y. Gen. Mun. Law § 50-h(1);(5). In federal court, "a 'plaintiff's failure to attend a 50-h [h]earing—*no matter the reason*—is a complete bar to his state law claims[.]' " *Bird v. Cnty. of Westchester*, No. 20-CV-10076, 2022 WL 2263794, at *12–13 (S.D.N.Y. June 23, 2022) (citation omitted); *see also Misek-Falkoff v. Metro. Transit Auth. (MTA)*, 843 N.Y.S.2d 155, 156 (App. Div. 2007) ("A party who has failed to comply with General Municipal Law § 50-h is generally precluded from commencing an action against a municipality[.]"); *Baumblatt v. Battalia*, 520 N.Y.S.2d 571, 574 (App. Div. 1987) (dismissing a complaint against a town because "the plaintiff failed to appear for examination on his original notice of claim as requested by the town's attorney pursuant to General Municipal Law § 50-h and this failure bars the commencement of an action against the town"). Plaintiffs' Second Amended Complaint only states that "Defendants have not held a hearing on this claim pursuant to General Municipal Law 50-h." (SAC ¶ 21.) This Court cannot determine at this stage whether this was due to Taranto's failure to attend the hearing.

Defendants also moved to dismiss Plaintiffs' intentional infliction of emotional distress claims against the County. (Defs.' Mem 21.) Plaintiffs "concede that a cause of action for intentional infliction of emotional distress against Putnam County cannot be maintained." (Pls.' Mem. 25.)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 89 of 120

**Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)**

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 90 of 120

Stinson v. Saint Vincent's Hospital, Not Reported in Fed. Supp. (2022)

2022 WL 2047221
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Michael STINSON, Plaintiff,
v.
SAINT VINCENT'S HOSPITAL, et al., Defendants.

No. 3:20-cv-00704 (VAB)
|
Signed 06/03/2022
|
Filed 06/06/2022

**Attorneys and Law Firms**

Michael Stinson, Enfield, CT, Pro Se.

**RULING AND ORDER**

VICTOR A. BOLDEN, UNITED STATES DISTRICT JUDGE

**\*1** Michael Stinson ("Plaintiff"), is currently confined at Carl Robinson Correctional Institution in Enfield, Connecticut. He has filed a Complaint naming Saint Vincent's Hospital, the Bridgeport Police Department, Dr. John Doe 1 ("Dr. Doe 1"), Hospital Security Guard John Doe 2 ("Security Guard Doe 2"), Hospital Security Guard John Doe 3 ("Security Guard Doe 3"), Hospital Security Guard John Doe 4 ("Security Guard Doe 4"), and Bridgeport Police Officer John Doe 5 ("Police Officer Doe 5") as defendants (collectively, "Defendants"). The allegations asserted against the Defendants arise from an incident that occurred on March 18, 2018, at Saint Vincent's Hospital in Bridgeport, Connecticut.

For the reasons set forth below, the Complaint is **DISMISSED** in part, and only the Fourteenth Amendment claim of deliberate or reckless indifference to medical needs against Police Officer John Doe 5 in his individual capacity remains. All other claims in the Complaint are **DISMISSED**.

Mr. Stinson will have until **September 9, 2022** to discover the first and last name of Defendant Bridgeport Police Officer John Doe 5 and to file a notice with the Clerk of Court indicating the first and last name of this Police Officer. The Court will dismiss the claim against Defendant Bridgeport

Police Officer Doe 5 if Mr. Stinson does not provide a written notice indicating the Defendant's first and last name by **September 9, 2022**

**I. FACTUAL BACKGROUND**

On or about March 17, 2018, Mr. Stinson allegedly had a motor vehicle accident and sustained unspecified injuries. Compl. at 3, ¶ 9, ECF No. 1 (May 21, 2020) ("Compl."). On March 18, 2018, Mr. Stinson allegedly sought medical treatment for his injuries in the emergency room at Saint Vincent's Hospital in Bridgeport, Connecticut. *Id.* at 3, ¶ 10. A physician working in the emergency room, Dr. Doe 1, allegedly refused to examine or evaluate Mr. Stinson but indicated that he would renew Mr. Stinson's prior prescription for pain medication. *Id.* at 3, ¶ 11. When Dr. Doe 1 allegedly handed Mr. Stinson the prescription, Mr. Stinson allegedly "complained 'this is only half of what I usually get.' " *Id.* at 3, ¶ 12. In response to Mr. Stinson's complaint, Dr. Doe 1 allegedly "became enraged, and ... lunged at [Mr. Stinson], smacking and pulling at [Mr. Stinson's] hand, trying to physically get back the prescription." *Id.* at 3, ¶ 13. A nurse allegedly called for security. *Id.* at 3, ¶ 14. Security Guards Doe 2 and Doe 3 allegedly responded to the scene. *Id.*

Security Guard Doe 2 allegedly wrapped his arms around Mr. Stinson's neck and began to choke Mr. Stinson. *Id.* at 3–4, ¶ 15. Security Guard Doe 3 allegedly punched Mr. Stinson repeatedly in the face as Security Guard Doe 2 allegedly continued to place Mr. Stinson in a "lethal choke hold." *Id.* at 4, ¶ 16. Security Guard Doe 4 allegedly arrived at the scene and "used all his body weight to slam [Mr. Stinson's] head into the ground" repeatedly and screamed, " 'yeah remember me.' " *Id.* at 4, ¶ 17. As Security Guards Doe 2, Doe 3, and Doe 4 allegedly "slammed" Mr. Stinson into the hallway, an emergency medical technician allegedly shouted and directed them to stop attacking Mr. Stinson. *Id.* at 4, ¶ 18. Security Guards Doe 2, Doe 3, and Doe 4 allegedly choked and restrained Mr. Stinson on the floor of the hallway for ten minutes until Police Officer Doe 5 arrived at the scene. *Id.* at 4, ¶ 19.

**\*2** After his arrival, Police Officer Doe 5 allegedly handcuffed Mr. Stinson to a hospital bed and questioned him regarding the incident. *Id.* at 4–5, ¶¶ 20-21. Police Officer Doe 5 allegedly informed Mr. Stinson that he had watched the security video footage of the incident and that he had not observed Mr. Stinson hit anyone. *Id.* at 5, ¶ 22. Police Officer Doe 5 allegedly also remarked that one of the security guards had stated previously working as a correctional officer at a

Stinson v. Saint Vincent's Hospital, Not Reported in Fed. Supp. (2022)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 91 of 120

time when Mr. Stinson was confined in a Connecticut prison facility and that Mr. Stinson's complaints had gotten him into trouble. *Id.*

Mr. Stinson allegedly informed several nurses that he was dizzy, nauseous, and had a severe headache. *Id.* at 5, ¶ 23. Dr. Doe 1 allegedly stated that Mr. Stinson was fine. *Id.* Neither Dr. Doe 1 nor the nurses allegedly provided Mr. Stinson with medical care despite the "large, visible contusions on his forehead." *Id.* at 5, ¶ 24.

Police Officer Doe 5 allegedly placed Mr. Stinson under arrest for assault and transported him to the Congress Street Police Station in Bridgeport. *Id.* at 5, ¶ 25; at 8–9, ¶ 39. After arriving at the station, Mr. Stinson allegedly asked Police Officer Doe 5 to take him to another hospital for treatment of the injuries that he had suffered during his motor vehicle accident on March 17, 2018 and for the injuries that he had incurred during the assault at Saint Vincent's Hospital earlier that day. *Id.* at 5–6, ¶ 26. Police Officer Doe 5 allegedly denied Mr. Stinson's requests for medical treatment. *Id.* at 6, ¶ 27. At some point before or during the morning of March 20, 2018, Bridgeport Police Department officials allegedly released Mr. Stinson from custody. *Id.* at 6, ¶ 28; Ex. B to Compl., ECF No. 1-1 (May 21, 2020) ("Ex. B").

At approximately 7:00 a.m. on March 20, 2018, Mr. Stinson allegedly arrived to the emergency room at Bridgeport Hospital in Bridgeport, Connecticut for treatment of injuries to his head, back, and neck. Compl. at 6, ¶ 28; Ex. B at 3. During his visit, Mr. Stinson allegedly underwent x-rays of his lumbar spine and a CT of his head and neck. Compl. at 6, ¶ 30; Ex. B at 12, 15–18. A physician allegedly prescribed pain medication and muscle relaxants and discharged Mr. Stinson at approximately 9:30 a.m. Compl. at 6, ¶ 29; Ex. B at 3, 12, 15.

## II. STANDARD OF REVIEW

Under 28 U.S.C. § 1915A(b), district courts must review prisoners' civil complaints against governmental actors and *sua sponte* "dismiss ... any portion of [a] complaint [that] is frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Liner v. Goord*, 196 F.3d 132, 134 & n.1 (2d Cir. 1999) (explaining that, under the Prisoner Litigation Reform Act, *sua sponte* dismissal of frivolous prisoner complaints is mandatory); *Tapia-Ortiz v. Winter*, 185 F.3d 8, 11 (2d Cir. 1999) ("Section 1915A requires that a

district court screen a civil complaint brought by a prisoner against a governmental entity or its agents and dismiss the complaint *sua sponte* if, *inter alia*, the complaint is 'frivolous, malicious, or fails to state a claim upon which relief may be granted.' " (quoting 28 U.S.C. § 1915A)).

Rule 8 of the Federal Rules of Civil Procedure requires that a plaintiff plead only "a short and plain statement of the claim showing that the pleader is entitled to relief," *see* Fed. R. Civ. P. 8(a)(2), to provide the defendant "fair notice of what the ... claim is and the grounds upon which it rests," *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

**\*3** A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level" and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Although the Federal Rules of Civil Procedure do not require "detailed factual allegations," a complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555–57. Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claim] is improbable, and ... recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted).

Complaints filed by *pro se* plaintiffs, however, "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F. 3d 471, 474 (2d Cir. 2006)) (internal quotation marks omitted); *see also Tracy v. Freshwater*, 623 F. 3d 90, 101–02 (2d Cir. 2010) (discussing the "special solicitude" courts afford *pro se* litigants).

## III. DISCUSSION

Mr. Stinson claims that Security Guard Doe 2 violated his Eighth Amendment rights by allegedly assaulting him, choking him, and slamming his head into the ground, Compl. at 7, ¶ 34; Security Guard Doe 3 allegedly violated Mr. Stinson's Eighth Amendment rights by assaulting him,

punching him, and slamming his head into the ground, *id.* at 7–8, ¶ 35; Security Guard Doe 4 allegedly violated his Eighth Amendment rights by assaulting him and slamming his head into the ground, *id.* at 8, ¶ 37, and also allegedly violated his First Amendment rights by assaulting him in retaliation for complaints that he made when John Doe 4 worked as a correctional officer for the Department of Correction, *id.* at 8, ¶ 36; Dr. Doe 1 allegedly violated Mr. Stinson's Eighth Amendment rights by refusing to treat injuries that he had suffered due to a motor vehicle accident, by assaulting him, and by failing to protect him from assault by Security Guards Doe 2, Doe 3, and Doe 4, *id.* at 6–7, ¶¶ 31–32; Police Officer Doe 5 allegedly violated his Fourth Amendment rights by falsely arresting him, *id.* at 8–9, ¶ 39, and allegedly violated his Eighth Amendment rights by denying him medical attention during his confinement at the police station after his arrest, *id.* at 8, ¶ 38.

Mr. Stinson alleges that Bridgeport Police Department is liable as a municipality, *id.* at 9, ¶ 40, and St. Vincent's Hospital has a custom, policy, and practice of allowing its security guards to assault and injure patients, *id.* at 9, ¶ 41. For relief, Mr. Stinson seeks compensatory and punitive damages. *Id.* at 10.

The Court will address the claims against the various Defendants in turn.

**A. Dr. John Doe 1 and Security Guards John Doe 2, Doe 3, and Doe 4**

Section 1983 of Title 42 of United States Code creates a private federal cause of action against any person, acting under color of state law, who deprives an individual of federally or constitutionally protected rights. *See Rehberg v. Paulk*, 566 U.S. 356, 361 (2012). To state a claim for relief under § 1983, a plaintiff must allege that: (1) the defendant "deprived [him or her] of a right secured by the Constitution or laws of the United States," and (2) the defendant "committed [the deprivation] under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). Thus, state action is a prerequisite to a section 1983 action.

**\*4** The Supreme Court has held that "state action may be found ... only if[ ] there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.' " *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (quoting *Jackson v. Metropolitan*

*Edison, Co.*, 419 U.S. 345, 351 (1974)). A plaintiff may demonstrate that the conduct of a "nominally private entity" constitutes state action under section 1983 in three ways: "(1) the entity acts pursuant to the 'coercive power' of the state or is 'controlled' by the state ('the compulsion test'); (2) when the state provides 'significant encouragement' to the entity, the entity is a 'willful participant in joint activity with the [s]tate,' or the entity's functions are 'entwined' with state policies ('the joint action test' or 'close nexus test'); or (3) when the entity 'has been delegated a public function by the [s]tate,' ('the public function test')." *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (quoting *Brentwood*, 531 U.S. at 296).

Mr. Stinson has failed to allege any facts to suggest that St. Vincent's Hospital, Dr. John Doe 1, Hospital Security Guard John Doe 2, Hospital Security Guard John Doe 3, or Hospital Security Guard John Doe 4 engaged in conduct that constitutes state action under § 1983. The Second Circuit and district courts in the Second Circuit have consistently held that private hospitals do not act under color of state law for § 1983 purposes. *See, e.g., White v. St. Joseph's Hosp.*, 369 F. App'x 225, 226 (2d Cir. 2010) (summary order) ("[P]rivate actors and institutions, such as ... hospitals ... are generally not proper § 1983 defendants because they do not act under color of state law.... [and] the presence of state funding or regulation, in the absence of some concerted action with state officials, does not transform a private party's action into state action.") (internal citation omitted); *Kia P. v. McIntyre*, 235 F.3d 749, 755–57 (2d Cir. 2000) (holding that a private hospital was not a state or municipal facility and thus was not liable under § 1983, insofar as it was acting "as a private actor providing medical care"); *Febres v. Yale New Haven Hosp.*, No. 19-CV-1195 (KAD), 2019 WL 7050076, at \*2–\*3 (D. Conn. Dec. 23, 2019) (granting motion to dismiss claims against Yale New Haven Hospital and physicians employed at the hospital because defendants were "private actors not subject to Section 1983 liability"); *Goonewardena v. N. Shore Long Island Jewish Health Sys.*, No. 11-CV-2456 (MKB), 2014 WL 1271197, at \*11 n.14 (E.D.N.Y. Mar. 26, 2014) (finding that, because the defendant was a private hospital and the plaintiff failed to plead any facts suggesting that the hospital acted in concert with state actors, the hospital could not be a state actor under § 1983), *aff'd* 597 F. App'x 19 (2d Cir. 2015); *Rose v. City of Waterbury*, Civil Action No. 3:12cv291 (VLB), 2013 WL 1187049, at \*5–\*6 (D. Conn. Mar. 21, 2013) (claims against St. Mary's Hospital dismissed because plaintiff failed to allege that the hospital and the City of Waterbury police officers "were engaged in joint activity"

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 93 of 120

Stinson v. Saint Vincent's Hospital, Not Reported in Fed. Supp. (2022)

or that there was such a close nexus between the state and the challenged action that "the actions of the Hospital [could be] fairly attribute[ed] to the state").

Dr. John Doe 5 was a private emergency room physician who was working at St. Vincent's Hospital on March 18, 2018, when Mr. Stinson sought treatment for injuries that he had sustained in a car motor vehicle accident. The John Doe security guards were employed by St. Vincent's Hospital and were working on March 18, 2018.

Mr. Stinson asserts no facts to suggest that Dr. John Doe 1 was a state actor or that the John Doe security guards were state actors. Nor are there allegations that either the actions of Dr. Doe 1 or the actions of the John Doe security guards meet the requirements of the public function test, the close nexus test, or the compulsion test for determining when private conduct can be attributed to the state. *See, e.g.*, *Wilson v. Agustino*, No. 3:12-CV-1554 (VLB), 2013 WL 331255, at *1–*3 (D. Conn. Jan. 28, 2013) (dismissing a claim against a Saint Francis Hospital emergency room physician who treated plaintiff after his arrest by Hartford Police Officers because no facts were asserted to show that the conduct of the private physician could be attributed to the State of Connecticut) (collecting cases); *Jouthe v. City of New York*, No. 05-CV-1374 (NGG) (VVP), 2009 WL 701110, at *20 (E.D.N.Y. Mar. 10, 2009) (concluding that the plaintiff failed to offer evidence that a private security guard employed by Long Island Jewish Medical Center was a state actor subject to liability under § 1983 because no facts suggested that the security guard was a designated "safety officer" or "special policeman" under New York law) (collecting cases).

**\*5** Mr. Stinson mentions that Security Guard Doe 4 formerly worked as a correctional officer for the Department of Correction. There are no facts from which it could be inferred, however, that on March 18, 2018, Security Guard Doe 4 was employed by the Department of Correction or in any other capacity by the State of Connecticut. Rather, Mr. Stinson clearly states that Security Guard Doe 4 was employed as a security guard at St. Vincent's Hospital. Compl. at 2, ¶ 7.

Because Mr. Stinson has failed to allege that the actions of St. Vincent's Hospital, Dr. John Doe 1, Security Guard John Doe 2, Security Guard John Doe 3, or Security Guard John Doe 4 on March 18, 2018 could be fairly attributed to the State of Connecticut, he has failed to plausibly assert a claim of a violation of his federal constitutional rights under § 1983.

Accordingly, the claims asserted under the First and Eighth Amendments against these Defendants will be dismissed. *See* 28 U.S.C. § 1915A(b)(1).

**B. Bridgeport Police Department**

Mr. Stinson asserts a claim of municipal liability against the Bridgeport Police Department. Although the Supreme Court has held that a municipality is "to be included among those persons to whom § 1983 applies," *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal police department is not a municipality. Rather, a police department "is a sub-unit or agency of the municipal government through which the municipality fulfills its policing function." *Reed v. Hartford Police Dep't*, No. 3:03-CV-2147 (SRU), 2004 WL 813028, at *2 (D. Conn. Apr. 6, 2004) (internal citation omitted). Because a municipal police department is not an independent governmental entity, it is not considered to be a person under § 1983. *Id.* ("Other courts addressing this issue concur that a municipal police department is not a 'person' within the meaning of section 1983 and not subject to suit.") (collecting cases); *see also Rose*, 2013 WL 1187049, at *9 (noting that courts within Connecticut have determined that state statutes do not include "provision[s] establishing municipal departments, including police departments, as legal entities separate and apart from the municipality they serve, or providing that they have the capacity to sue or be sued.... [r]ather, ... it is the municipality itself which possesses the capacity to sue and be sued") (internal citation and quotation marks omitted).

Accordingly, all federal claims asserted against the Bridgeport Police Department are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

**C. Police Officer Doe 5 – Individual Capacity Claims**

Mr. Stinson contends that Police Officer Doe 5 violated his federal constitutional rights by falsely arresting him on an assault charge on March 18, 2018, and by refusing to facilitate the provision of medical treatment to him during his confinement at the police station until his release at some point prior to the morning of March 20, 2018.

The Court will address these claims of false arrest and the denial of medical treatment in turn.

**1. The False Arrest Claim**

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 94 of 120

Stinson v. Saint Vincent's Hospital, Not Reported in Fed. Supp. (2022)

An arrest by a law enforcement official constitutes a seizure under the Fourth Amendment and is not reasonable unless it is based on probable cause to believe that the individual has committed a crime. *Dunaway v. New York*, 442 U.S. 200, 213 (1979). Probable cause exists to arrest an individual without a warrant if "the arresting officer has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.' " *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir. 2008) (quoting *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007)).

**\*6** False arrest claims brought under section 1983 as violations of the Fourth Amendment's right "to be free from unreasonable seizures, are substantially the same as claims for false arrest ... under state law." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (internal citations and quotation marks omitted). In a § 1983 action, the elements of claims for false arrest are controlled by state law. *See Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004) ("In analyzing § 1983 claims for unconstitutional false arrest, we have generally looked to the law of the state in which the arrest occurred."). Connecticut law defines false arrest or false imprisonment as "the unlawful restraint by one person of the physical liberty of another." *Russo v. City of Bridgeport*, 479 F.3d 196, 204 (2d Cir. 2007) (internal citation and quotation marks omitted). "Connecticut law places the burden of proving an unlawful arrest [and imprisonment] on the plaintiff." *Id.* at 203. As such, "the overall burden of proving the absence of probable cause" for the arrest also falls on the plaintiff. *Davis*, 364 F.3d at 433. A plausible false arrest or false imprisonment claim under Connecticut law also requires that the underlying charges for which the plaintiff was arrested to have terminated in his or her favor. *See Miles v. City of Hartford*, 445 F. App'x 379, 383 (2d Cir. 2011) (summary order) (noting favorable termination is an element of a § 1983 claim "sounding in false imprisonment or false arrest" under Connecticut law) (citing *Roesch v. Otarola*, 980 F.2d 850, 853–54 (2d Cir. 1992)).

Mr. Stinson alleges that Police Officer Doe 5 arrested him for assault. He contends that there was no probable cause to support the arrest because Police Officer Doe 5 viewed the video footage of the incident and did not observe him hitting anyone at St. Vincent's Hospital. The State of Connecticut Judicial Branch website reflects that a Bridgeport Police Officer arrested Mr. Stinson on March 18, 2018 on the charge of assault of public safety, emergency medical, public transit, or health care personnel

in violation of Connecticut General Statutes § 53a-167c. *See Criminal/Motor Vehicle Conviction Case Detail*, State of Conn. Jud. Branch, https://www.jud2.ct.gov/crdockets/CaseDetailDisp.aspx?source=Pending&Key=f5f7560e-763c-4d81-b349-447f6e27ea41 (last visited June 1, 2022). On March 25, 2019, a judge in the Connecticut Superior Court for the Judicial District of Fairfield at Bridgeport found Mr. Stinson guilty, following his plea of *nolo contendere*, on the charge of having assaulted a public safety, emergency medical, public transit or health care worker, and sentenced him to one year of imprisonment. *See id.*

Because the criminal assault charge arising from Mr. Stinson's arrest by Police Officer Doe 5 on March 18, 2018 did not terminate in his favor, his Fourth Amendment false arrest claim is not plausible. *See, e.g.*, *Jackson on Behalf of Z.J. v. City of Middletown*, No. 3:11-CV-00725 (JAM), 2017 WL 2218304, at \*7–8 (D. Conn. May 19, 2017) (concluding that the plaintiffs' false arrest claims failed due to "lack of favorable termination to the extent that favorable termination is an element of a claim for false arrest under Connecticut law.... [One of the plaintiff's] charges did not terminate in his favor because he pled *nolo contendere* to one charge, and the others were *nolled*.") (citing *Miles*, 445 F. App'x. 379; *Azana v. City of West Haven*, Civil No. 3:10cv883(JBA), 2012 WL 264559, at \*7–\*8 (D. Conn. Jan. 27, 2012) (no favorable termination where plea of *nolo contendere*); *Charles v. Johnson*, No. 3:13cv00218(MPS), 2015 WL 4509389, at \*2 (D. Conn. 2015) (same)).

Accordingly, the Fourth Amendment false arrest claim will be dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### 2. The Denial of Medical Treatment Claim

As an initial matter, the Eighth Amendment is applicable to sentenced inmates and not to arrestees or pretrial detainees. *See Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015) (distinguishing between pretrial detainee's claims, which are brought under the Fourteenth Amendment, and post-conviction detainee's claims, which are brought under the Eighth Amendment); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) ("Because there had been no formal adjudication of guilt against Kivlin at the time he required medical care, the Eighth Amendment has no application. The Due Process Clause [of the Fourteenth Amendment], however, does require the responsible government or

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 95 of 120

Stinson v. Saint Vincent's Hospital, Not Reported in Fed. Supp. (2022)

governmental agency to provide medical care to persons, such as Kivlin, who have been injured while being apprehended by the police."); *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) (noting that the Court of Appeals properly relied on Due Process Clause rather than the Cruel and Unusual Punishment Clause of the Eighth Amendment when evaluating pretrial detainees claims). Therefore, Mr. Stinson's Eighth Amendment claim asserted against Police Officer Doe 5 is dismissed. *See* 28 U.S.C. 1915A(b)(1).

**\*7** Courts in the Second Circuit have applied standards under both the Fourth and the Fourteenth Amendment to claims of denial of medical treatment by pre-arraignment arrestees. *Compare Goodwin v. Kennedy*, No. CV 13-1774(SJF)(AKT), 2015 WL 1040663, at \*7 (E.D.N.Y. Mar. 10, 2015) (applying the deliberate indifference standard of the Due Process Clause of the Fourteenth Amendment to arrestees' denial of medical treatment claims), *with Lewis v. Clarkstown Police Dep't*, No. 11 CIV. 2487(ER), 2014 WL 6883468, at \*5–\*6 (S.D.N.Y. Dec. 8, 2014) (applying the Fourth Amendment standard to arrestee's denial of medical treatment claim). The Second Circuit has recently observed, however, that such pre-arraignment conditions of confinement claims should be treated as arising under the Fourteenth Amendment. *See Shakir v. Stankye*, 805 F. App'x 35, 40 (2d Cir. 2020) (summary order) ("[W]e have treated even pre-arraignment conditions of confinement claims as arising under the Fourteenth Amendment." (citing *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) ("A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment...."), and *Weyant v. Okst*, 101 F.3d 845, 856–57 (analyzing a pre-arraignment arrestee's denial of medical treatment claim under the Fourteenth Amendment standard))).

In *Darnell*, the Second Circuit considered the Fourteenth Amendment due process claims of twenty individuals who had been arrested and "subjected to appalling conditions of confinement while held *pre-arraignment* at Brooklyn Central Booking." 849 F.3d at 21 (emphasis added). The court held that to state a claim for allegedly unconstitutional conditions of confinement under the Fourteenth Amendment, a detainee must meet two prongs. *Id.* at 29. First, a detainee must allege that objectively "the conditions, either alone or in combination, pose[d] an unreasonable risk of serious damage to his health ... which includes the risk of serious damage to physical and mental soundness." *Id.* at 30 (internal citations and quotation marks omitted). Under this prong, a detainee

may not be deprived of basic human needs such as "food, clothing, shelter, medical care, or reasonable safety." *Id.* (internal citation omitted).

Under the second prong, also called the "*mens rea*" prong, a detainee must assert either that the prison official "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to [him or her] even though the [prison]-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35. Negligent conduct by prison or police officials, however, does not meet the *mens rea* prong of the Fourteenth Amendment standard. *See id.* at 36 ("A detainee must prove that an official acted intentionally or recklessly, and not merely negligently.").

Mr. Stinson alleges that, during his confinement at the Bridgeport Police Department, Police Officer Doe 5 denied his requests for medical attention, and made no effort to facilitate the provision of medical treatment for his injuries in violation of his Eighth Amendment rights.

Mr. Stinson alleges that he suffered contusions to his face and experienced dizziness, nausea, and a severe headache after security guards punched him in the face and repeatedly banged his head on the floor. The symptoms experienced by Mr. Stinson as well as the visible contusions to his face, and the possibility that he may have experienced a concussion when he struggled with the hospital security guards, suggest that, during his confinement at the Bridgeport Police Department, Mr. Stinson suffered from a sufficiently serious medical condition or conditions requiring assessment and/or treatment. *See id.* at 30 (establishing that a detainee may not be deprived of basic human needs such as "food, clothing, shelter, medical care, or reasonable safety" (internal citation omitted)); *see also Harris v. City of New York*, 15-CV-6341 (NG) (JO), 2018 WL 1997974, at \*5 (E.D.N.Y. Apr. 27, 2018) (stating that concussions are "serious medical injur[ies]"). Thus, Mr. Stinson has met the first prong of the Fourteenth Amendment standard.

**\*8** Mr. Stinson alleges that, before transporting him to the police station, Police Officer Doe 5 viewed the video footage of the excessive force used against him by the security guards at Saint Vincent's Hospital and that Police Officer Doe 5 was present when medical staff members at the hospital refused to evaluate him or provide him with medical treatment after the use of force. Furthermore, Mr. Stinson made Police Officer Doe 5 aware of his symptoms after he arrived at

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 96 of 120

Stinson v. Saint Vincent's Hospital, Not Reported in Fed. Supp. (2022)

the Bridgeport Police Department. Despite this information, Police Officer Doe 5 allegedly refused to transport Mr. Stinson to another medical facility or to arrange for medical treatment to be provided to him at the police department.

At this stage of the case, these allegations are sufficient to meet the second prong of the Fourteenth Amendment standard set forth in *Darnell*.

Accordingly, Mr. Stinson's Fourteenth Amendment claim, that Police Officer Doe 5 was deliberately or recklessly indifferent to Mr. Stinson's injuries and need for medical treatment during his confinement at the Bridgeport Police Department, will proceed.

### D. Police Officer Doe 5 – Official Capacity Claims

It is unclear whether Mr. Stinson intended to sue Police Officer Doe 5 in his official capacity as well as his individual capacity. In view of his allegation that Defendant Bridgeport Police Department had engaged in an unlawful municipal practice or policy of denying medical treatment to arrestees, the Court liberally construes the Complaint to assert a Fourteenth Amendment deliberate/reckless indifference to medical needs claim against Police Officer Doe 5 in his official capacity. Compl. at 9. Any claim against a municipal official or employee in his official capacity is considered to be a claim against the municipality. *See Hafer v. Melo,* 502 U.S. 21, 25 (1991).

"In order to prevail on a claim against a municipality under [S]ection 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury,* 542 F.3d 31, 36 (2d Cir. 2008) (citing *Monell,* 436 U.S. at 690–91). The fifth element reflects the notion that "a municipality cannot be made liable under § 1983 for acts of its employees by application of the doctrine of *respondeat superior.*" *Id.* at 36 (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 478 (1986) (internal quotation marks omitted)). A municipality may be "held liable if a plaintiff proves the municipality violated a federally protected right through (1) municipal policy, (2) municipal custom or practice, or (3) the decision of a municipal policymaker with final policymaking authority." *Zherka v. DiFiore,* 412 F. App'x. 345, 348 (2d Cir. 2011) (citing *Monell,* 436 U.S. at 694).

Mr. Stinson alleges that the Bridgeport Police Department has a "long standing policy and practice of denying detainees medical attention." He offers no facts to support the existence of such a policy or practice. Rather, he describes an incident, involving Police Officer Doe 5's alleged refusal to facilitate the provision of medical treatment for his injuries while in police custody, which appears to be an isolated one. Mr. Stinson's conclusory statement regarding a "long standing policy and practice of denying detainees medical attention" is insufficient to demonstrate that the Department had implemented an unconstitutional policy or custom at the time of his arrest and confinement at the Bridgeport Police Department in March 2018. *See, e.g., Montero v. City of Yonkers, New York,* 890 F.3d 386, 403–04 (2d Cir. 2018) (" '[T]he mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.' ") (quoting *Dwares v. City of N.Y.,* 985 F.2d 94, 100 (2d Cir. 1993)).

**\*9** Accordingly, the Fourteenth Amendment claim of deliberate or reckless indifference to medical needs asserted against Police Officer Doe 5 in his official capacity will be dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### ORDERS

The Court enters the following orders:

(1) The claims asserted against the Bridgeport Police Department, the First and Eighth Amendment claims asserted against Saint Vincent's Hospital, Dr. John Doe 1, Security Guard John Doe 2, Security Guard John Doe 3, and Security Guard John Doe 4, the Fourth Amendment false arrest claim asserted against Police Officer Doe 5, the Eighth Amendment claim asserted against Police Officer Doe 5, and the Fourteenth Amendment claim of deliberate or reckless indifference to medical needs asserted against Police Officer Doe 5 in his official capacity are **DISMISSED** under 28 U.S.C. § 1915A(b)(1). The Court will permit the Fourteenth Amendment claim of deliberate or reckless indifference to medical needs to proceed against Police Officer John Doe 5 in his individual capacity.

(2) The Court informs Mr. Stinson that the Clerk cannot effect service of the complaint on Defendant Bridgeport Police Officer John Doe 5 in his individual capacity because Mr. Stinson has not provided the Court with a first or last name for

this Doe defendant. Mr. Stinson will have until **September 9, 2022** to discover the first and last name of Police Officer John Doe 5 and to file a notice with the Clerk indicating the first and last name of this Doe Police Officer. The Court will dismiss the claim against Defendant Bridgeport Police Officer Doe 5 if Mr. Stinson does not provide a written notice indicating the Defendant's first and last name by **September 9, 2022**.

**SO ORDERED** at Bridgeport, Connecticut, this 3rd day of June, 2022.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 2047221

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3518439
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Myrna Althia Alicia WALKER, Plaintiff,

v.

CIBC LIMITED, Defendant.

1:20-CV-1337 (TJM/CFH)
|
Signed 04/13/2021

**Attorneys and Law Firms**

Myrna Althia Alicia Walker, 841 Western Avenue, Apartment 2A, Albany, New York 12203, Plaintiff pro se.

### REPORT-RECOMMENDATION & ORDER

CHRISTIAN F. HUMMEL, UNITED STATES MAGISTRATE JUDGE

#### I. In Forma Pauperis

**\*1** Plaintiff pro se Myrna Althia Alicia Walker purported to commence this action on October 28, 2020, by submitting a complaint and application to proceed in forma pauperis ("IFP") in lieu of paying the Court's filing fee. See Dkt. No. 1 ("Compl."); Dkt. No. 2. On March 15, 2021, plaintiff submitted a supplement to her complaint. Dkt. No. 4. On April 6, 2021, plaintiff submitted an additional filing entitled "Emergency Petition for the Death Penalty Against Adethia Keshia Fitten and Others on the Principle Found in the Law of Necessity." Dkt. No. 5. On April 7, 2021, plaintiff submitted additional 86 pages to supplement to her complaint. Dkt. Nos. 6, 7. On April 8, 2021, plaintiff submitted additional exhibits and a letter requesting to file those exhibits under seal. Dkt. No. 8.

The Court has reviewed plaintiff's IFP application and determines that she financially qualifies to proceed IFP for purposes of filing only. [1]

#### II. Legal Standards

Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). It is a court's responsibility to determine that a plaintiff may properly maintain his complaint before permitting her to proceed with her action. As plaintiff is representing himself, the court must afford plaintiff special solicitude; thus, it is to consider her claims "liberally" and "interpret them 'to raise the strongest arguments that they suggest.' " Cold Stone Creamery, Inc. v. Gorman, 361 F. App'x 282, 286 (2d Cir. 2010) (summary order) (quoting Brownell v. Krom, 446 F.3d 305, 310 (2d Cir. 2006)).

Pleading guidelines are set forth in the Federal Rules of Civil Procedure. Specifically, Rule 8 provides that a pleading which sets forth a claim for relief shall contain, inter alia, "a short and plain statement of the claim showing that the pleader is entitled to relief." See FED. R. CIV. P. 8(a)(2). "The purpose ... is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." Flores v. Graphtex, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (internal quotation marks and citations omitted). Rule 8 also requires the pleading to include:

> (1) a short and plain statement of the grounds for the court's jurisdiction ...;

> (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

> (3) a demand for the relief sought ....

FED. R. CIV. P. 8(a). Although "[n]o technical form is required," the Federal Rules make clear that each allegation contained in the pleading "must be simple, concise, and direct." Id. at 8(d).

**\*2** Further, Rule 10 of the Federal Rules provides in pertinent part that:

> [a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. A later

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 99 of 120

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence – and each defense other than a denial – must be stated in a separate count or defense.

FED. R. CIV. P. 10(b). This serves the purpose of "provid[ing] an easy mode of identification for referring to a particular paragraph in a prior pleading[.]" Flores, 189 F.R.D. at 54 (internal quotation marks and citations omitted). A complaint that fails to comply with the pleading requirements "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of their claims." Gonzales v. Wing, 167 F.R.D. 352, 355 (N.D.N.Y. 1996). As the Second Circuit has held, "[w]hen a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative ... to dismiss the complaint." Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (citations omitted). However, "[d]ismissal ... is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Id. (citations omitted). In such cases of dismissal, particularly when reviewing a pro se complaint, the court generally affords the plaintiff leave to amend the complaint. Simmons v. Abruzzo, 49 F.3d 83, 86-87 (2d Cir. 1995). A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).

### III. Initial Review

#### A. Plaintiff's Complaint

Plaintiff purports to bring this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000, et seq. On her form Title VII complaint, she indicates that defendant discriminated against her due to her race and color, religion, sex, and "my date of birth – Easter."

Compl. at 2. Plaintiff further indicates, through checking the boxes on the form complaint, that defendant terminated her employment, failed to promote, engaged in unequal terms and conditions of employment, retaliated against her, and "forced prostitution; [i]dentity theft, which is used to do Bank frauds & Poisonings." Id.

Plaintiff's complaint, inclusive of exhibits, is 158 pages long. Dkt. No. 1. Included with the exhibits to the complaint is an Equal Employment Opportunity Commission ("EEOC") dismissal notice [2] noting that plaintiff's EEOC charge was not timely filed and the EEOC was closing its file. Dkt. No. 1-1. The remainder of the exhibits appended to the complaint appear to be an 80-page letter relating to apparent visa fraud that plaintiff sent to The US Department of Justice; the United States Department of Homeland Security, Immigration and Customs Enforcement; and the Federal Bureau of Investigation; as well as an incident report dated May 29, 2019, regarding an apparent rape of plaintiff. Dkt. No. 1-2 at 81-82.

**\*3** The supplement plaintiff filed on March 15, 2021, is 112 pages long. Dkt. No. 4. The supplement appears to be filings from a complaint plaintiff had before Supreme Court, Rensselaer County against Unity House of Troy and Joseph Posa. Id. The "emergency motion," filed on April 4, 2021, is 22 pages long, with 70 additional pages of exhibits. Dkt. No. 5. These exhibits are (1) various transfer orders and orders of protection plaintiff either sought or obtained against various individuals in family court proceedings in different counties (dkt. no. 5-1); (2) a residential lease agreement from July 2018, for a property in Troy, New York, with landlord Joseph Posa (dkt. no. 5-2); (3) records from a proceeding before the Rensselaer County Supreme Court in a case captioned Myrna Althia Alicia Walker vs. "Change of Name" Heidi Elizabeth Zuach (dkt. no. 5-3); and (4) a lease agreement dated May 2, 2017, between Capital Group Management LLC and plaintiff for a property in Troy, New York (dkt. no. 5-4). The submission filed on April 7, 2021, is 59 pages long and includes various orders of protection, a USPS tracking number report, a Unity House Domestic Violence Services Transitional Housing Program Handbook, a form from the Rensselaer County Department of Social Services, earnings statements, a New York State incident report from 2018, an eviction notice, a letter from the Unity House Transitional Housing program, a "notice" letter, and a "birth registration" form. Dkt. No. 6-6. The exhibits filed on April 7, 2021, appear to be letters plaintiff sent to the New York State Department of Labor, United States

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 100 of 120

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

Department of Homeland Security, Immigration and Customs Enforcement, and the EEOC, apparently related to "pandemic unemployment compensation benefits." See dkt. no. 7.

Plaintiff's complaint discusses Allison Carolyn Rattray, the Corporate Secretary and Legal Counsel of defendant CIBC First Caribbean International Bank (Jamaica) Limited. Dkt. No. 1 at 3. Plaintiff contends that Ms. Rattray kills unidentified people "with her married name" and drinks plaintiff's blood. Id. Apparently, plaintiff contends that Ms. Rattray is or was her "employer" who "uses the drinking blood of the employee to kill the employing the employment agreement and the incomes paid by direct deposit as the consideration for the blood that is drank before the killings and the doomings if [sic] innocent persons." Id. at 4. Plaintiff also appears to suggest that Ms. Rattray and her husband, "Barrington Andrew Rattray, Senior Judge, The Commercial Division, The Supreme Court of Jamaica," force plaintiff to use "illegal psychotropic medicines," cocaine, and alcohol. Id. at 5. Plaintiff refers to an employment agreement she signed with Ms. Rattray in 1995 and appears to suggest that since that date, Ms. Rattray "has been stalking the Plaintiff inside her bedroom, bathroom mirror, on her cell phone from 1995 even until today October 20, 2020 even the bathroom stables has visual and audio devices inside of them." Id. at 6. The Complaint then appears to proceed to explain why Ms. Rattray and her various family members are carrying out unspecified killings. See generally Dkt. No. 1. Plaintiff further suggests that through her employment with defendant, both defendant and the Commercial Division of the Supreme Court of Jamaica

has been using me as a sex doll; as sex services; as sex product also incorporating The University of the West Indies Hospital to do surgeries; using illegal force of The Jamaican police; using the illegal Force of the Jamaican Army; using the illegal force of the Jamaican parliament to have men from any where have sex with The Plaintiff because The Plaintiff was born on the day the crucifixion was celebrated, that is Easter and Good Friday.

Id. at 13. Plaintiff asks the Court for

an Injunction to stop, restrain and prevent Allison Carolyn Rattray (maiden name Smith), Corporate Secretary and Legal Counsel, CIBC FirstCaribbean Jamaica; her husband, Barrington Andrew Rattray, Senior Judge, The Commercial Division, The Supreme Court of Jamaica, King Street, Kingston, Jamaica, West Indies Deryke Smith, her brother; Lacelles Smith retired lecturer The University of the West Indies, Jamaica, West Indies; and the Rhoda Smith children and others from practicing their religion in a way that results in the death or harm or injury of The Rights of The Plaintiff and or the mother of The Plaintiff and or the siblings of The Plaintiff; and or any member of The Public, which includes anyone in the global community.

Id. at 14.

As for plaintiff's causes of action, plaintiff lists:

forced religion imposed on The Plaintiff whom is the employee by The Employer, CIBC Limited. The Forced Religion imposed on Myrna Althia Alicia Walker [ ] to kill innocent Persons. The daily murders of innocent Persons is used to supply the demands of the global organ Donor list. The staff is Allison Carolyn Rattray.

**\*4** Dkt. No. 1 at 69. As for a second cause of action is

employment discrimination – I chose a career path to be an Attorney-At-Law. Allison Carolyn Rattray (maiden name Smith) my (former) then manager at

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 101 of 120

CIBC had be fired; told me that (1) I am not worthy to be an Attorney-at-Law because of my Race (2) I was not worthy to be in the same Profession as her. She has been defaming my character ever since.

Id. at 70. Third cause of action is listed as employment discrimination - compensation: denied increases in my salary verbally communicated to be by Ms. Cherlyn Blackman my Senior Manager of 3% in 2004; Denied Promotion communicated to be my Human Resources Regional Director, Jerime Cjnttihs-Bell; denied fringe benefits that accompanied my five (5) CIBC Achievers awards – my salary was split and part paid to my aunt. Id. In the prayer for relief, plaintiff requests:

> (1) an Injunction(s) for Criminal Indictment(s) of Allison Carolyn (Smith) Rattray, Corporate Secretary and Legal Counsel CIBC for her forced Prostitution of The Plaintiff and Others; (2)An Injunction to prevent and stop all Prostitution or abuse of The Plaintiff; (3) Restitution(s) by CIBC for lost Incomes and fringe benefits[; and] (4) Job Reference letter from CIBC and an apology and my land Title Deed.

Id. at 71.

**B. Analysis**

First, plaintiff's complaint fails to meet the pleading requirements of Rules 8 and 10. Her complaint does not present a short and plain statement of the claim showing that she is entitled to relief. FED. R. CIV. P. 8. Further, she does not present her claims in numbered paragraphs, limited to one "circumstance" per paragraph. FED. R. CIV. P. 10. Instead, her complaint is a lengthy, disjointed, difficult to follow narrative. Her complaint clearly "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to

assess the sufficiency of their claims." Gonzales, 167 F.R.D. at 355.

Second, plaintiff's claims, insofar as she seeks to bring them under Title VII are (1) barred by the statute of limitations, and (2) fail to state a claim for employment discrimination in violation of Title VII. [3] To the extent plaintiff suggests that she was discriminated against in violation of Title VII insofar as she was told that she was inadequate due to her race or denied promised promotions because of her race, dkt. no. 1 at 70, even if plaintiff could provide additional factual support and clarification for the alleged discrimination, plaintiff provides that the alleged discrimination occurred as early as 1995 until 2004, and would be beyond the statute of limitations of Title VII. Indeed, plaintiff's entire employment with defendant occurred outside of the statute of limitations as she suggests that her employment began in January 1995 and that she was terminated in March 2009. Dkt. No. 1 at 52-53. Thus, the complained-of actions occurred more than 300 days prior to when plaintiff appears to have filed a complaint with the EEOC. See Gunning v. New York State Just. Ctr. for Prot. of People with Special Needs, No. 1:19-CV-1446 (GLS/CFH), 2020 WL 5203673, at *3 (N.D.N.Y. Sept. 1, 2020) ("Title VII's statute of limitations bars claims based upon events that occurred more than 300 days prior to filing a charge of discrimination with a state or local employment agency, and, therefore, "[a] plaintiff may bring a claim under Title VII only for acts of discrimination that occurred within the statutory period set by 42 U.S.C. § 2000e–5(e)(1).") (quoting Patterson v. Cnty. of Oneida, 375 F.3d 206, 220 (2d Cir. 2004)). The undersigned notes that plaintiff does not indicate when she filed a complaint with the EEOC. However, she submits the EEOC's dismissal letter, dated September 10, 2020, which states that plaintiff did not timely file a complaint with the EEOC. Dkt. No. 1-1. As plaintiff likely filed her EEOC complaint in 2020, [4] appears to have been last employed by defendant in 2009, and complains of alleged employment discrimination occurring as early as 1995, her filing of an EEOC complaint in 2020 is clearly more than 300 days after the alleged discrimination occurred. Thus, any cognizable Title VII claims arising out of her employment with defendant are barred by the statute of limitations.

**\*5** However, even if the statute of limitations was not an issue, plaintiff's claims still must fail because plaintiff's claims fail to state any cognizable legal claim under the United States Constitution, federal statute, or state law, and ultimately fails establish this Court's jurisdiction under federal question or diversity jurisdiction. [5] Plaintiff makes several disjointed,

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 102 of 120

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

confusing claims about being sold as a prostitute against her will by defendant's employees and other nonparties, defendant's employees and others murdering innocent people, defendant's employees drinking plaintiff's blood, and being stalked and prostituted by various officials from Jamaica and employees of defendant's company. See generally dkt. nos. 1, 4, 6, 7. Plaintiff makes several allegations against her former supervisor, Ms. Rattray, and says the various physical wrongdoings Ms. Rattray committed against plaintiff were all due to "The employment agreement between The Plaintiff and CIBC FirstCarribean Jamaica." Dkt. No. 1 at 60-61. Although plaintiff's submissions seem to suggest that she was employed by defendant at some point in time, and that a supervisor told her she could not be a lawyer due to her race and denied promised salary increases for unclear reasons, nothing about the factual allegations pleadings suggest that she presents a valid employment discrimination claim under Title VII or any other statute.

The Court is at a loss as to how the allegations in the complaint relate to a valid employment discrimination claim or any valid legal claim. Plaintiff presents a difficult to comprehend series of allegations against various individuals – many of whose connections to her apparent former employer is difficult, if not impossible, to comprehend – who she alleges forced her into prostitution, performed plastic surgeries on her against her will, installed "spying devices" into plaintiff's body, forced her to undergo various injections, and involved plaintiff in murder scheme that is somehow related to her Easter birthday. See Dkt. No. 1 at 56-60. Plaintiff also sets forth unexplained allegations that appear to involve Ms. Rattray and others, such as "an abuse of a veteran of the United States Army by the said Allison Carolyn Rattray" (dkt. no. 1 at 54). Plaintiff submits dozens of pages of exhibits and supplements that appear to relate to cases filed in other courts, orders of protection obtained in other courts, unemployment insurance issues, police reports, and documents sent to various federal agencies. See dkt. nos. 4, 5, 6, 7. The relevance of this deluge of documents is entirely unclear.

Further, to the extent plaintiff requests injunctions (dkt. no. 1 at 71) to prevent defendant's employees from prostituting or harming plaintiff or seeks some kind of prosecution of defendant's employees for criminal conduct, this Court does not have authority to direct persons to cease engaging in illegal activity through a civil suit as it is not a law enforcement agency. It appears plaintiff is either seeking the criminal prosecution of an individual or individuals or a law enforcement investigation, which is beyond this Court's

jurisdiction. See generally Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); McFadden v. Ortiz, 5:12-CV-1244(MAD/ATB), 2013 WL 1789593 (N.D.N.Y. Apr. 26, 2013) (noting that there is no private right of action to enforce either state or federal criminal statutes).

Next, plaintiff files an "emergency motion" for the Death Penalty, [6] which appears to ask the United States Supreme Court to enforce the death penalty against various individuals who plaintiff contends engaged in "drug assisted surgeries on The Plaintiff herein to induce The Coronavirus ahead of the proposed mass vaccination of the US public, which is set for May 1, 2021[,]" implanting maggots into plaintiff's bones, releasing poisons into plaintiff's body, "install[ing] television" and "Netflix Television" into plaintiff's eye and spinal cord, "alter[ing]" plaintiff's "joints to make [her] walk in [sic] all four" to be "displayed as a naked dog on a lease [sic]," and other similar allegations. See Dkt. No. 5. As discussed above, this Court does not have the authority or jurisdiction to sua sponte impose the death penalty in a civil case nor can it seek the criminal prosecution of individuals or at the request of a plaintiff or decide the ultimate punishment if convicted after a criminal trial.

**6** Generally, in cases involving pro se plaintiffs, a court should not dismiss a complaint without granting leave to amend "at least once" "when a liberal reading of the complaint gives any indication that a valid claim might be stated." Branum v. Clark, 927 F.2d 698, 704-05 (2d Cir. 1991). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000); see also Cortec Indus. Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). The Court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a pro se plaintiff's complaint to proceed. See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp., 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may sua sponte dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 103 of 120

the complaint.' " *Aguilar v. United States*, 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998)); see also *Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory for purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint."). Thus, although the Court must show special solicitude to pro se litigants, see *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and is to exercise "extreme caution ... in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond, ..." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted), the Court also has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed with an action in forma pauperis.

Even if, arguendo, the statute of limitations was not a jurisdictional bar and plaintiff had been able to establish this Court's jurisdiction, the undersigned would still recommend dismissal with prejudice on its initial review as plaintiff's complaint is "factually frivolous." See *Bennett v. Mnuchin*, 6:20-CV-243 (BKS/TWD), 2020 WL 1674068 (citing *Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992)) (holding that a court may dismiss a factually frivolous claim when the allegations are "clearly baseless," including claims that "describ[e] fantastic or delusional scenarios.") *Brown v. New York State Educ. Dept.*, 8:18-CV-169 (TJM/CFH), 2018 WL 1865547, at *2 (N.D.N.Y. Mar. 19, 2018) (dismissing pro se plaintiff's complaint with prejudice where "it is clear that no federal claim can be stated on these facts[.]"). Accordingly, the undersigned recommends dismissal with

prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) as any leave to amend would be clearly futile.

## IV. Conclusion

**WHEREFORE**, for the reasons set forth herein, it is hereby

**ORDERED**, that plaintiff's in forma pauperis application (dkt. no. 2) be granted for purposes of filing only; and it is

**RECOMMENDED**, that plaintiff's complaint (dkt. no. 1) be **DISMISSED WITH PREJUDICE**; and it is further

**RECOMMENDED**, that plaintiff's "Emergency Motion for the Death Penalty" (dkt. no. 5) be **DISMISSED**; and it is further

**RECOMMENDED**, that plaintiff's letter motion to file exhibits under seal (dkt. no. 8) be **DISMISSED AS MOOT**.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1), plaintiff has FOURTEEN (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a). [7]

**All Citations**

Not Reported in Fed. Supp., 2021 WL 3518439

---

## Footnotes

1    Plaintiff is still financially responsible for any other fees or costs she may incur.

2    It appears that the EEOC dismissal notice is dated September 10, 2020. Dkt. No. 1-1.

3    A plaintiff establishes "a prima facie case of discrimination by showing that (1) he is a member of a protected class; (2) he is competent to perform the job or is performing his duties satisfactorily; (3) he suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 104 of 120

**Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)**

rise to an inference of discrimination based on his membership in the protected class." Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005) overruled on other grounds Zarda v. Altitude Express, Inc., 883 F.3d 100 (2d Cir. 2018).

4      As the EEOC dismissal notice is dated September 10, 2020, the Court makes the reasonable inference that plaintiff filed her EEOC complaint some time in 2020.

5      Even if this Court were to assess this case as seeking to proceed under diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), the plaintiff has also failed to set forth a cognizable state law claim. Scherer v. Equitable Life Assur. Soc'y of the United States, 347 F.3d 394, 397 (2d Cir. 2003) (quoting 28 U.S.C. § 1332(a)) (noting that diversity jurisdiction "confers original jurisdiction on the federal district courts with respect to 'all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different States.' ").

6      This "emergency motion" notes that it is presented to the United States Supreme Court, but contains a caption including this Court. It is unclear if this is a document plaintiff intends to submit before this Court, or before the United States Supreme Court. See dkt. no. 5.

7      If you are proceeding pro se and are served with this Report-Recommendation & Order by mail, three (3) additional days will be added to the fourteen (14) day period, meaning that you have seventeen (17) days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(c).

---

**End of Document**                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3204860
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Myrna Althia Alicia WALKER, Plaintiff,

v.

CIBC LIMITED, Defendant.

1:20-CV-1337 (TJM/CFH)
|
Signed 07/29/2021

**Attorneys and Law Firms**

Myrna Althia Alicia Walker, Albany, NY, Pro Se.

### DECISION and ORDER

THOMAS J. McAVOY, Senior United States District Judge

## I. INTRODUCTION

**\*1** This case was before the Hon. Christian F. Hummel, United States Magistrate Judge, for an initial review of plaintiff's complaint and other filings pursuant to 28 U.S.C. § 1915(e)(2)(B). Judge Hummel recommends that plaintiff's complaint (dkt. no. 1) be dismissed with prejudice; that plaintiff's "Emergency Motion for the Death Penalty" (dkt. no. 5) be dismissed; and that plaintiff's letter motion to file exhibits under seal (dkt. no. 8) be dismissed as moot. *See* April 13, 2021 Report-Recommendation & Order, dkt. no. 10. Plaintiff did not file objections directed to Judge Hummel's recommendations, and the time to do so has expired. Plaintiff did, however, file an amended complaint. For the reasons that follow, the Court adopts Judge Hummel's recommendations, and independently reviews plaintiff's amended complaint and finds it fails to assert viable causes of action.

## II. DISCUSSION

### a. Complaint

As Judge Hummel explains, plaintiff *pro se* Myrna Althia Alicia Walker purported to commence this action on October 28, 2020, by submitting a complaint and application to proceed in forma pauperis ("IFP") in lieu of paying the Court's filing fee. *See* Dkt. No. 1 ("Compl."); Dkt. No. 2. On March 15, 2021, plaintiff submitted a supplement to her complaint. Dkt. No. 4. On April 6, 2021, plaintiff submitted an additional filing entitled "Emergency Petition for the Death Penalty

Against Adethia Keisha Fitten and Others on the Principle Found in the Law of Necessity." Dkt. No. 5. On April 7, 2021, plaintiff submitted an additional 86 pages to supplement to her complaint. Dkt. Nos. 6, 7. On April 8, 2021, plaintiff submitted additional exhibits and a letter requesting to file those exhibits under seal. Dkt. No. 8.

Plaintiff purports to bring this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000, *et seq.* On her form Title VII complaint, she indicates that defendant discriminated against her due to her race and color, religion, sex, and "my date of birth – Easter." Compl. at 2. Plaintiff further indicates, through checking the boxes on the form complaint, that defendant terminated her employment, failed to promote, engaged in unequal terms and conditions of employment, retaliated against her, and "forced prostitution; [i]dentity theft, which is used to do Bank frauds & Poisonings." *Id.* Plaintiff's complaint, inclusive of exhibits, is 158 pages long. Dkt. No. 1. The exhibits include an 80-page letter relating to apparent visa fraud that plaintiff sent to the US Department of Justice, the United States Department of Homeland Security, Immigration and Customs Enforcement, and the Federal Bureau of Investigation, as well as an incident report dated May 29, 2019, regarding an apparent rape of plaintiff.

The supplement plaintiff filed on March 15, 2021 is 112 pages long. Dkt. No. 4. The supplement appears to be filings from a complaint plaintiff had before the Supreme Court, Rensselaer County against Unity House of Troy and Joseph Posa. *Id.* The "emergency motion," filed on April 4, 2021, is 22 pages long, with 70 additional pages of exhibits. Dkt. No. 5. These exhibits are (1) various transfer orders and orders of protection plaintiff either sought or obtained against various individuals in family court proceedings in different counties (dkt. no. 5-1); (2) a residential lease agreement from July 2018, for a property in Troy, New York, with landlord Joseph Posa (dkt. no. 5-2); (3) records from a proceeding before the Rensselaer County Supreme Court in a case captioned Myrna Althia Alicia Walker vs. "Change of Name" Heidi Elizabeth Zuach (dkt. no. 5-3); and (4) a lease agreement dated May 2, 2017, between Capital Group Management LLC and plaintiff for a property in Troy, New York (dkt. no. 5-4). The submission filed on April 7, 2021, is 59 pages long and includes various orders of protection, a USPS tracking number report, a Unity House Domestic Violence Services Transitional Housing Program Handbook, a form from the Rensselaer County Department of Social Services, earnings statements, a New York State

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 106 of 120

incident report from 2018, an eviction notice, a letter from the Unity House Transitional Housing program, a "notice" letter, and a "birth registration" form. Dkt. No. 6-6. The exhibits filed on April 7, 2021 appear to be letters plaintiff sent to the New York State Department of Labor, United States Department of Homeland Security, Immigration and Customs Enforcement, and the EEOC, apparently related to "pandemic unemployment compensation benefits." *See* dkt. no. 7.

**\*2** Plaintiff's complaint discusses Allison Carolyn Rattray, allegedly the Corporate Secretary and Legal Counsel of defendant CIBC First Caribbean International Bank (Jamaica) Limited. Dkt. No. 1 at 3. Plaintiff contends that Ms. Rattray kills unidentified people "with her married name" and drinks plaintiff's blood. *Id.* Apparently, plaintiff contends that Ms. Rattray is or was her "employer" who "uses the drinking blood of the employee to kill employing the employment agreement and the incomes paid by direct deposit as the consideration for the blood that is drank before the killings and the doomings if [sic] innocent persons." *Id.* at 4. Plaintiff also appears to suggest that Ms. Rattray and her husband, "Barrington Andrew Rattray, Senior Judge, The Commercial Division, The Supreme Court of Jamaica," forced plaintiff to use "illegal psychotropic medicines," cocaine, and alcohol. *Id.* at 5. Plaintiff refers to an employment agreement she signed with Ms. Rattray in 1995 and appears to suggest that since that date, Ms. Rattray "has been stalking the Plaintiff inside her bedroom, bathroom mirror, on her cell phone from 1995 even until today October 20, 2020 even the bathroom staples [sic] has visual and audio devices inside of them." *Id.* at 6. The Complaint then appears to proceed to explain why Ms. Rattray and her various family members are carrying out unspecified killings. *See generally* Dkt. No. 1. Plaintiff further suggests that through her employment with defendant, both defendant and the Commercial Division of the Supreme Court of Jamaica

> has been using me as a sex doll; as sex services; as sex product also incorporating The University of the West Indies Hospital to do surgeries; using illegal force of The Jamaican police; using the illegal Force of the Jamaican Army; using the illegal force of the Jamaican parliament to have men from any where have sex with The Plaintiff because The Plaintiff was

> born on the day the crucifixion was celebrated, that is Easter and Good Friday.

*Id.* at 13. Plaintiff asks the Court for

> an Injunction to stop, restrain and prevent Allison Carolyn Rattray (maiden name Smith), Corporate Secretary and Legal Counsel, CIBC First Carribean Jamaica; her husband, Barrington Andrew Rattray, Senior Judge, The Commercial Division, The Supreme Court of Jamaica, King Street, Kingston, Jamaica, West Indies Deryke Smith, her brother; Lacelles Smith retired lecturer The University of the West Indies, Jamaica, West Indies; and the Rhoda Ford children and others from practicing their religion in a way that results in the death or harm or injury of The Rights of The Plaintiff and or the mother of The Plaintiff and or the siblings of The Plaintiff; and or any member of The Public, which includes anyone in the global community.

*Id.* at 14.

As for plaintiff's first cause of action, plaintiff lists:

> forced religion imposed on The Plaintiff whom is the employee by The Employer, CIBC Limited. The Forced Religion imposed on Myrna Althia Alicia Walker [ ] to kill innocent Persons. The daily murders of innocent Persons is used to supply the demands of the global organ Donor list. The staff is Allison Carolyn Rattray.

Dkt. No. 1 at 69. As for a second cause of action is

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 107 of 120

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

employment discrimination – I chose a career path to be an Attorney-At-Law. Allison Carolyn Rattray (maiden name Smith) my (former) then manager at CIBC had me fired; told me that (1) I am not worthy to be an Attorney-at-Law because of my Race (2) I was not worthy to be in the same Profession as her. She has been defaming my character ever since.

*Id.* at 70. The third cause of action is listed as

employment discrimination - compensation: denied increases in my salary verbally communicated to me by Ms. Cherlyn Blackman my Senior Manager of 3% in 2004; Denied Promotion communicated to me by Human Resources Regional Director, Jerime Cjnttihs-Bell; denied fringe benefits that accompanied my five (5) CIBC Achievers awards – my salary was split and part paid to my aunt.

*Id.* In the prayer for relief, plaintiff requests:

(1) an Injunction(s) for Criminal Indictment(s) of Allison Carolyn (Smith) Rattray, Corporate Secretary and Legal Counsel CIBC for her forced Prostitution of The Plaintiff and Others; (2) An Injunction to prevent and stop all Prostitution or abuse of The Plaintiff; (3) Restitution(s) by CIBC for lost Incomes and fringe benefits[; and] (4) Job Reference letter from CIBC and an apology and my land Title Deed.

*Id.* at 71.

Judge Hummel found (a) that plaintiff's complaint fails to meet the pleading requirements of Fed. R. Civ. P. 8 and 10, *see* Dkt. 10 at 8-9; (b) plaintiff's claims under Title VII (1) are barred by the statute of limitations, and (2) fail to state a claim for employment discrimination in violation of Title VII, *see id.* at 9-10; and (c) apart from the Title VII claims, "plaintiff's claims fail to state any cognizable legal claim under the United States Constitution, federal statute, or state law, and ultimately fails [to] establish this Court's jurisdiction under federal question or diversity jurisdiction." *Id.* at 10. Judge Hummel indicated that he was

**\*3** at a loss as to how the allegations in the complaint relate to a valid employment discrimination claim or any valid legal claim. Plaintiff presents a difficult to comprehend series of allegations against various individuals – many of whose connections to her apparent former employer is difficult, if not impossible, to comprehend – who she alleges forced her into prostitution, performed plastic surgeries on her against her will, installed "spying devices" into plaintiff's body, forced her to undergo various injections, and involved plaintiff in a murder scheme that is somehow related to her Easter birthday. *See* Dkt. No. 1 at 56-60. Plaintiff also sets forth unexplained allegations that appear to involve Ms. Rattray and others, such as "an abuse of a veteran of the United States Army by the said Allison Carolyn Rattray" (dkt. no. 1 at 54). Plaintiff submits dozens of pages of exhibits and supplements that appear to relate to cases filed in other courts, orders of protection obtained in other courts, unemployment insurance issues, police reports, and documents sent to various federal agencies. See dkt. nos. 4, 5, 6, 7. The relevance of this deluge of documents is entirely unclear.

*Id.* at 11.

Judge Hummel also concluded that to the extent plaintiff requests injunctions (dkt. no. 1 at 71) to prevent defendant's employees from prostituting or harming plaintiff or seeks some kind of prosecution of defendant's employees for criminal conduct, this Court does not have authority to direct persons to cease engaging in illegal activity through a civil suit as it is not a law enforcement agency. *Id.* at 11-12.

As to plaintiff's "emergency motion" for the Death Penalty, Judge Hummel found that it appears to ask the United States Supreme Court to enforce the death penalty against various individuals who plaintiff contends engaged in "drug assisted surgeries on The Plaintiff herein to induce The Coronavirus

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 108 of 120

ahead of the proposed mass vaccination of the US public, which is set for May 1, 2021[,]" implanting maggots into plaintiff's bones, releasing poisons into plaintiff's body, "install[ing] television" and "Netflix Television" into plaintiff's eye and spinal cord, "alter[ing]" plaintiff's "joints to make [her] walk in [sic] all four" to be "displayed as a naked dog on a lease [sic]," and other similar allegations. *See* Dkt. No. 5. Judge Hummel concluded that "this Court does not have the authority or jurisdiction to *sua sponte* impose the death penalty in a civil case nor can it seek the criminal prosecution of individuals or at the request of a plaintiff to decide the ultimate punishment if convicted after a criminal trial." Dkt. 10 at 12.

Judge Hummel concluded that although the Court must show special solicitude to *pro se* litigants, and is to exercise "extreme caution ... in ordering sua sponte dismissal of a *pro se* complaint before the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond, ..." *id.* at 14 (quoting *Anderson v. Coughlin,* 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted)), the Court also has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed with an action *in forma pauperis. Id.* Judge Hummel concluded:

> Even if, *arguendo,* the statute of limitations was not a jurisdictional bar and plaintiff had been able to establish this Court's jurisdiction, the undersigned would still recommend dismissal with prejudice on its initial review as plaintiff's complaint is "factually frivolous." *See Bennett v. Mnuchin,* 6:20-CV-243 (BKS/TWD), 2020 WL 1674068 (citing *Denton v. Hernandez,* 504 U.S. 25, 32-33 (1992)) (holding that a court may dismiss a factually frivolous claim when the allegations are "clearly baseless," including claims that "describe[e] fantastic or delusional scenarios."); *Brown v. New York State Educ. Dept.*, 8:18-CV-169 (TJM/CFH), 2018 WL 1865547, at *2 (N.D.N.Y. Mar. 19, 2018) (dismissing *pro se* plaintiff's complaint with prejudice where "it is clear that no federal claim can be stated on these facts[.]"). Accordingly, the undersigned recommends dismissal with prejudice pursuant to 28 U.S.C. § 1915(e) (2)(B)(i) as any leave to amend would be clearly futile.

**\*4** *Id.* at 14. As indicated above, Judge Hummel also recommends that plaintiff's "Emergency Motion for the Death Penalty" (dkt. no. 5) be dismissed, and that plaintiff's letter motion to file exhibits under seal (dkt. no. 8) be dismissed as moot. *Id.* at 15.

After examining the record, this Court has determined that the recommendations in the Report-Recommendation and Order are not subject to attack for plain error or manifest injustice. Further, even if plaintiff's amended complaint is treated as an objection, the Court has completed a *de novo* review and has determined to adopt Magistrate Judge Hummel's recommendations for the reasons stated in his report.

**b. Amended Complaint**

As indicated, plaintiff filed an amended complaint after Judge Hummel recommended that the complaint be dismissed with prejudice. After a review of the amended complaint, the Court finds that it too must be dismissed with prejudice.

Plaintiff's amended complaint is a form Title VII complaint. *See* dkt. no. 11. She indicates that the defendant is "CIBC Limited/Michael Capatide CEO CIBC." *Id.* at ¶ 3(b). [1] Plaintiff checks the boxes indicating that the defendant discriminated against her on account of her "race or color," "religion," "sex (or sexual harassment)," "national origin," and "other" indicating on the line that follows: "my right to marry; my right to life; my right to work and provide for my daily living expenses." *Id.* at ¶ 6. Where plaintiff is asked to indicate what the complained-of conduct involves, she checked the boxes for "failure to employ," "termination of employment," "failure to promote," "unequal terms and conditions of employment," "retaliation," and "other acts as specified below" after which she writes: "I am being sex trafficked by CIBC First Caribbean staff in lieu of my salary." *Id.* at ¶ 7. In the section of the amended complaint asking for the facts underlying her claims, plaintiff asserts she is being sex trafficked because she was born on Easter and that the sex trafficking is in lieu of her salary paid to her by CIBC First Caribbean Jamaica." *Id.* ¶ 8. She also asserts that "the force" of the Jamaican Police, the Jamaican Judiciary, the Jamaican Hospital, and the University of the West Indies are conspiring with her "Walker relatives used to commit crimes with my identity using identity theft of Myrna Suzette Walker employed by Jamaican government Judge Barrington Andrew Rattray & Allison Carolyn Rattray." *Id.* In addition, she asserts that "Adethia Keisha Fitten is physically cutting me to create presumed consent for the crimes organized by Judge Barrington Andrew Rattray." *Id.*

The First Cause of Action alleges "forced organized criminality using the salary that was paid to the plaintiff by CIBC First Caribbean Jamaica January 1, 1995 to March 28, 2009." It also asserts that Myrna Suzette Walker "is a

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 109 of 120

thief," and that "Allison Carolyn Rattray ... hired Myrna Suzette Walker and her five (5) children and Adethia Keisha Fitten to steal and to say that the stealing was done by the plaintiff." Plaintiff also appears to indicate that "to do the stealing," Myrna Suzette Walker "and others" repeatedly physically injure plaintiff. As discussed by Judge Hummel, these allegations do not provide plaintiff with a timely Title VII cause of action, *see, e.g.,* Am. Compl. attach. 4, dkt. no. 11-4 at 1, [2] nor do they provide a basis for the relief plaintiff seeks. *See* Dkt. 11, at 5. [3]

**\*5** The Second Cause of Action asserts violations of the "Human Rights Act of 1998." The Human Rights Act of 1998 appears to be a law or act of Parliament in the United Kingdom. *See Brady v. Wks. Med. Ctr.*, No. 19-CV-00655-SM, 2019 WL 6529870, at \*2 (D.N.H. Nov. 12, 2019)("A law in effect in the United Kingdom bears that title.")(citing Human Rights Act 1998, ch. 42, http://www.legislation.gov.uk/ukpga/1998/42/contents), *report and recommendation approved*, No. 19-CV-655-SM, 2019 WL 6529459 (D.N.H. Dec. 4, 2019); *Simpson v. Dauphin Cty. Hous. Auth.*, No. 1:16-CV-01747, 2017 WL 2375702, at \*2, n. 4 (M.D. Pa. Apr. 26, 2017) ("Simpson also references a 'Human Rights Act of 1998,' which as best we can tell refers to an Act of Parliament of the United Kingdom, not applicable in this jurisdiction."), *report and recommendation adopted*, No. 1:16-CV-1747, 2017 WL 2362510 (M.D. Pa. May 31, 2017). The Human Rights Act of 1998 does not provide plaintiff with a viable cause of actions against the defendant for any events occurring in the Northern District of New York over which this Court would have jurisdiction. *See Brady*, 2019 WL 6529870, at \*2.

The Third Cause of Action is confusing but appears to be a claim seeking unpaid wages. *See* dkt. no. 11 at 4 (stating at the start of Third Cause of Action: "The right to my paycheck."). Plaintiff asserts that her aunt Myrna Suzette Walker "assisted by CIBC First Caribbean staff Allison Carolyn Rattray has been falsely selling me as a whore in lieu of my current income(s) from JC Penney, Aerotek, Walmart, Fidelis Care and more." However, Myrna Suzette Walker, Allison Carolyn Rattray, JC Penney, Aerotek, Walmart, or Fidelis Care are not defendants in this action. Further, plaintiff does not assert when it was that she worked at JC Penney, Aerotek, Walmart, or Fidelis Care, or when or where it was that Myrna Suzette Walker and Allison Carolyn Rattray purportedly took actions preventing plaintiff from receiving her wages from these employers. The claim in this regard fails to assert a

viable cause of action under Title VII. In addition, in nearly incomprehensible fashion plaintiff ends the Third Cause of Action by asserting: "The rapes of me by co-workers is [sic] recorded and published. Walmart staff a [sic] man named Donnell she [sic] gave permission to live in my apartment as well as Fidelis Care Health Insurance staff- Rashid Rardon." These allegations fail to provide a sufficient basis for the Court to discern any viable cause of action under Title VII or any other law or statute over which the Court would have jurisdiction.

Accordingly, for the reasons set forth above plaintiff's amended complaint will be dismissed. Because the allegations in the amended complaint are factually frivolous, and because plaintiff filed an amended complaint that did not cure the pleading defects pointed out by Judge Hummel, dismissal will be with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) as any leave to amend would be futile.

### III. CONCLUSION

For the reasons discussed above, the Court **ACCEPTS AND ADOPTS** Judge Hummel's recommendations in the April 13, 2021 Report-Recommendation & Order, dkt. no. 10. Thus, it is hereby

**ORDERED** that plaintiff's complaint (dkt. No. 1) is **DISMISSED with prejudice**; and it is further

**ORDERED** that plaintiff's "Emergency Motion for the Death Penalty" (dkt. no. 5) is **DENIED and DISMISSED**; and it is further

**ORDERED** that plaintiff's letter motion to file exhibits under seal (dkt. no. 8) is **DENIED and DISMISSED as moot**.

Based on the Court's review of the amended complaint, it is hereby

**ORDERED** that plaintiff's amended complaint (dkt. No. 11) is **DISMISSED with prejudice**.

The Clerk of the Court may mark this file as closed.

### IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2021 WL 3204860

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

---

### Footnotes

1    At paragraph 3(a) asking to identify the defendant, plaintiff writes: "Not Applicable"

2    Dkt. no. 11-4 is a letter from Maureen Kielt, Director of the EEOC Buffalo Local Office to plaintiff in the matter of *Walker v. CIBC* confirming that plaintiff indicated that her "last date of harmed occurred on March 24, 2009, when [she] was terminated," thus making her EEOC administrative claim against CIBC untimely. Dkt. No. 11-4 at 1.

3    In the Prayer for Relief, plaintiff requests the Court to grant the following relief:

    1. The plaintiff do not [sic] want to be a party to the religious killing business of Myrna Suzette Walker; her five children; and CIBC First Caribbean Jamaica staff, Allison Carolyn Rattray and her husband Judge Barrington Andrew Rattray, Supreme Court of Jamaica;

    2. The plaintiff do not [sic] want cocaine nor any thing to ingest from anyone, by force or otherwise.

    3. The plaintiff wants full restitution socially, physically, professionally.

Dkt. 11, at 5 (emphasis in original).

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1789593
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Alexander McFADDEN, Plaintiff,

v.

Jose D. ORTIZ, Executive Officer Chase JP
Morgan Chase & Co., and James Simon, Manager
Chase JP Morgan Chase & Co., Defendants.

No. 5:12–CV–1244 (MAD/ATB).
|
April 26, 2013.

**Attorneys and Law Firms**

Alexander McFadden, Pine City, NY, pro se.

Jose D. Ortiz, Executive Officer for Chase JP Morgan Chase & Co., Houston, TX.

James Simon, Manager for Chase JP Morgan Chase & Co., New York, NY.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

 **\*1** Plaintiff *pro se* Alexander McFadden ("McFadden"), an inmate at the Southport Correctional Facility ("SCF"), filed this action pursuant to 42 U.S.C. § 1983. In his complaint, Plaintiff appears to allege that Defendants, two executives of Chase JP Morgan Chase & Co. ("Chase"), violated his constitutional rights through conduct that, in some way, involved a bank account. *See* Dkt. No. 1 at ¶ 4.

On August 7, 2012, Magistrate Judge Andrew T. Baxter issued an Order and ReportRecommendation, recommending that the Court dismiss Plaintiff's complaint in its entirety with prejudice, pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii). *See* Dkt. No. 5. Currently before the Court are Plaintiff's objections to Magistrate Judge Baxter's August 7, 2012 Order and ReportRecommendation.

**II. BACKGROUND**

In his Order and Report–Recommendation dated August 7, 2012, Magistrate Judge Baxter recommended that Plaintiff's motion to proceed *in forma pauperis* ("IFP") should be denied by the Court and, upon review of the complaint, that this action be dismissed in its entirety with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii). *See* Dkt. No. 5 at 9. Further, Magistrate Judge Baxter recommended that if the Court approves his report, the Court should certify that any appeal from this matter will not be taken in good faith pursuant to 28 U.S.C. § 1915(a)(3). *See id.*

Regarding Plaintiff's complaint, Magistrate Judge Baxter's Order and ReportRecommendation recommends that because there is no indication that either Defendant acted under "color of state law," and because there are no allegations that either or both Defendants "conspired" with any state actors to bring this action under section 1983, Plaintiff's complaint should be dismissed. *See* Dkt. No. 5 at 5.

Regarding Plaintiff's claim that Defendants violated New York Penal Law by offering false documents for filing, tampering with public records, and falsifying business records, Magistrate Judge Baxter recommended that because there is no private right of action to enforce either state or federal criminal statutes, Plaintiff is barred from bringing a claim to enforce these provisions of the New York State Criminal Law. *See* Dkt. No. 5 at 6.

Accordingly, Magistrate Judge Baxter recommended this Court hold that, due to Plaintiff's failure to state a claim under 42 U.S.C. § 1983 upon which relief can be granted, combined with the courts inability to determine what venue might be appropriate, Plaintiff's motion for IFP should be denied, and Plaintiff's complaint should be dismissed in its entirety with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii). *See* Dkt. No. 5 at 9.

In his "objections" to Magistrate Judge Baxter's Order and Report–Recommendation, Plaintiff simply provides the Court with language from various cases discussing various types of objections and the Court's authority to review unpreserved errors. *See* Dkt. Nos. 14, 15.

**III. DISCUSSION**

## A. Review of a magistrate judge's decision

 **\*2**  If a party files specific objections to a magistrate's report-recommendation, the district court performs a *"de novo* determination of those portions of the report of specified proposed findings or recommendations to which objections is made." 28 U.S.C. § 636(b)(1) (2006). However, if a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that were presented] to the magistrate judge," the court simply reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). At the conclusion of the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

## B. *In Forma Pauperis* application

In order for a plaintiff to proceed without payment of any fees, he must first meet the financial criteria for IFP status. *See* 28 U.S.C. § 1915(a)(1). The plaintiff must submit an affidavit, including a statement of all assets, establishing his inability to pay the filing fee of $350.00. *See id.* Here, Plaintiff submitted a standard IFP application form, but answered only some of the relevant questions. Furthermore, while Plaintiff is incarcerated and has filed a motion to proceed IFP, his application states that, in the past twelve months, he has had income from "[b]usiness, profession or other self employment," and has "millions of dollars" in "cash, checking or savings accounts." *See* Dkt. No. 2 at ¶¶ 3, 4. Plaintiff, however, does not answer the question that asks him to "describe the source of money and state the amount received and what you expect you will continue to receive ." *See id.* at ¶ 3. Plaintiff answers "yes" to the questions asking whether he owns "real estate, stocks, bonds, securities, other financial instruments, automobile or any other assets." *See id.* at ¶ 5. Once again, however, Plaintiff does not complete the question by describing the property and stating its value. *See id.* Lastly, the form indicates that Plaintiff only has $9.60 in his prison account, and that during the last six months prior to this application, the average balance in his prison account was $4.03. *See* Dkt. No. 2 at 2.

If Plaintiff's claims are true and he does in fact have millions of dollars and real estate or other valuable property, then he cannot meet the financial requirements for proceeding IFP. Generally, when plaintiff has failed to properly complete the IFP request, the court will deny IFP without prejudice and allow plaintiff to resubmit the form with proper information.

However, in this case, based upon the inadequacy of Plaintiff's responses, combined with his failure to state a plausible cause of action and the fact that amendment would be futile as discussed below, even if Plaintiff met the financial requirements for IFP, the Court would still find dismissal of this action to be proper.

## C. Sufficiency of the complaint

### 1. Legal Standard

 **\*3**  In addition to determining whether Plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if it determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B) (i)-(iii).

### 2. Application

### a. Color of state law

Plaintiff brings this complaint pursuant to 42 U.S.C. § 1983. *See* Dkt. No. 1. To state a claim under section 1983, a plaintiff must allege two elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a deprivation of her rights or privileges as secured by the Constitution of the United States. *See Annis v.*

County of Westchester, 136 F.3d 239, 245 (2d Cir.1998). Under extremely limited circumstances not alleged here, private actors, such as Defendant, may be held liable under section 1983. *See White v. Monarch Pharmaceuticals, Inc.,* No. 08–CV–0430, 2009 WL 3068217, \*1 (2d Cir. Sept. 28, 2009); *see also Rendell—Baker v. Kohn,* 457 U.S. 830, 838–42 (1982). The law does not reach private conduct, no matter how "discriminatory or wrongful." *Annis,* 136 F.3d at 245 (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1002 (1982)).

In the present matter, Plaintiff names two executives of Chase as Defendants. Along with being very difficult to determine what these Defendants allegedly did to Plaintiff, there is no indication that either Defendant acted under color of state law. Moreover, the complaint does not allege or suggest that Defendants conspired with a state actor to violate his constitutional rights. Further, Plaintiff does not allege any conduct attributable to either Defendant sufficient to establish

their personal involvement in any alleged constitutional deprivation. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quotation and other citations omitted).

Based on the foregoing, the Court finds that Magistrate Judge Baxter correctly recommended that the Court should dismiss the complaint.

### *b. Criminal statutes*

Plaintiff states in the "Causes of Action" section of his complaint that Defendants violated the New York Penal Law regarding falsifying business records, tampering with public records, and offering false documents for filing. *See* Dkt. No. 1 (citing N.Y. PENAL LAW §§ 175.10, 175.25, and 175.35). Even if this is true, however, there is no private right of action to enforce either state or federal criminal statutes. *See Abrahams v. Incorporated Village of Hempstead,* No. 08–CV–2584, 2009 WL 1560164, *8 (E.D.N.Y. June 2, 2009) (holding that dismissal of civil suit for perjury was proper because there is no private right of action for perjury under New York Law). Therefore, even assuming, *arguendo,* that Defendants violated some criminal statutes, Plaintiff may not bring a claim based on those statutes to enforce New York Criminal Law.

**\*4** As such, Magistrate Judge Baxter correctly recommended the Court find that Plaintiff has failed to allege a plausible cause of action.

### *c. Venue*

Venue in federal-question cases is generally determined by 28 U.S .C. § 1391(b) which provides that

> [a] civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, ... or (3) a judicial district in which any defendant may be found, if

there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b). In this case, one of the Defendants is listed with a Houston, Texas address, while the other Defendant is listed as having a New York City address. *See* Dkt. No. 1 at ¶¶ 3(a) and (3)(b). Thus, neither of the Defendants reside, or are located, in the Northern District of New York. Plaintiff is incarcerated at Southport Correctional Facility, located in the Western District of New York. Therefore, since both Plaintiff and one of the Defendants are New York residents, this case could clearly not be brought as a diversity action. Moreover, under Plaintiff's section 1983 claim, venue is not proper in the Northern District of New York. All Defendants do not reside in the same state, neither Defendant is located in this district, and the complaint does not allege any conduct that occurred in the Northern District of New York.

Under 28 U.S.C. § 1406, a district court faced with a case brought "laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). The Second Circuit has suggested that "a district court should not dismiss for improper venue on its own motion except in extraordinary circumstances." *Concession Consultants, Inc. v. Mirisch,* 355 F.2d 369 (2d Cir.1966).

In the present matter, the Court finds and agrees with Judge Baxter's Order and ReportRecommendation that this case presents precisely the extraordinary circumstances making it proper for the Court to dismiss for improper venue *sua sponte.*

### *d. Leave to amend*

When a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citations omitted). Of course, an opportunity to amend is not required where "[t]he problem with [the plaintiff's] cause of action is substantive" such that "better pleading will not cure it ." *Id.* (citation omitted); *see also Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993).

**\*5** Here, the Court agrees with Magistrate Judge Baxter that any attempt by Plaintiff to amend his complaint would be futile. As discussed, although Plaintiff alleges "due process violations," section 1983 does not permit such actions to be brought against private individuals absent some involvement by the state. Moreover, Plaintiff does not have the right to enforce New York State criminal statutes.

Based on the foregoing, the Court finds that Magistrate Judge Baxter correctly recommended that the Court should dismiss Plaintiff's complaint with prejudice.

### IV. CONCLUSION

After carefully considering Magistrate Judge Baxter's Order and Report–Recommendation, the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Baxter's August 7, 2012 Order and Report–Recommendation is **ADOPTED** in its entirety for the reasons stated therein; and the Court further **ORDERS** that Plaintiff's application to proceed *in forma pauperis* is **DENIED;** and the Court further

**ORDERS** that Plaintiff's complaint is **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii); and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve Plaintiff with a copy of this Memorandum–Decision and Order in accordance with Local Rules.

**IT IS SO ORDERED.**

### All Citations

Not Reported in F.Supp.2d, 2013 WL 1789593

---

    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

1997 WL 599355
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,

v.

Andrew PETERS, Warden, Watertown Correctional
Facility; Joseph Williams, Warden, Lincoln Work–
Release Center; Francis J. Herman, Senior Parole
Officer Interstate Bureau; T. Stanford, Senior Parole
Officer; Deborah Stewart, Parole Officer; John Doe #
1, Parole Agent, Watertown Correctional Facility; John
Doe # 2, Parole Agent, Lincoln Work Release Center;
Susan Bishop, Director of Interstate Compact, South
Carolina; Cecil Magee, Parole Officer, South Carolina;
Frank Barton, Parole Officer, South Carolina; John
McMahan, Parole Officer, South Carolina, Defendants.

No. Civ.A. 95CV1641RSPDS.
|
Sept. 22, 1997.

## Attorneys and Law Firms

Kenneth Brown, State Court Institute–Greene, Waynesburg,
PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol Albany, NY, for defendants Peters, Herman Stewart,
Doe # 1, Doe # 2, and Williams, Jeffrey M. Dvorin, Assistant
Attorney General, Carl N. Lundberg, Chief Legal Counsel,
South Carolina Department of Probation, Columbia, SC, for
defendants Bishop, Magee, Barton, McMahan, and Stanford,
Carl N. Lundberg, of Counsel.

## DECISION AND ORDER

POOLER, J.

**\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Daniel Scanlon, Jr.,
duly filed on April 17, 1997. Following ten days from the
service thereof, the Clerk has sent me the entire file, including
any and all objections filed by the parties herein.

Plaintiff Kenneth Brown commenced this Section 1983 civil
rights action on November 17, 1995. On February 12,

1996, Magistrate Judge Scanlon ordered Brown to submit an
amended complaint alleging the specific acts committed by
the individuals named as defendants which Brown claimed
violated his constitutional rights. Brown filed an amended
complaint on March 21, 1996. In his amended complaint,
Brown alleged that defendants violated his rights under the
Eighth and Fourteenth Amendments by failing to process
properly his interstate compact paperwork, resulting in Brown
being imprisoned pursuant to a parole hold when in fact
he had never violated the conditions of his parole. For a
more complete statement of Brown's claims, see his amended
complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams made
a motion to dismiss for failure to state a claim pursuant to
Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No. 14, at 2. On
August 19, 1996, defendants Bishop, Magee, Barton, and
McMahan made a motion to dismiss the complaint against
them or, in the alternative, for summary judgment. Dkt. No.
20. On October 17, 1996, defendants Herman, Stewart, and
Stanford made a motion to dismiss for failure to state a
claim. Dkt. No 34. On April 17, 1996, Magistrate Judge
Scanlon recommended that all defendants' motions to dismiss
be granted and that the complaint be dismissed. Dkt. No. 50.

On June 9, 1997, Brown filed objections to the
magistrate judge's report-recommendation, having been
granted additional time in which to do so. Dkt. No. 52. In
addition, Brown filed on June 9, 1997, a motion for leave to
file a second amended complaint and a copy of his proposed
amended complaint. Dkt. No. 53. I turn first to the last motion
filed, Brown's motion for leave to amend his complaint a
second time.

Brown seeks to file a second amended complaint "setting
forth in detail the personal involvement of each defendant
and how their acts of commission and omission served to
deprive plaintiff of Constitutionally secured rights." Dkt. No.
53. The district court has discretion whether to grant leave
to amend. Ruffolo v. Oppenheimer & Co., 987 F.2d 129,
131 (2d Cir.1993). In exercising that discretion, the court
should freely grant leave to amend when justice so requires.
Fed.R.Civ.P. 15(a). However, the court need not grant leave
to amend where it appears that amendment would prove to be
unproductive or futile. Ruffolo, 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional
allegations against the named defendants. However, the
additional allegations fail to cure the deficiency which

forms the basis of defendants' motion to dismiss—the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987).

**\*2** Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." *Smiley v. Davis,* 1988 WL 78306, \*2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a *de novo*

determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint; (5) the standard of review for a Fed.R.Civ.P. 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for *pro se* pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court not to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. *See Camardo v. General Motors Hourly–Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); *Chambner v. Leonardo,* 1991 WL 44838, \*1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); *Schoolfield v. Dep't of Correction,* 1994 WL 119740, \*2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); *Vargas v. Keane,* 1994 WL 693885, \*1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also Scipio v. Keane,* 1997 WL 375601, \*1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P. 72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 117 of 120

no clear error on the face of the record in order to accept the recommendation").

 **\*3**  Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous. [1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.


CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.


**ORDER and REPORT–RECOMMENDATION**

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim.*


BACKGROUND

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1–2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

 **\*4**  Plaintiff, meanwhile, asked Reid whether any officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5–7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams, the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992,

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 118 of 120

upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days that he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8–10.

In February, 1993, plaintiff was arrested on robbery charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11–14; Exs. C–J.

**\*5** Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15–17; Exs. F–I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

## DISCUSSION

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. *See LaBounty v. Adler,* 933 F.2d 121, 122 (2d Cir.1991) (citing *Ortiz v. Cornette,* 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the necessary legal elements to state a claim under the law. *See Christopher v. Laidlaw Transit, Inc.* 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

**\*6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork

Case 3:25-cv-00673-AMN-ML   Document 5   Filed 09/24/25   Page 119 of 120

Brown v. Peters, Not Reported in F.Supp. (1997)

relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dismiss should be granted.

B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

C. Motion to Dismiss by Herman, Stewart and Stanford.

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill,* 824 F.2d at 196.

**\*7** Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

D. Plaintiff's "John Doe" Claims.

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.

E. Discovery Motions.

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

### CONCLUSION

WHEREFORE, based upon the foregoing analysis, it is hereby

ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 3:25-cv-00673-AMN-ML    Document 5    Filed 09/24/25    Page 120 of 120

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.* *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

**All Citations**

Not Reported in F.Supp., 1997 WL 599355

---

### Footnotes

1    I note, however, that the report-recommendation would survive even *de novo* review.

---

**End of Document**                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.